**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

A.G.I.A, Inc.,                                          :

     Plaintiff,                                  :

vs.                                                         :     CA No.:  07-CV-105 RCL

MEDEX ASSISTANCE CORPORATION,            :

     Defendant.                               :

_____

**APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1.      Plaintiff, AGIA, INC. ("AGIA") respectfully moves this Court for a Temporary

Restraining Order and a Preliminary Injunction against Defendant MEDEX ASSISTANCE

CORP. ("MEDEX") pursuant to Rule 65 of the Federal Rules of Civil prohibiting MEDEX from:

(1) using or disclosing Eligible Member Data; or (2) soliciting Eligible Members, and (3)

directing MEDEX to transfer the dedicated toll free phone numbers to AGIA pending the

confirmation of an arbitration award. .

2.      As stated in the accompanying memorandum, Defendant MEDEX is interfering

with AGIA's ability to provide emergency services to its Eligible Members, violating its Service

Agreement with AGIA and violating the Maryland Trade Secrets Act by misappropriating

AGIA's confidential customer information and soliciting AGIA's customers.

3.      AGIA enjoys a strong likelihood of success on the merits because AGIA's

Eligible Member Data (1) is a trade secret which is entitled to trade secret protection under the

Maryland Uniform Trade Secrets Act, and (2) the confidentiality and non-solicitation covenants

in the Service Agreement between AGIA and MEDEX are fully enforceable.

4.      For the reasons stated in AGIA's Memorandum of Points and Authorities in

Support of the this Application for Temporary Restraining Order and Preliminary Injunction,

unless Defendants are enjoined from converting AGIA's property to their own use and from

soliciting AGIA's customers, AGIA and its Eligible Members will be irreparably harmed by:

    (a)    the Eligible Members access to emergency help being delayed or interrupted;

    (b)    disclosure of trade secrets, customer lists, and other confidential information which are solely the property of AGIA and its clients;

    (c)    loss of confidentiality of clients' records and, loss of confidence and trust of clients, loss of goodwill and loss of business reputation;

    (d)    AGIA being put in breach of its contracts with its affinity group clients and loosing it reputation in the industry.

    (e)    Violation of the eligible Members privacy rights under the Gramm-Leach-Bliley Act ("GLBA"). 15 U.S.C. §§ 6801 et seq.

    (f)    present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

5.    AGIA has no adequate remedy at law.  *See Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) (holding that a securities firm "faced

irreparable non-compensable harm in the loss of its customers"); *accord Multi-Channel TV*

*Cable Co. v. Charlotteville Quality Cable*, 22 F.3d 546, 552 (4th Cir. 1994) (following *Bradley*).

Proof  irreparable harm is not required where a statute specifically calls for injunctive relief

which is the case with the Maryland Trade Secrets Act

6.    Greater injury will be inflicted upon AGIA by the denial of a temporary

injunction than would be inflicted upon Defendants by the granting of such relief.

7.    AGIA has a substantial likelihood of success on the merits.

8.    The issuance of injunctive relief will serve the public interest in the enforcement

of reasonable contract and protection of trade secret business information. Injunctive relief will

further preserve the Eligible Members access to emergency help and preserve their privacy.

9.      It is crucial that Defendant's conduct be immediately enjoined in order to avoid irreparable harm to AIGA and the Eligible Members.  As the Fourth Circuit observed in *Bradley*, underline injunctive relief is necessary to avoid irreparable harm to AGIA and to maintain the status quo.   756 F.2d at 1054 (unsatisfactory to permit solicitation).

10.      In support of this motion, AGIA has filed a memorandum of law and asks that it be incorporated herein.

WHEREFORE, AGIA respectfully prays that this Court enter a Temporary Restraining Order and Preliminary Injunction in the form of Order submitted herewith.

Dated: Greenbelt, Maryland

Respectfully Submitted,

JOSEPH, GREENWALD AND LAAKE, P.A.

By:   */s/ filed via ECF*
      Stephen M. Pavsner (Bar No. DC912220)
      Lawrence R. Holzman (Bar No. DC466472)
      6404 Ivy Lane, Suite 400
      Greenbelt, Maryland 20770
      (301)220-2200
      (301)220-1214 (fax)
      spavsner@jgllaw.com
      lholzman@jgllaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of January, 2007, a copy of the foregoing Application for a Temporary Restraining Order and Preliminary Injunction was sent to:

Medex Assistance Corporation
c/o Resident Agent
Bruce R. Kirby
8501 LaSalle Road, Suite 200
Towson, MD  21286
*via overnight delivery (FedEx)*

Creighton  R. Magid
Dorsey & Whitney, LLP
Washington Square
1050 Connecticut Avenue, NW, Suite 1250
Washington, DC  20036
*via electronic mail (magid.chip@dorsey.com) and overnight delivery (FedEx)*

William R. Stoeri
F. Matthew Ralph
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
*via overnight delivery (FedEx)*

　　　　　　　*/s/ filed via ECF*
　　　　　　　Lawrence R. Holzman

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

A.G.I.A, Inc.,                                    :

      Plaintiff,                              :

vs.                                              :     CA No.:  07-CV-105 RCL

MEDEX ASSISTANCE CORPORATION,     :

      Defendant.                             :

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

**JOSEPH, GREENWALD AND LAAKE, P.A.**
**6404 Ivy Lane, Suite 400**
**Greenbelt, Maryland 20770**
**(301)220-2200**
**(301)220-1214 (fax)**
Attorneys for Plaintiff

<u>**TABLE OF CONTENTS**</u>

PRELIMINARY STATEMENT……………...………………..…………....2

STATEMENT OF FACTS……… …………………………………....…………4

ARGUMENT……………………………………………………...….…..4

POINT I          JURISDICTION……….………………………..…......……..….4

POINT II         THE STANDARD FOR A PRELIMINARY INJUNCTION…………..4

POINT III        AGIA HAS A STRONG LIKELIHOOD OF SUCCESS ON THE
                 MERITS…………………………………………………………5

                 A.  AGIA'S Eligible Member Data is Entitled to Trade Secret
                     Protection………………………………………………………..5

                 1.  The Eligible Member Data is a trade secret………………………..6

                 2.  MEDEX Has Threatened Misappropriation of the Eligible Member
                     Data and Begun Solicitation………………………………….…..8

                 B.  MEDEX Breached Its Contractual Duty Of Confidentiality………...10

POINT IV         THE BALANCE OF HARM OVERWHELMINGLY FAVORS
                 AGIA……………………………………………………………12

                 A. AGIA Will Be Irreparably Harmed If MEDEX Is Not Temporarily Restrained
                    and Preliminarily Enjoined………………………………12

                 B. A Temporary Restraining Order and Preliminary Injunction will not injure
                    MEDEX…………………………………………………………15

POINT V          GRANTING THE INJUNCTION SERVES THE PUBLIC
                 INTEREST………………………………………………….16

POINT VI         MEDEX'S USE OF THE MEMBER DATA VIOLATES FEDERAL LAW
                 PROTECTING THE PRIVACY OF THE
                 MEMBERS…………………………………………..………...18

POINT VII        THE COURT HAS THE POWER TO ISSUE A PRELIMINARY
                 INJUNCTION PENDING ARBITRATION….

POINT VIII       ANY SECURITY REQUIRED SHOULD BE MINIMAL………..…22

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Plaintiff A.G.I.A., Inc. ("AGIA") in support of its motion for a temporary restraining order and preliminary injunction to preserve the status quo pending a final confirmed award in the arbitration between AGIA and Defendant MEDEX Assistance Corporation ("MEDEX") before the American Arbitration Association ("AAA").

AGIA is an insurance broker and administrator.  In the early 1990's it developed an emergency assistance program for travelers known as Emergency Assistance Plus or simply EA+.  Copies of EA+ marketing materials and plan description are submitted as Exhibits 1 and 2.  AGIA markets EA+ through affinity groups.  An affinity group is a membership organization such as The Good Sam Club, the Legionnaires and the California State Employees Association.  These and other affinity groups endorse EA+ and enter into contracts with AGIA whereby AGIA acts as the group's exclusive agent to market EA+ to the groups' members.  AGIA is given access to the groups' confidential membership lists for the sole purpose of marketing EA+.  In exchange AGIA pays the affinity groups a royalty.  AGIA's affinity group contracts generally designate the membership lists as confidential and prohibit their use for any other purpose or their further distribution.

Since the initial development of EA+ in 1992 AGIA has marketed it to approximately 7.4 million affinity group members via direct mail campaigns and advertising in affinity group publications.  Since 2002 it has spent over $10.5 million in marketing EA+.  As a result of its efforts it has obtained 158,034 EA+ subscribers ("Eligible Members") of which 92,754 were active as of December 31, 2006.

AGIA has contracted with MEDEX to provide Eligible Members with 24-hour phone service (including dedicated toll-free numbers for certain large client groups) and emergency support since January 1, 1999. Since that time AGIA has provided MEDEX with data consisting of the Eligible Members' names, addresses and certain other basic information ("Eligible Member Data"). MEDEX needed the Eligible Member Data to identify and service the Eligible Members and to confirm the calculation of its contractual payments. The Service Agreement in effect since January 1, 2002, has been filed under seal. It expressly states that the Eligible Member Data is confidential and prohibits MEDEX from soliciting AGIA's affinity groups during or after the term of the Agreement providing as follows.

> 12. CONFIDENTIAL MATTERS: Without prior written consent, neither AGIA nor MEDEX shall, at any time during or after termination of this Agreement cause or allow to be disclosed or divulged to any person, organization or news media representative, any information related to the business operations of the parties, including the terms and provisions of, or a copy of, this Agreement and any exhibits or addenda attached hereto, the names and affairs of any eligible members if that information is designated by AGIA, MEDEX, eligible member or by law, custom or usage to be conditional or secret."
>
> …
>
> "The Participating or Prospective Groups listed below, along with their subsidiaries and affiliates, are clients and/or prospective clients of AGIA for the Emergency Assistance Plus plan (EA+), as described in the attachment to Addendum B. MEDEX hereby agrees to work exclusively with AGIA on all MEDEX programs sponsored by a Participating or Prospective Group, including their subsidiaries or their affiliates. MEDEX and its employees, officers, and representatives will not communicate directly with representatives of these Participating or Prospective Groups unless AGIA authorizes MEDEX in writing to do so. This exclusive arrangement shall survive the termination of this agreement." (See, amended addendum A to the Service Agreement.)

The Service Agreement was terminated effective December 31, 2006.

Prior to termination, AGIA requested that MEDEX transfer the dedicated toll-free phone numbers to AGIA and return all Eligible Member Data. MEDEX refused, taking the position

that it was entitled to keep the Eligible Member Data and to use it to solicit Eligible Members to purchase MEDEX's competing program.

The transfer of the dedicated toll-free phone lines is imperative to protect the Eligible Members. Upon enrollment, Eligible Members receive a membership card with a toll free phone number for calls within the United States and a collector phone number for calls outside of United States. The larger affinity groups representing the majority of Eligible Members have dedicated toll-free lines used exclusively for their Eligible Members. As explained in the declaration of AGIA's executive vice president David McCarty there is no legitimate reason MEDEX to hold on to these dedicated lines. AGIA has made repeated requests that MEDEX transferor the lines or otherwise assist in the transition and has offered to pay M EDEX therefore. MEDEX has refused to do so and even threaten to let the line go unanswered. MEDEX's true reason for refusing to transfer the dedicated lines became clear on January 8, 2007 when AGIA discovered that, despite MEDEX's repeated promises not to solicit Eligible Members without giving AGIA prior notice, MEDEX began soliciting Eligible Members who called in on the toll-free number for assistance. .

Protection of the Eligible Member Data is imperative, to preserve the Members' statutory privacy rights, protect the affinity groups and protect AGIA's business. MEDEX's retention of the Data with the express intent of using it to solicit Eligible Members is a misappropriation and breach of contract. Its actual solicitation of Eligible Members compounds the situation.

AGIA seeks an order prohibiting MEDEX from: (1) using or disclosing the Eligible Member Data; or (2) soliciting Eligible Members in violation of the party's Service Agreement and the Maryland Uniform Trade Secrets Act, and (3) directing MEDEX to transfer the dedicated toll free phone numbers to AGIA pending the confirmation of an arbitration award.

## STATEMENT OF FACTS

For a more complete recitation of the facts, the court is respectfully referred to the accompanying declarations of John B. Wigle, David H. McCarty and Michael D. Schley, which are incorporated herein by reference.  <u>See</u> Exhibit 20, 21, and 22 respectively.

## ARGUMENT

### POINT I

### JURISDICTION

Federal jurisdiction is based on diversity.  28 U.S.C. §1332.  Personal jurisdiction and venue are based on consent.  The parties' Service Agreement included a choice of forum clause designating Washington D.C. as the venue for any arbitration.  Parties who agree to arbitrate in a particular jurisdiction are generally held to consent both to personal jurisdiction and venue in the courts within that jurisdiction.  *Doctor's Assocs., Inc. v. Stuart,* 85 F. 3d 975,983 (2d Cir. 1996).

### POINT II

### THE STANDARD FOR A PRELIMINARY INJUNCTION

A Plaintiff is entitled to a temporary restraining order and preliminary injunction where it can show (1) a likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that an injunction will not substantially injure the other party, and (4) that the public interest will be furthered by an injunction.  *Davenpeort v, International Bd. of Teamsters*, 166 F. 3d 356, 361 (D.C. Cir. 1999); *Morgan Stanley D.W. Inc. v. Rothe,* 150 F. Supp. 2d 67, 72 (D.D.C. 2001).   No single factor is dispositive, and these four factors are to be balanced against each other to determine if injunctive relief is warranted. Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors.  *Id.* at 72.

**POINT III**

**AGIA HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS**

AGIA will succeed on the merits in this case because: (1) AGIA's Eligible Member Data is entitled to trade secret protection under the Maryland Uniform Trade Secrets Act and (2) the confidentiality and non-solicitation covenants in the Service Agreement are fully enforceable against MEDEX;

**A.    AGIA's Eligible Member Data is Entitled to Trade Secret Protection**

Section 16 of the parties' Service Agreement provides: "this agreement shall be construed, and have effect in accordance with the laws governing the State of Maryland…."  The Maryland Uniform Trade Secrets Act, *Md. Code Ann. Com. Law II §11-1201, et seq.* ("MUTSA")   provides statutory remedies for misappropriation of trade secrets including damages and injunctive relief.  §§11-1202 & 11-1203. Section 11-1201(c) Defines misappropriation as follows:

> *Misappropriation means the:*
> *(1) Acquisition of a trade secret of another by a person who knows or has reason to know that trade secret was acquired by improper means; or*
> *(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:*
> *(i) Used improper means to acquire knowledge of the trade secret or:*
> *(ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:*
> > *1. Derived from or through a person who had utilized improper means to acquire it;*
> > *2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limited use; or*
> > *3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limited use; or*
> *(iii) Before material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.*

Section 11-1201 (e) of MUTSA defines a trade secret as follows:

7

> *Trade secret – "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:*
> > *(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and*
> > *(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*

Thus, a claim under MUTSA raises two questions: (1) Whether there is a trade secret; and (2) whether there has been actual or threatened misappropriation. *LeJeune v. Coin Acceptors, Inc.,* 381 Md. 288, 306, 849A.2d 451, 461 (2004).  The *LeJeune* case includes a thorough discussion of MUTSA.

### 1.        The Eligible Member Data is a trade secret.

Courts interpreting MUTSA have held that "[t]here is no question that a customer list can constitute a trade secret." *Padco Advisors. Inc. v. Omdahl,* 179 F. Supp. 2d 600, 609 (D. Md 2002) (citing *Home Paramount Pest Control Cos. v. FMC Corp.,* 107 F. Supp 2d 684, 692 (D. Md. 2000)); See also, *Dworkin v. Blumenthal*, 77 Md. App. 774, 781, 551 A. 2d 947 (1989).

Although MUTSA preempts common law definitions of trade secrets, Maryland courts have continued to apply the Restatement of Torts' six-part test as a helpful guide in determining the existence of a trade secret.  *Home Paramount Pest Control Companies, Inc. v. FMC Corporation,* 107 F. Supp. 2d 684, 692; *Bond v. Polycycle, Inc.,* 127 Md. App. 365, 372, 732 A.2d 970 (1999).  The six factors are:

> *(1) the extent to which the information is known outside of his business;*
> *(2) the  extent to which it is known by employees and others involved in his business;*
> *(3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors;*
> *(5) the amount of effort or money expended by him in developing the information; [and]*
> *(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.*

*Bond,* Md. App. at *372 (*quoting *Restatement of Torts* § 757 cmt. b (1939)*).*

Only reasonable efforts to maintain secrecy are required.

> *An owner is not required to maintain absolute secrecy to retain trade secret protection. "Simply because information is disclosed outside of a company does not result in the loss of trade secret status . . . 'the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, <u>if the disclosure is made in confidence, express or implied.'"</u>*

*Catalyst & Chem. Servs. v. Global Ground Support*, 350 F. Supp. 2d 1, 16-19 (D.D.C. 2004)(Emphasis added).

The economic value of the Eligible Member Data and the difficulty of developing it are patent.  AGIA has spent over a decade and $10.5 million to distill 7.4 million potential customers into 158,034 actual EA+ subscribers of which it estimates MEDEX has Eligible Member Data for approximately 150,000.

Who, among the population of the United States or even among affinity group members, might actually purchase travel insurance is neither commonly known nor readily ascertainable. AGIA maintains the eligible member data on secure servers and observes other security precautions, including strict privacy protection measures.  It transmits the data to MEDEX in encrypted form.  The Service Agreement specifically states that the Data is confidential and shall not be disclosed or divulged.  The lengths to which AGIA has gone to maintain the secrecy of the Eligible Member Data is set forth in more detail in the attached declarations.

MEDEX takes the position that since the Agreement does not specifically preclude the "use" of the Data it is free to do so.  As discussed in more detail below this ignores the cannons of contractual interpretation and the implied covenant of good faith and fair dealings.

**2.    MEDEX Has Threatened Misappropriation of the Eligible Member Data and Begun Solicitation**.

MEDEX argues that, because its use of the Eligible Member Data is not expressly prohibited, MEDEX is free to do so.  However the definition of misappropriation includes: (1)

use of a trade secret without express or implied consent; (2) use of a trade secret with knowledge that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (3) use of a trade secret that was derived through a person who owed a duty to maintain its secrecy or limit its use.  MUTSA § 11-1201(e).  AGIA has provided MEDEX with Eligible Member Data since 1999 for the sole purpose of serving AGIA's EA+ Eligible Members.  The parties' Service Agreement expressly sets forth MEDEX's service duties and expressly protects its confidentiality.  Furthermore, AGIA has advised MEDEX that the Eligible Member Data is not only a trade secret, but is also protected by federal privacy laws applicable to financial institution customers.  Thus, (1) MEDEX has neither express nor implied consent from AGIA to use the Eligible Member Data and (2) MEDEX knows that it acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy.  Under these circumstances there is no question that its post-termination use of the Data to solicit EA+ Eligible Members to purchase its own competing emergency travel assistance products is a misappropriation.  MEDEX"s retention of the Eligible Member Data with the intent to use it is in and of itself a misappropriation and represents a sword of Damocles hanging over AGIA's head.

Since discussions of termination began in November 2006, MEDEX has repeatedly asserted the right to use the Eligible Member Data for its own purposes.  For example, in a letter dated December 1, 2006 to AGIA executive David McCarty, MEDEXs' executive vice president, David Mair, stated:

> With regard to the request in your November 16, letter that MEDEX destroy information regarding enrolled participants [Eligible Members], we discussed briefly MEDEXs' ongoing business purposes, including but not limited to, audit, compliance, case records, <u>ongoing sales and individual correspondence</u> as might be warranted.

See Exhibit 6 (Emphasis Added.)

Because this was only a vague reference to potential solicitation, AGIA squarely raised the issue with MEDEX. As set forth in the Declaration of Michael D. Schley, MEDEX, through its attorneys, has repeatedly asserted that MEDEX has every right to use the Eligible Member Data for future solicitations of sales of MEDEX's own, competing products.

In an attempt to avoid the necessity of a preliminary injunction AGIA asked MEDEX to stipulate that it would not use AGIA's Eligible Member Data nor solicit Eligible Members pending the outcome of the arbitration. MEDEX refused to make such a commitment. Instead, MEDEX made a conditional offer to give AGIA 14 days' prior notice of any use. See Exhibit 12, 15 & 17. This is unacceptable to AGIA particularly since at the time MEDEX first made these promises it was already violating them.

Eligible Members have a membership card which includes a dedicated toll free phone number for them to call for assistance, answered by MEDEX. See Exhibit 2. For several of AGIA's affinity groups, there is an assigned, dedicated toll-free number specifically for members of that group. All of the dedicated toll-free numbers are used solely to service the EA+ program (or a related emergency service program provided under the Service Agreement to members of one AGIA affinity group client). The dedicated lines are used only by Eligible Members. AGIA has contracted with a new provider, On Call International, LLC ("On Call") and mailed out new cards with new phone numbers. However, with almost a hundred thousand active Eligible Members there will inevitably be a transitional period during which Members will still call the old numbers. In anticipation of this, AGIA asked MEDEX to release the dedicated toll-free numbers to it. MEDEX refused to do so but promised to refer any Member who called in to the new On Call numbers. AGIA was shocked to discover, on January 8, 2007, that MEDEXs' recorded greeting on the EA+ dedicated phone lines began with a sales solicitation targeting the

Eligible Members.  A transcript of MEDEXs' phone greeting used on all of the toll-free numbers is submitted as Exhibit 16. MEDEX changed the message after counsel for AGIA complained. However, this episode made it clear to AGIA that it could not rely on MEDEX's promises or good faith and that it was necessary to apply for preliminary relief.

MEDEX's counsel has stated that their offer of notice "moots" the necessity for preliminary injunction.  However, one party's right to preliminary relief does not depend on the other party's offer of notice.  It depends on whether the aggrieved party's request for relief meets the factors addressed above, including actual or threatened irreparable injury.  In this case there has been both actual and threatened solicitation.  Further, as set forth in more detail in the declaration of Michael D. Schley, Defendant has previously misled Plaintiff and failed to live up to their promise to give prior notice.

**B.    MEDEX Breached Its Contractual Duty Of Confidentiality**

The Service Agreement includes confidentiality and non-solicitation clauses.  MEDEX has violated and claims the right to violate these clauses in the future. Such conduct and threatened conduct is an additional basis for granting a preliminary injunction.

Confidentiality and non-solicitation clauses are enforceable under Maryland Law.  *See PadCo. Advisors, Inc. v. Omdahl* 179 F. Supp. 2d, 600, 606-609 (holding that a non-disclosure covenant, and a non-solicitation covenant in an employment agreement are enforceable so long as they are reasonable in time and not overly broad in scope). A breach of contract occurs if it "affects the purpose of a contract in an important or vital way." *Swedish Civ. Aviation Admin. v. Project Mgmt. Enters.*, 190 F. Supp. 2d 785, 791 (D. Md. 2002)(citation omitted).  MEDEX has breached and is threatening to continue to breach its contractual obligations to maintain

confidentiality and refrain from soliciting AGIA's affinity groups.  MEDEX argues that it is not

soliciting the affinity group but rather the Eligible Members.

One form of breach of contract is a breach of the implied covenant of good faith and fair

dealing with respect to the performance of the contract. Since 1964, Maryland courts have

recognized that "in every contract there exists an implied covenant that each of the parties

thereto will act in good faith and deal fairly with the other." *Food Fair Stores, Inc. v. Blumberg*,

234 Md. 521, 200 A.2d 166 (1964); *Julian v. Christopher*, 320 Md. 1, 575 A.2d 735 (1990). The

implied duty of good faith requires the parties to a contract to make reasonable efforts to fulfill

any conditions of the contract, and forbids them from acting in such a manner as to prevent the

other party from performing his obligations under the contract. *Informed Physician Servs., Inc. v.

Blue Cross & Blue Shield*, 350 Md. 308, 711 A.2d 1330 (1998); *Parker v. Columbia Bank*, 91

Md. App. 346, 604 A.2d 521, cert. denied, 327 Md. 524, 610 A.2d 796 (1992).  *Julian v.

Christopher*, 320 Md. 1, 575 A.2d 735 (1990).

The Service Agreement in the instant case expressly prohibits solicitation of AGIA's

affinity groups.  It strains credulity for MEDEX to assert it is free to frustrate this non-

solicitation provision by simply circumventing the affinity groups altogether and directly

soliciting EA+ Eligible Members.

### POINT IV

### THE BALANCE OF HARM OVERWHELMINGLY FAVORS AGIA

A court must balance the competing claims of injury and must consider the effect on each

party of the granting or withholding a preliminary injunction. *Amoco Production Co. v. Village

of Gamble,* 480 US 531, 553 (1987); *Morgan Stanley D.W. Inc. v. Rothe,* 105 F. Supp. 2d 67

(2001 D.D.C.).  However, the requirements of irreparable injury and inadequate legal remedies

need not be satisfied to enjoin violation of a statute that specifically provides for injunctive relief. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153,194, (1978)(holding that "while '[i]t is emphatically the province and duty of the judicial department to say what the law is,' it is equally--and emphatically-- the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority" (internal citation omitted)). MUTSA specifically provides for injunctive relief. *Md. Code Ann. Com. Law II* § 11-1202. While irreparable injury and lack of a legal remedy are not required in the instant case they are nonetheless present.

### A.    AGIA Will Be Irreparably Harmed If MEDEX Is Not Temporarily Restrained and Preliminarily Enjoined

Absent a statute authorizing injunctive relief a plaintiff must show a threat of irreparable harm. "A threatened loss of prospective customers or goodwill supports [a claim for] irreparable harm" supporting a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc, v, John D. Brush & Co., Inc.,* 240 F.3d 832, 841, (9th Cir. 2001) (trademark suit). Damage to the goodwill of a business is often difficult to calculate, thus supporting a finding of irreparable injury. *See Rent-A- Center Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F2d 597, 603 (9th Cir. 1991) (holding that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm). Damage to one's reputation may also be an irreparable injury particularly if compensatory damages would be uncertain or inadequate. *United Healthcare Ins. Co. v. Advance PCS,* 316 F.3d 737,741 (8th Cir. 2002). The more serious the potential injury, the less demanding courts may be in requiring proof of imminent harm. *Federal Sav. & loan Ins. Corp.v Sahni,* 868 F2d 1096, 1097, (9th Cir. 1989).

Certain injuries are presumed to be irreparable. Intent to use a trade secret will almost always be sufficient to show irreparable harm. *Campbell Soup Co. v. ConAgra, Inc.,* 977 F2d

86.92-93 (3rd Cir. 1992).  Irreparable harm is also presumed where defendants engage in acts or practices prohibited by a statute that provides for injunctive relief. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F3d 814, 827 (9th Cir. 2001).

All of the foregoing authorities support the issuance of a temporary restraining order and a preliminary injunction in the instant case.  If MEDEX uses the Eligible Member Data to solicit AGIA's EA+ subscribers, AGIA will lose over 10 years and $10.5 million invested in distilling 158,034 EA+ Eligible Members from over 7.4 million potential subscribers.  Furthermore, MEDEX's actions threaten to place AGIA in breach of its affinity group contracts, and AGIA will certainly suffer a loss of the goodwill and reputation it has built up over decades in the affinity group market.  Further, it may be put in violation of the Gramm-Leach-Bliley Act as discussed below.  Finally, it will suffer the loss of confidentiality of the Eligible Member Data and the concomitant loss of the Eligible Members' trust and good will.

If MEDEX renews its solicitations to EA+ Eligible Members who continue to call in on the old toll free numbers it will be virtually impossible for AGIA to determine why a particular Eligible Member has left the EA+ program, whether that Eligible Member has migrated to MEDEX and the future loss of revenue and good will associated with that Eligible Member.  If MEDEX commences a direct mail or other solicitation campaign to the Eligible Members, the Members will either be confused by the source or offended that their Data is being used by an unauthorized provider.  AGIA's client affinity groups will most certainly be offended that their members are being solicited for an unauthorized program.  AGIA's contractual relationships with its affinity groups and the confidentiality of its Eligible Member Data are the heart of its business.  MEDEX's misappropriation of the Eligible Member Data threatens AGIA's very existence.

With respect to AGIA's reputation with its affinity group clients the court should be aware that EA+ is only one of many programs AGIA is under contract with its affinity groups to provide. AGIA also has contracts with its affinity groups to provide, life insurance, accidental death and dismemberment insurance, Medicare supplemental insurance, etc. If AGIA's affinity groups come to believe it can not protected the Eligible Member Data AGIA will be at risk for loosing not just EA+ but all its other business.

**B.     A Temporary Restraining Order and Preliminary Injunction will not injure MEDEX.**

AGIA is not trying to enjoin MEDEX for going about its business; it wants only to preserve the status quo.  Before MEDEX became angered by the termination of the Service Agreement, it asserted no plans for or interest in soliciting the Eligible Member Data.

AGIA merely seeks an order prohibiting MEDEX from using AGIA's Eligible Member Data pending the outcome of arbitration on the merits.  MEDEX will not suffer any harm from this order because its business predates its relationship with AGIA and includes many other contracts.  Indeed, the website of its marketing affiliate MEDEX Global Group, Inc. paints a picture of a robust company with millions of members. This website includes the following:

> "MEDEX Global Group, Inc. is a recognized leader in emergency travel assistance and international medical insurance. Providing quality services to millions of members and hundreds of global organizations, MEDEX provides peace of mind to travelers and those who care about them.
>
> **Group Programs**
> The world's leading multinational corporations, USAID contractors, colleges and universities, and international organizations trust MEDEX for all of their travel preparation and emergency assistance needs"

MEDEX, http://www.medexassist.com (last visited Jan. 25, 2007).  A copy of the web page is attached as Exhibit 19.

MEDEX's counsel stated in his letter of January 9, 2007 that "MEDEX has not decided whether it will even use this limited member information." <u>See</u> Exhibit 15.  Delaying such a decision pending arbitration on MEDEX's right to use the information will not harm MEDEX.

As discussed in the point VI below, federal law specifically protects personal information such as AGIA's Eligible Member Data. MEDEX can not be harmed by this court enjoining MEDEX from breaking the law.

**POINT V**

**GRANTING THE INJUNCTION SERVES THE PUBLIC INTEREST**

The public interest in protecting trade secrets is self-evident from the Maryland Legislature's adoption of MUTSA.  In this regard the district court for the District of Columbia has previously stated: "Consequently, the public's interest has been disserved by defendants' actions.  The public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior."  *Morgan Stanley D.W. Inc. v. Rothe,* 105 F. Supp. 2d 67, 79, (2001 D.C.C.). (Quoting from *IDS Life Ins. Co. v. Sun America, Inc.,* 958 F. Supp. 1258, 1282 (N.D.Ill. 1997).

There are almost a hundred thousand active EA+ Members affected by this transition. Currently, when they call in on the old toll free number they reach a recording at MEDEX referring them to On Call.  This means that an ill or injured Eligible Member who may be stranded in a remote part of the world, with unreliable phone service, must now make a second call in order to get the emergency assistance he or she needs.

There is no legitimate reason for MEDEX not to transfer the dedicated EA+ toll free lines to AGIA or its designee so that Eligible Member calls are immediately routed to the new service provider.  MEDEX acknowledges that it has done this for other clients who, like AGIA, have

transitioned away from MEDEX, but it refuses to do so for AGIA, even when compensation has

been offered.  AGIA recognizes that this aspect of its request seeks a mandatory injunction but

believes such relief is appropriate given the fact that the Eligible Members need fast and reliable

access to emergency services and that MEDEX has already used the toll-free numbers as a tool

for soliciting the Eligible Members.

POINT VI

## MEDEX'S USE OF THE MEMBER DATA VIOLATES FEDERAL LAW PROTECTING THE PRIVACY OF THE MEMBERS

AGIA is a financial institution[1] governed by the privacy provisions of the Gramm-Leach-

Bliley Act ("GLBA"). 15 U.S.C. §§ 6801 et seq. The GLBA prohibits a financial institution from

selling or transferring  a consumer's nonpublic personal information ("NPI") to a third party

without first providing the consumer with a privacy notice and an opportunity to "opt out" of the

sale or transfer. 15 U.S.C. § 6802(b); 15 C.F.R. § 313.10.  The Eligible Member Data is NPI.[2]

No notice has ever been given to the Eligible Members, because AGIA had no plans to transfer

the Eligible Member Data.  Consequently, any such transfer is prohibited.

---

[1] Section 509(3) of the GLBA defines a "financial institution" to mean "any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 [12 U.S.C. §1843(k)]."  15 U.S.C. § 6809(3).  As the FTC has stated, "[t]hose financial activities" include not only a number of traditional financial activities specified in section 4(k) itself, but also those activities that the Federal Reserve Board has found to be either closely related to banking or usual in connection with the transaction of banking or other financial operations abroad, by regulation (or order or interpretation) 'in effect on the date of the enactment of the Gramm-Leach-Bliley Act.'"  65 Fed. Reg. 33647 (May 24, 2000).  The business of insurance is specifically enumerated, in section 4(k)(4)(B) of the Bank Holding Company Act (12 U.S.C. §1843(k)(4)(B)), as such a "financial activity," including acting as agent or broker for insurance.  AGIA acts as an agent for insurance sales and, as a licensed insurance administrator, acts for and is subject to the rules governing insurance underwriters.  It is therefore a "financial institution" subject to the GLBA.

[2] The GLBA specifically defines nonpublic personal information to include "any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information." 15 U.S.C. § 6809(4)(C)(9)(i).  AGIA derived the Eligible Member Data from much larger data bases of nonpublic personal information, which are the confidential membership lists of AGIA's client affinity groups.  The Eligible Member Data is therefore nonpublic personal information protected by the GLBA.

AGIA's transfer of the Eligible Member Data to MEDEX, as a subcontracting service provider, was exempt from the notice and "opt out" rule. 15 U.S.C. § 6802(b)(2); 15 C.F.R. §§ 313.13 & 313.14. However, a service provider is expressly prohibited from reusing or redisclosing any NPI it receives from a financial institution. This is true even if the service provider itself is not a financial institution. The FTC regulation on redisclosure and reuse states, in relevant part:

§313.11 **Limits on redisclousure and reuse of information**

(a)(1) *Information you receive under an exception.* If you receive nonpublic personal information from a nonaffiliated financial institution under an exception in § 313.14 or 313.15 of this part, your disclosure and use of that information is limited as follows:

\*\*\*

(iii) You may disclose and use the information pursuant to an exception in § 313.14 or 313.15 in the ordinary course of business <u>to carry out the activity covered by the exception under which you received the information.</u>

(2) *Example.* If you receive a customer list from a nonaffiliated financial institution in order to provide account processing services under the exception in §313.14(a), you may disclose that information under any exception in § 313.14 or 313.15 in the ordinary course of business in order to provide those services. You could also disclose that information in response to a properly authorized subpoena. <u>You could not disclose that information to a third party for marketing purposes or use that information for your own marketing purposes.</u>

(15 C.F.R. § 313.11, emphasis supplied.)

Consequently, any use by MEDEX of the Eligible Member Data for marketing or other commercial purposes is in direct violation of the GLBA and FTC regulations protecting the privacy of the Members whom MEDEX was hired to serve. AGIA has put MEDEX on notice that such use would violate the GLBA and privacy laws, but MEDEX maintains that there are no such restrictions on it use of the Eligible Member Data. As mentioned above, enjoining the use by MEDEX of NPI in violation of the GLBA also serves the public interest by protecting the citizen's private personal information.

## POINT VII

## THE COURT HAS THE POWER TO ISSUE A PRELIMINARY INJUCTION PENDING ARBITRATION

The Service Agreement provides for arbitration with the AAA. However, it would take an unreasonable amount of time to obtain interim relief from the AAA. The AAA's Commercial Arbitration Rule 34 recognizes that a party may seek preliminary relief in a court.

The arbitration clause is subject to the Federal Arbitration Act ("FAA") 9 U.S.C. §§ 1-14. The FAA governs contractual arbitration in written contracts involving interstate or foreign commerce. 9 U.S.C. §§ 1, 2. The instant case clearly involves interstate commerce. The parties are from different states, the affinity groups hail from various states, the Eligible Members come from all over the country and the very nature of the business is assisting national and international travelers. The FAA preempts conflicting state law under the Supremacy Clause. *See Southland Corp. v. Keating,* 465 US 1, 12 (1984).

The power to stay a pending action includes the power to grant a preliminary injunction where such relief is otherwise proper, and where denying relief might render the arbitration a "hollow formality" because it could not restore the parties to the *status quo ante. Performance Unlimited v. Questar Publishes Inc.,* 52 F.2d 1373, 1380 (6th Cir. 1995). The Fourth Circuit has expressly held that temporary injunctive relief should be granted pending arbitration before the NASD under similar circumstances:

> The arbitration process would be a **hollow formality** where the arbitral award when rendered could not return the parties to the status quo ante... When an account executive breaches her employment contract by soliciting her former employer's customers, **a non-solicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be "unsolicited."** It may be

> impossible for the arbitration award to return the parties to the status quo
> ante because the prevailing parties' damages may be too speculative.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053-1054 (4th Cir. 1985) (emphasis added).

The vast majority of federal courts that have considered the issue have held that a plaintiff may obtain preliminary injunctive relief pending arbitration. *See Teradyne Inc. v. Mostek Corp.,* 797 F.2d 43 (1st Cir. 1986); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F.2d 1049, 1053 (2d Cir. 1990); *Roso-Lino Bev. Distrib. v. Coca-Cola Bottling Co.,* 749 F.2d 124 (2d Cir. 1984); *Connecticut Resources Recov. Auth. v. Occidental Pet. Corp.,* 705 F.2d 31, 35 (2d Cir. 1983); *Ortho Pharmaceutical Corp. v. Amgen Inc.,* 882 F. 2d 806 (3d Cir. 1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir. 1985); *RGI, Inc. v. Tucker & Assoc.,* 858 F.2d 227 (5th Cir. 1988); *Performance Unlimited v. Questar Publishing,* 52 F.3d 1373 (6th Cir. 1995); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211 (7th Cir. 1993); *Sauer-Getribe KG v. White Hydraulics,* 715 F.2d 348 (7th Cir. 1983), *cert. denied,* 364 U.S. 1070 (1984); *Peabody Coalsales v. Tampa Electric,* 36 F.3d 46, 48 (8th Cir. 1994); *PMS Distrib. v. Huber,* 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton,* 844 F.2d 726 (10th Cir. 1988); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hegarty,* 808 F. Supp. 1555 (S.D. Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir. 1993). The only contra line of case is found in the 8th Circuit, *see, e.g.*, *Manion v. Nagin* 255 F. 3d 535,538-539 (8th Cir. 2001)

In *Performance Unlimited v. Questar Publishers Inc.,* 52 F.2d 1373, 1380 (6th Cir. 1995), the 6th Circuit Court of Appeals thoroughly reviewed the law concerning a federal court's subject matter jurisdiction under the FAA to grant preliminary relief in support of arbitration including the 8th Circuit's minority position holding:

After a thorough review of the relevant case law, we adopt the reasoning of the First, Second, Third, Fourth, Seventh, and arguably the Ninth, Circuits and hold that in a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief provided that the party seeking the relief satisfies the four criteria which are prerequisites to the grant of such relief. We further conclude that a grant of preliminary injunctive relief pending arbitration is particularly appropriate and furthers the Congressional purpose behind the Federal Arbitration Act, where the withholding of injunctive relief would render the process of arbitration meaningless or a hollow formality because an arbitral award, at the time it was rendered, "'could not return the parties substantially to the status quo ante.'" *Bradley*, 756 F.2d at 1053 (quoting *Lever Bros. Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)).

*Id.,* 52 F. 2d at 1380.

The United States Court of Appeals for the District of Columbia has also approved the issuance of a preliminary injunction pending arbitration;

"Even assuming that invalidation of the contracts in their entirety were necessary to preserve appellants' rights under the Act, an expedited judicial decision on the merits was not the appropriate method for a federal court to guarantee this relief. Instead of seeking a decision on the merits, appellants should have sought a stay or an injunction against the contract awards pending arbitration."

*Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 110-111 (D.C. Cir. 1986).

The District Court for the District of Columbia has granted preliminary injunctions pending arbitration in a number of cases, including *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz,* 298 F. Supp. 2d 27 (D.D.C. 2002); *Morgan Stanley D.W. Inc. v. Rothe,* 105 F. Supp. 2d 67 (2001 D.D. C.). In the *Rothe* case Morgan Stanley filed a complaint in the D.C. district court seeking a TRO and preliminary injunction pending NASD arbitration. Rothe opposed the motion on several grounds including the arbitration clause. The court granted Plaintiff's motion stating, "While an arbitration hearing will be the appropriate form in which to mediate the details of the dispute, this court is the appropriate form to determine whether the Defendant's alleged breach of his contract justifies granting the Plaintiff a temporary restraining order." *Id,* at 80.

As a practical matter it takes at least 60 days to get an arbitrator appointed. After an appointment it would take additional time to arrange for a hearing for preliminary relief pursuant to AAA rule 34. The arbitrator's interim award would be ineffective until it had been confirmed by this court. Thus, AGIA could not realistically obtain an enforceable preliminary order from the AAA within the next 90 days. Therefore, a temporary restraining order and preliminary injunction issued by this court is necessary and appropriate to maintain the status quo.

## POINT VIII

## ANY SECURITY REQUIRED SHOULD BE MINIMAL

The purpose of security is to protect a party who has been damaged from being wrongfully enjoined. Fed. R. Civ. Pro. 65(c). The amount of the security is at the discretion of the court and may in exceptional circumstances, even be waived. *Kaepa, Inc. v. Achilles, Corp.* 76 F. 3d 625, 628 (5th Cir. 1996). Security has been dispensed with entirely or only a nominal bond required where the court determined there was no realistic likelihood of harm to defendant from enjoining its conduct. *Jorgensen v. Cassiday,* 320 F. 3d 906, 919 (9th Cir. 2003); *Doctor's Assocs., Inc. v. Stuart,* 85 F. 3d 975, 985 (2d Cir. 1996); [Ian look for a D.C. Case] *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F. 3d 411, 421, fn. 3 (4th Cir. 1999). When the balance of the potential hardship each party will suffer as result of a preliminary injunction weighs overwhelmingly in favor of the party seeking the injunction, a district court may waive the bond requirement. *Elliott v. Kiesewetter,* 98 F. 3d 47, 60 (3d Cir. 1996). A strong likelihood of success in the merits has also been relied on to dispense with security. *Sherr v. Volpe,* 466 F. 2d. 1027, 1035 (7th Cir. 1972).

Under the facts and circumstances any security should be minimal e.g. $5,000. There is a strong likelihood that AGIA will prevail on the merits and the balance of harm overwhelming

favors it.  It is hard to see what possible harm MEDEX will suffer from having to hold off soliciting to Eligible Members pending arbitration.  It has existed and flourished for years without being able to solicit the Eligible Members, what harm will delaying until hearing on the merits cause.

Respectfully submitted,

JOSEPH, GREENWALD, & LAAKE, P.A.

_____
     */s/ filed via ECF*
Stephen M. Pavsner (Bar No. DC912220)
Lawrence R. Holzman (Bar No. DC466472)
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301)220-2200
(301)220-1214 (fax)
spavsner@jgllaw.com
lholzman@jgllaw.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of January, 2007, a copy of the foregoing Plaintiff's Memorandum of Law in Support of Application for Temporary Restraining Order and Preliminary Injunctive Relief was sent to:

Medex Assistance Corporation
c/o Resident Agent
Bruce R. Kirby
8501 LaSalle Road, Suite 200
Towson, MD  21286
*via overnight delivery (FedEx)*

Creighton  R. Magid
Dorsey & Whitney, LLP
Washington Square
1050 Connecticut Avenue, NW, Suite 1250
Washington, DC  20036
*via electronic mail (magid.chip@dorsey.com) and overnight delivery (FedEx)*

William R. Stoeri
F. Matthew Ralph
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
*via overnight delivery (FedEx)*

_____*/s/ filed via ECF*_____
Lawrence R. Holzman

# EMERGENCY ASSISTANCE PLUS (EA+)
# PLAN DESCRIPTION
Administered by MEDEX Assistance Corporation

A comprehensive program providing you with 24/7 emergency medical assistance - including emergency evacuation and repatriation - and other travel assistance services when you are 50 or more miles away from home.

## PROGRAM DESCRIPTION

### How To Access EA+ Services
### 24 hours a day, 7 days a week, 365 days a year

Your EA+ identification card is your key to travel security. If you have a medical or travel problem simply call us for assistance. Our toll-free and collect-call telephone numbers are printed on your ID card. Either call the toll-free number of the country you are in, or call an Assistance Center collect at:

### Baltimore, Maryland – (410) 453-6330

A multilingual assistance coordinator will ask for your name, your company or group name, the group number shown on your ID card, and a description of your situation. We will immediately begin assisting you. A full listing of services follows .

If the condition is an emergency, you should go immediately to the nearest physician or hospital without delay and then contact one of the Assistance Centers. We will then take the appropriate action to assist you and monitor your care until the situation is resolved.

EA+ provides you with Medical Assistance Services, Medical Evacuation and Repatriation Services, Travel Assistance Services, and Personal Security Services as described below. These services are subject to certain Conditions, Limitations, and Exclusions also described below.

## MEDICAL ASSISTANCE SERVICES

**Worldwide Medical and Dental Referrals:** We will provide referrals to help You locate appropriate treatment or care.

**Monitoring of Treatment:** Our Assistance Coordinators will continually monitor Your case. In addition, Our MEDEX Physician Advisors provide Us consultative and advisory services, including review and analysis of the quality of medical care You are receiving.

**Facilitation of Hospital Payment:** Upon securing payment, We will either wire funds or guarantee required emergency hospital admittance deposits. You are ultimately responsible for the payment of the cost of medical care and treatment, including hospital expenses.

**Transfer of Insurance Information to Medical Providers:** We will assist You with hospital admission, such as relaying insurance benefit information, to help prevent delays or denials of medical care. We will also assist with discharge planning.

**Medication, Vaccine and Blood Transfers:** In the event medication, vaccines, or blood products are not available locally, or a prescription medication is lost or stolen, We will coordinate their transfer to You upon the prescribing physician's authorization, if it is legally permissible.

**Replacement of Corrective Lenses and Medical Devices:** We will coordinate the replacement of corrective lenses or medical devices if they are lost, stolen, or broken during travel.

**Dispatch of Doctors/Specialists:** In an Emergency where You cannot adequately be assessed by telephone for possible evacuation, or You cannot be moved and local treatment is unavailable, We will send an appropriate medical practitioner to You.

**Local Ambulance Benefit:** We will reimburse You up to $200 toward the cost of either initial emergency transportation by ambulance to a hospital or transportation by ambulance from one hospital to another.

**Medical Records Transfer:** Upon Your consent, We will assist with the transfer of medical information and records to You or the treating physician.

**Continuous Updates to Family, Employer, and Physician:** With Your approval, We will provide case updates to appropriate individuals You designate in order to keep them informed.

**Hotel Arrangements for Convalescence:** We will assist You with the arrangement of hotel stays and room requirements before or after hospitalization.

## MEDICAL EVACUATION & REPATRIATION SERVICES

**Emergency Medical Evacuation:** If you sustain an Injury or suffer a sudden and unexpected Illness and adequate medical treatment is not available in Your current location, We will arrange and pay for a medically supervised evacuation to the nearest medical facility We determine to be capable of providing appropriate medical treatment. Your medical condition and situation must be such that, in the professional opinion of the health care provider and MEDEX, You require immediate emergency medical treatment, without which there would be a significant risk of death or serious impairment. If You are traveling outside of North America and need to be evacuated by air ambulance, We will attempt to arrange for a person traveling with You to accompany You on the air ambulance.

**Transportation to Join a Hospitalized Member:** If You are traveling alone and are or will be hospitalized for more than seven days, We will coordinate and pay for economy round-trip airfare for a person of Your choice to join You.

**Return of Dependent Children:** If Your child(ren) or grandchild(ren) under age 19 are present but left unattended as a result of Your Injury or Illness, We will coordinate and pay for one-way economy airfare to send them back to either Your or their Permanent Primary Residence. We will also arrange and pay for the services and transportation expenses of a qualified escort, if required.

**Transportation After Stabilization:** Following emergency medical evacuation and stabilization, We will coordinate and pay for one-way economy airfare to Your point of origin. Following stabilization of Your condition, We will alternatively return You to Your Permanent Primary Residence if: (1) You are unable to operate Your vehicle and no one in Your traveling party is capable of operating the vehicle or (2) Your condition prevents You from traveling as a passenger in the vehicle, or it is deemed medically necessary that you be returned to Your Permanent Primary Residence for inpatient hospitalization or rehabilitation, as determined by Your treating physicians and Our MEDEX Physician Advisor. This benefit will be approved only after Your condition has stabilized to the point where You are capable of traveling by commercial transportation, or Your condition has reached maximum medical improvement.

**Repatriation of Mortal Remains:** We will assist in obtaining the necessary clearances for Your cremation or the return of Your mortal remains. We will coordinate and pay for the expenses of the preparation and transportation of Your mortal remains to Your Permanent Primary Residence. We will also pay for round trip economy airfare for one person who was traveling with You to Your Permanent Primary Residence provided We have approved and coordinated the return of Your remains. However, if We return a person traveling with You, there may be no benefit for the return of Your vehicle, except as otherwise approved under the RV/Vehicle Return Benefit.

**RV/Vehicle Return:** We will return Your automobile, non-commercial truck or RV to Your Permanent Primary Residence or place of rental if: (1) We approved transporting You to Your Permanent Primary Residence under either the Transportation After Stabilization or Repatriation of Mortal Remains benefits and (2) no one in Your traveling party is capable of driving Your vehicle. The vehicle must be in good con- dition and capable of being safely driven on the highway in compliance with local laws. If the vehicle was an RV, We will also return an additional vehicle if it was hitched to Your RV. You must pay any costs required to maintain the safe operation of the vehicle during the return. The return must be approved and coordinated by Us and must be performed by one of Our contracted service providers.

Alternatively, You may choose to have Your vehicle returned by a friend or family member. In such instance, and provided the vehicle is returned directly and expediently to Your Permanent Primary Residence, We will provide reasonable transportation for that person to the location of the vehicle, and We will reimburse You for gas and tolls during the return. In addition, We will provide a $100 per diem benefit for incidental expenses while driving.


## TRAVEL ASSISTANCE SERVICES

**Pre-Travel Information:** Upon Your request, We can provide continuously updated destination intelligence for more than 180 countries covering ten subject areas: security, health, transportation, entry/exit, finance, culture, language, communication, legal, and weather/environment.

**Emergency Travel Arrangements:** We will make new reservations for airlines, hotels, and other travel services in the event of an Illness or Injury.

**Transfer of Funds:** We will provide You with an emergency cash advance subject to Our first securing funds from You or Your family.

**Replacement of Lost or Stolen Travel Documents:** We will assist You in taking the necessary steps to replace passports, tickets, and other important travel documents.

**Legal Referrals:** Should You require legal assistance, We will direct You to an attorney and assist You in securing a bail bond.

**Translation Services:** Our multilingual Assistance Coordinators are available to provide immediate verbal translation assistance in a variety of languages in an emergency; otherwise We will provide You with referrals to local interpreter services.

**Message Transmittals:** You may send and receive emergency messages toll-free, 24 hours a day, through Our Assistance Centers.

**Emergency Pet Housing and/or Pet Return:** We will coordinate arrangements for temporary boarding or the return of a per left unattended as a result of Your Injury or Illness.


## PERSONAL SECURITY SERVICES

**Real-time Security Intelligence:** In the event You feel threatened by political unrest, social instability, weather conditions, or health or environmental hazards, We will provide you with the latest authoritative information and guidance for over 180 countries and select cities. Our global intelligence database is continuously updated and includes destination intelligence from over 5,000 worldwide sources.

**Security Evacuation Services:** In the event of a threatening situation, We will assist you in making evacuation arrangements, including flight arrangements, securing visas, and logistical arrangements such as ground transportation and housing. In more complex situations, We will assist You in making arrangements with providers of specialized security services.

## PROGRAM DEFINITIONS

The following definitions apply:

"You" and "Your" means a person validly enrolled for EA+ and for whom We have received the appropriate enrollment fee.

"Dependent" means the Member's legal spouse, unless they are legally separated; the Member's unmarried children from birth and under age 19; or under age 23, if enrolled as a full-time student in an accredited college, university, vocational or technical school; and children whose support is required by a court decree. Children include natural children, stepchildren and legally adopted children. They must be primarily dependent on the Member for support and maintenance and must live in a parent-child relationship with the Member. Family coverage includes any and all legal dependents of the Member at the time of service.

"We," "Us," "Our," and "MEDEX" means MEDEX Assistance Corporation.

"MEDEX Physician Advisors" means physicians retained by MEDEX to provide Us with consultative and advisory services, including the review and analysis of the quality of medical care You are receiving.

"Permanent Primary Residence" means the locale of the address as shown on Your state driver's license or state-issued identification card.

"Injury" means an identifiable accidental injury caused by a sudden, unexpected, unusual, specific event that occurs during Your Enrollment Period.

"Illness" means a sudden and unexpected sickness that manifests itself during Your Enrollment Period.

"Enrollment Period" means the period of time for which You are validly enrolled for EA+ and for whom We have received the appropriate enrollment fee

## CONDITIONS AND LIMITATIONS

The services described are available to You only during Your Enrollment Period and only when You are 50 or more miles away from Your Permanent Primary Residence.

We will only cover the transportation costs under the Medical Evacuation and Repatriation Services if We have given Our prior approval or if those services are coordinated by Us.

We have sole discretion in making the determination as to whether we will cover the cost of Emergency Medical Evacuations and RV/Vehicle Returns. Our decision will be based on medical considerations, including the options of the treating physicians, Our MEDEX Physician Advisors and Our medical director with respect to Your condition and ability to travel. We will determine the appropriate method, destination, and timing of any evacuation. The destination will be the nearest facility capable of proving appropriate care as determined by Us.

We have sole discretion in making the coverage determination for your Transportation After Stabilization. Our determination will be based on Your medical inability to return in Your vehicle. We will not return You to Your Permanent Primary Residence for the sole sake of Your convenience.

In the event We are arranging transportation by commercial air under the Medical Evacuation and Repatriation Services, and You hold an original return airline ticket, We may use that ticket and are only responsible for any applicable change fees.

We will only direct-pay any transportation costs under the Medical Evacuation and Repatriation Services to the transportation providers, unless otherwise approved by Us in advance.

We are not responsible for the availability, quality, results of, or failure to provide any medical, legal or other care or service caused by conditions beyond Our control. This includes Your failure to obtain care or service or where the rendering of such care or service is prohibited by U.S. law, local laws, or regulatory agencies.

Your legal representative shall have the right to act for You and on Your behalf if You are incapacitated or deceased.

PROGRAM COSTS

Once enrolled in Emergency Assistance Plus, you cannot be singled out for fee increase nor can your benefits be changed, unless the program costs or benefits are changed for all members of the group. If rates and benefits are changed for the group, individual participant rates will only change upon your renewal date and with proper notification. Annual program rates are earned as paid after the initial money back review period and your program costs are guaranteed for the remaining annual period.

EXPENSES NOT COVERED

We shall not be responsible for any costs or expenses arising from:

1) Hospital or medical expenses of any kind or nature.
2) Travel arrangements that were neither coordinated by or approved by Us in advance.
3) Your traveling against the advice of a physician, traveling with a chronic or life-threatening condition, or traveling for the purpose of obtaining medical treatment.
4) Suicide, attempted suicide, or willful self-inflicted injury.
5) Taking part in military or police service operations.
6) The commission of, or attempt to commit, an unlawful act.
7) Injury or Illness caused by or contributed to by use of drugs or alcohol.
8) Pregnancies, except in the case of a major, vital complication during the first two trimesters of pregnancy which presents a clear and significant risk of death or imminent serious injury or harm to the mother or fetus.
9) Mountaineering or rock climbing necessitating the use of guides or ropes, spelunking, skydiving, parachuting, ballooning, hang gliding, deep sea diving utilizing hard helmet with air hose attachment, racing of any kind other than on foot, bungee jumping, operating a vehicle when not properly licensed, or participating in professional sports unless otherwise agreed in writing by Us prior to Your Enrollment Period.
10) Psychiatric, psychological, or emotional disorders.
11) Incidental expenses, including but not limited to accommodations, local transportation, meals, telephone, and facsimile charges.
12) Subsequent evacuations for the same or related medical condition, regardless of location.
13) Services covered by other valid and collectible insurance, including Medicare.
14) Services not otherwise shown as covered.

**REIMBURSEMENT TO MEDEX AND RIGHTS OF SUBROGATION**

You or a responsible party on Your behalf shall either pay the cost of medical care and treatment, including hospital expenses, directly or shall reimburse Us upon demand for all such costs and expenses which may be imposed upon Us by health care providers for the cost of medical care and treatment, including hospital expenses, or related assistance services either authorized by You or deemed to be advisable and necessary by Us under urgent medical circumstances, to the extent that such expenses are not Our responsibility.  Such reimbursement shall be without regard to the specific terms, conditions, or limitations of any insurance policies or benefits available to You.

We shall be fully and completely subrogated to Your rights against parties who may be liable for the payment of, or a contribution toward the payment of, the costs and expenses of assistance services provided by Us or medical care and treatment, including hospital expenses, in the event that We pay or contribute to the payment of them. You must assign to Us any and all rights of recovery under any such insurance plans, including any occupational benefit plan, health insurance, Medicare, or other insurance plan or public assistance program, up to the sum of any payments by Us.



**The Good Sam
EA+ Program**

P.O. Box 21807
Santa Barbara, CA 93121-1807

#BWNJYFR
#P033 SALN 1073 1AN9#  00010
Nicholas ▬▬▬▬▬▬▬▬▬▬▬▬▬



IIIhⅢIlⅢllⅢⅢlllⅢⅢllⅢⅢlIⅢⅢlhⅢIlⅢⅡ                    April 24, 2006

Dear Nicholas ▬▬▬▬▬▬

     In response to your recent request, we've provided you with duplicate Good Sam Emergency Assistance Plus Identification Cards below. Please keep these cards with you at all times or in an accessible, safe place.

     These courtesy ID cards are a handy resource for frequently needed information such as your group number, coverage number and the phone numbers to call for general information or assistance. We hope you will find them useful.

     We value your participation in the Good Sam Emergency Assistance Plus Program and welcome the opportunity to continue serving you. If you have any questions about EA+, please call us toll-free at 1-800-782-7267, and one of our Customer Service Associates will be happy to help.

               Sincerely,

               John B. Wigle, RHU, Benefits Officer
               Good Sam
               Emergency Assistance Plus Program



**The Good Sam
EA+ Program**

For assistance while on your trip, please use the following numbers:
* Emergency Assistance inside the US, call toll free **1-877-565-2542**
* Emergency Assistance outside the US, call collect **1-410-453-6330**
* Billing & general plan information inside the US, call **1-800-782-7267**

Nicholas ▬▬▬▬▬▬

Coverage #:
Effective Date: 06/27/2000    **Group #: 502**

In the event of any travel-related emergency, call as soon as possible. Be prepared to give your name, group name & number, and a brief description of the situation.



**The Good Sam
EA+ Program**

For assistance while on your trip, please use the following numbers:
* Emergency Assistance inside the US, call toll free **1-877-565-2542**
* Emergency Assistance outside the US, call collect **1-410-453-6330**
* Billing & general plan information inside the US, call **1-800-782-7267**

Nicholas ▬▬▬▬▬▬

Coverage #:
Effective Date: 06/27/2000    **Group #: 502**

In the event of any travel-related emergency, call as soon as possible. Be prepared to give your name, group name & number, and a brief description of the situation.







**MEDEX ASSISTANCE CORPORATION**
P.O. Box 19056
Baltimore, MD 21284-9056
Toll-Free 1-877-565-2542



:

Nicholas 

034

### SCHEDULE
### EMERGENCY ASSISTANCE PLUS PROGRAM

| | |
|---|---|
| **Group:** | Good Sam |
| **Group Number:** | 502 |
| **Coverage Number:** | |
| **Name of Covered Person:** | Nicholas |
| **Type of Coverage:** | Family |
| **Effective Date of Coverage:** | 06/27/2000 |
| **Period of Coverage:** | Annual |

FAILURE TO OBTAIN PRIOR APPROVAL FROM MEDEX MAY INVALIDATE YOUR ELIGIBILITY FOR PAYMENT OR TRANSPORTATION EXPENSES. IN ADDITION, IF THE EVACUATION METHOD OR DESTINATION GOES OUTSIDE THE BOUNDARIES OF THIS PROGRAM DESCRIPTION, IT MAY INVALIDATE PAYMENT OF SUBSEQUENT TRANSPORTATION EXPENSES.

ANY BILLS INCURRED BY A MEMBER RELATING TO ASSISTANCE SERVICES AUTHORIZED BY MEDEX MUST BE RECEIVED WITHIN 90 DAYS OF THE DATE OF SERVICE IN ORDER TO RECEIVE PAYMENT.





16/31

**National Rifle Association**

**NRA. EMERGENCY ASSISTANCE PLUS**

24-HR. MEDICAL ASSISTANCE **if you get sick or hurt
while traveling in the U.S. or abroad includes:**

**Medical Evacuation ○ Medical Assistance ○ Travel Assistance
○ Assistance for Companions**

I will receive a Plan
Description that gives the full
terms and conditions of this
plan. I can take up to 30 days
from my effective date to read
it over. If I then feel that NRA
Emergency Assistance Plus is
not what I want, I will mail
back the Description and you
will promptly send me a
100% refund.

ISSUE TO YOU GUARANTEED • ISSUE TO YOU GUARANTEED • ISSUE TO YOU GUARANTEE

# REGISTRATION CERTIFICATE  Questions? Call toll-free 1-866-477-4314

16/31

### THE NRA EMERGENCY ASSISTANCE PLUS

☐ If I get sick or hurt while I'm away from
home in the U.S. or abroad — even if I'm not traveling by
car — I want Emergency Assistance Plus to come to my aid.
This goes for all my family, too, if I also enroll them (at right).

If your permanent primary address has changed, please write corrections here:

Address:_____

City:_____ State:_____ Zip:_____

This information is only an outline of the plan's features. The full terms, benefits
and conditions of the plan are shown in your EA+ Plan Description. This plan will
not cover any losses that occur less than 50 miles away from home. You must
call EA+ so we can make the arrangements for you. For purposes of this plan,
your permanent primary residence is defined as the address that appears on
your driver's license. Please read your Plan Description carefully.

*Check Desired Coverage:*

**Annual Rate:    Member Only ...................$79**

**Member + Family................. $99**
(only $20 more to cover your family)

**Payment Method:**

Enclosed is my check or money order payable to: *NRA Endorsed EA+ Programs.*

I'll charge it for my convenience. Make this and future payments with my
credit card. I may cancel at any time.

Visa        MasterCard        Discover        Expires:        /

Card #:

**Please Complete:**

Your date of birth:    /    /        Today's date:    /    /

Authorized Signature:

10-EAE-1-A   10-EAF-1-A        11.9603   © 2006 AGIA

**PLAN ARRANGED BY:** The NRA Endorsed EA+ Programs • **EMERGENCY ASSISTANCE PROVIDED BY:** MEDEX Assistance Corporation
**Administered by:** A.G.I.A., Inc., P.O. Box 22108, Santa Barbara, CA 93121

How Do I Get EA+?

### No-Risk Guarantee

As soon as we receive your NRA EA+ Request and payment, we will mail you a Description of Coverage and an ID card. Take up to 30 days to read the Description. If, for any reason, you decide that EA+ isn't what you had in mind, even simply cancel within 30 days, and your entire payment will be refunded unless you file a claim for benefits in the first 30 days, in which case the payment cannot be refunded.

Give yourself "emergency coverage" at least as good as what you have for your family auto. Sign up for NRA Endorsed Emergency Assistance Plus (EA+) in case YOU break down while traveling in the U.S. or abroad!

NRA ENDORSED EA+ PROGRAM
PO BOX 221208
SANTA BARBARA  CA 93121-9905

**BUSINESS REPLY MAIL**
POSTAGE WILL BE PAID BY ADDRESSEE



 NRA — Protecting Your Rights, Protecting Your Family

 PROTECTION WORLDWIDE



*If you get sick or hurt away from home, Emergency Assistance Plus gives you 24-hour assistance!*

 24-HOUR YEAR-ROUND TOLL-FREE SERVICE!



**EA+ takes care of you and your family.**

 NRA — Protecting Your Rights, Protecting Your Family

### What is Emergency Assistance Plus?

Emergency Assistance Plus is a plan that protects you and your family if you get sick or hurt while traveling in the U.S. or abroad.

Available to NRA Members, EA+ gives you a 24-hour, year-round toll-free number to call for help when you need it most.



What is EA+?

- What if you travel thousands of miles from home and can't drive your vehicle back? EA+ will arrange to have it driven home.

- What if you're hospitalized following an accident and have to make alternate arrangements to be transported to a different facility that may be miles away? EA+ will pay for this expensive necessity to get you to the most appropriate medical facility for the help you need.

- What if your wallet is lost or stolen while you're traveling? EA+ will arrange to have funds transferred right away to get you back on your feet.

- What if you need emergency dental care while you're on vacation? EA+'s 24-hour locator service will help you find a professional, competent dentist in the area.



EA+ gives you these crucial services and more!

So don't face being sick or hurt, alone and far from home. Let EA+ help take care of those unforeseen emergencies. Sign up now for NRA Endorsed EA+!

David H. McCarty
Executive Vice President

November 16, 2006

Bruce Kirby
President
Medex Global Group, Inc.
8501 LaSalle Road, Suite #200
Baltimore, MD  21286

*Re: Termination of Service Agreement*

Dear Bruce,

You (through Rob Currie) have recently expressed to us your opinion that Medex has a contract with AGIA for the calendar year 2007. I wish to make it crystal clear that there is no such agreement and that the Service Agreement will terminate at the close of business on December 31, 2006.

AGIA gave Medex notice more than a year ago, that we would not continue the existing agreement beyond December 31, 2006. We gave you the opportunity to propose new pricing terms that might be acceptable for a new 2007 contract. I know that you understood this clearly, as I have seen emails to us this year in which you acknowledged this understanding – in your words, "our existing contract expires at the end of this year." Our correspondence requesting new contract terms began at least as early as November 2005. We accommodated your request to postpone pricing changes to 2007 if we were able to come to agreement terms. You cannot credibly maintain that you did not have at least 120 days' notice that the contract would not renew at the end of 2006. However, since your recent statements appear to indicate this position, let this letter serve as formal notice under Paragraph 9.C of the Service Agreement that AGIA does not agree to the proposed new Fee Schedule and its conditions, and is therefore terminating the Service Agreement effective December 31, 2006.

It is imperative that we begin preparing for cessation of business at the end of next month. We will expect to receive, on January 2, 2006, full payment of the unearned fees under the Service Agreement, as required by Paragraph 9.D. Timely receipt of these funds will be imperative, as we will be required to pay the new service provider for its services. We will also require delivery of the member data in your possession, *prior to* the January 1, 2007 transition date, as our new service provider must be in position to service the members beginning immediately.  Transfer of the toll free and collect telephone numbers is also requested and the details of that can be discussed over the next few weeks.  This member data belongs to AGIA and its clients. We will therefore insist upon an appropriate procedure for your destruction of the data in your possession following completion of your termination responsibilities.

Bruce Kirby
November 16, 2006
Page 2 of 2

There are other transition issues which we will need to address, to be sure. I will be the liaison for coordinating the transition; please let me know as soon as possible who will be the contact person at your organization.

Bruce, on behalf of AGIA and our clients, thank you for your past service and your cooperation in this upcoming transition.

Sincerely,


David H. McCarty
Executive Vice President

7950 Main Street North, # 215, Maple Grove, MN 55369
PHONE: 612.235.4951  800.244.2462 Ext.1  FAX: 763.416.4931  DMcCarty@AGIA.com

*B_Kirby-MedexTerm/jp*

**MEDEX Global Group**
8501 LaSalle Road ┊ Suite 200 ┊ Baltimore, MD 21286
p 800-537-2029  f 410-453-6301
www.**medex**assist.com



Via Electronic Mail

November 22, 2006

Dave McCarty
Executive Vice President
AGIA
7950 Main Street North, #215
Maple Grove, MN  55369

Re: Termination of Service Agreement

Dear Dave:

Bruce Kirby forwarded your letter of November 16, 2006 to me for acknowledgement of receipt and reply while he is away for the holiday.  This will confirm our receipt of that letter indicating AGIA's intent to terminate the existing Service Agreement.  It arrived to considerable disappointment at MEDEX.  We understand from your conversation with Bruce that the factor driving the decision described in your letter is pricing.

Because there are questions raised by AGIA's decision and requests in your letter, we have forwarded it to our outside counsel at Dorsey & Whitney for review.  Until we are able to resolve those issues, we reserve all rights available to MEDEX.

In the interim, Deneen Detorie will continue to be the point person for MEDEX in working with you and AGIA.  In the event she is unavailable, please feel welcome to reach me as well.

Regards,

David L. Mair
Director, Client Relations

DLM:

cc:  Bruce Kirby
     Deneen Detorie

TRAVEL WITH **CONFIDENCE**



AGIA Insurance Services

29 November 2006

David Mair
Director, Client Relations
Medex Global Group, Inc.
8501 LaSalle Road
Suite #200
Baltimore, MD  21286

Dear David:

Thank you for your and Deneen's time this morning.  I will look forward to your proposal outlining the details of how you will complete the servicing of the EA+ cases that were initiated prior to January 1, 2007.  We both agree it is best for the customer if Medex completes a case they started and that the portion of your fees earned in December compensate Medex for this service.  I will look forward to your detailed proposal of how you would see this best working out by the end of this week, (I think you said Friday at the latest).

In the meantime, this letter will serve as AGIA's response, or suggested solution, to our apparent disagreement on the ownership and transfer of the telephone numbers that have been a part of our marketing efforts these past years.  Most of these numbers have been specifically and especially established for use in AGIA's marketing efforts for AGIA's clients, and AGIA paid Medex for specific servicing including the cost of these phone lines, as part of the annual fee.  For these reasons, we expected the numbers to be transferred to our new service provider, along with the rest of our program.  Based on this morning's call, I understand now that you don't agree with us.

Our main priority and focus in this transition is that our customers are serviced continuously and that no one's needed care is put at risk.  We would rather not enter into a lengthy debate over this subject and risk the customers' services, and I sense you feel the same way.  Therefore, we would like to propose the following for the telephone numbers:

1.  Prior to January 1, 2007, AGIA will notify all current customers that the servicing of the EA+ program is being moved to On-Call International.  The new telephone numbers (866-816-2073 and 603-328-1752) and ID cards will be included in that package.

2. Beginning January 1, 2007 and forward, we are proposing that Medex perform a 'warm' transfer of any calls they receive from any of our customers, excluding "active cases", that for some reason are using the old telephone numbers.  AGIA will compensate Medex $20 for each call received after January 1, 2007.

3. We propose that Medex permanently transfer the client specific telephone numbers to On-Call.  AGIA will pay Medex $2,500 per telephone number for their assistance with this transfer to be effective on a date to be determined by AGIA.

4. The telephone numbers affected are as follows:

- 800-537-2029
- 800-527-0218
- 877-773-3432
- 800-698-5688
- 877-565-2542
- 800-586-0193
- 410-453-6330

We think that your suggestion to net those fees out of the final unearned fee transfer that is due to AGIA is probably the most efficient for everyone concerned.  Our records show that the unearned fees due to AGIA as of October 31, 2006 are $790,457.  We are agreeable to having you net the fees listed in #2 and #3 above out of the total unearned owed us, and that we would remit only the earned fees for November and December.

We are moving ahead swiftly to make this transition as efficient and seamless as possible for all parties concerned, especially our customers.  We are notifying the customers and sponsoring clients of these changes.  We appreciate your cooperation and support in this process and continued adherence to our contract including the ongoing exclusivity provisions.  We are hopeful to receive your acceptance of our proposal by this Friday, December 1st, so that we can ensure the proper servicing of our customers.  Your acceptance will mean that we have resolved our existing disagreement.

Sincerely,


David H. McCarty
Executive Vice President

DHM:pcv

Cc:     Bruce Kirby, President (Fax: 410-308-7918)

        Deneen Detorie
        Assistant Vice President, Client Relations Team

G:\Office and subdirectories\11 29 06 Medex.doc

**MEDEX Global Group, Inc.**
8501 LaSalle Road | Suite 200 | Baltimore, MD 21286
p 800-537-2029  f 410-453-6301
www.medexassist.com



**MEDEX**

<u>Via Electronic Mail</u>

December 1, 2006

David McCarty
Executive Vice President
AGIA
7950 Main Street North, #215
Maple Grove, MN 55369

Re: MEDEX Service Agreement

Dear Dave:

This will summarize our November 29 discussion and serve as a reply to your letter of the same date. During our call, we covered six items, each of which is addressed below.

Regarding confirmation of enrolled participants, we agreed that Deneen Detorie would deliver by email a copy of the last complete participant roster to AGIA. That was delivered on November 30. It appears, however, the staff at AGIA was not prepared for its arrival. I hope that the confusion in that regard has been resolved.

Regarding calculation and return of unearned revenue, we agree this is contemplated by Section 9D of the Service Agreement. The January 2, 2007 date expressed in your November 16 letter is, however, impracticable. At that date, MEDEX will not have received a complete report or fees for sales during the preceding two months. The Service Agreement provides that AGIA has up to 60 days following receipt of collected fees to remit the fees to MEDEX. Thereby, the last date for submission of reports and fees is March 1, 2007. As discussed, we will calculate unearned revenue beginning on March 2. Since the Service Agreement is silent with regard to the timing for return of unearned fees, we will use a corresponding 60 day period, which was viewed as a reasonable time, for payment of the unearned amount. We agreed that if AGIA was able to confirm and remit fees earlier than 60 days, we would use the date following our receipt of the fees as an alternative start date for our calculations.

With regard to transfer of telephone numbers, these numbers are valued MEDEX assets and we expect to redeploy them for other business following termination of the Service Agreement. In follow-up to our discussion, you proposed purchase of these numbers, including three MEDEX numbers we had previously discussed as being outside any consideration in this regard. We respectfully decline your requests to transfer or to purchase these MEDEX assets.

Regarding management of existing assistance cases at January 1, 2007, we do agree that individuals who require essential care should not face interruption of services. To that end, MEDEX will continue to coordinate assistance services for cases involving active medical evacuations until the medical transfer is completed. For circumstances that require guarantee of third party fees, after December 31, we will not, however, guarantee or advance any payments. You indicated your desire to have all other cases assumed by On-Call International beginning on January 1, 2007. In cooperation with that desire, we will cease support of all other existing cases at that date.

TRAVEL WITH **CONFIDENCE**

Regarding calls that are received by MEDEX beginning on January 1, 2007, we discussed three options. The first option was to provide callers the new phone numbers. The second option was to warm transfer callers for appropriate compensation. A third option, which you agreed to consider, was our willingness to continue to provide assistance services for eligible individuals through the period of their respective current enrollments. Upon reflection, we believe the only viable alternative for MEDEX is to continue to assist members who have purchased the travel assistance services through the period of their enrollment. In consideration of that service, we would retain paid fees. In the alternative, we will provide the phone numbers to callers for those lines that will be answered, pending redeployment of the remaining toll free lines.

With regard to the request in your November 16 letter that MEDEX destroy information regarding enrolled participants, we discussed briefly MEDEX's ongoing business purposes, including but not limited to audit, compliance, case records, ongoing sales and individual correspondence, as might be warranted. You indicated your understanding and asked only that we confirm our reasons for maintaining this information. This paragraph will serve as that confirmation.

Your November 29 letter covers two additional items, one of which is addressed in part above. We discussed the potential to deduct funds to MEDEX resultant from satisfactory negotiations from the unearned fees. Since we have declined your offers, there are no deductions to be made in that regard. You add a reference to paying only the earned fees for November and December, an item not discussed during our call. The Service Agreement does not make any allowance for a reduction in fees payable to MEDEX, and we appreciate your cooperation and continued adherence to our contract. We will expect a full description of all sales from October through December and full payment of fees as required by Section 3.

We appreciate your focus on maintaining services for your clients, and as described above, we look forward to working with you to provide that service until the date specified in your termination letter. We hope, however, that you recognize that implementation and transfer challenges after that date are related to AGIA's decision to change providers, not decisions or actions on our part. We believe the best way to ensure a transition with the least potential for disruption would be to allow MEDEX to continue to service current enrollees during the balance of their enrollment period, as described above. Our offer in that regard remains open to you until December 6.

Please let me know if you have questions.

Sincerely,

David L. Mair
Director, Client Relations

DLM:

cc:  Bruce Kirby
     Deneen Detorie
     Bill Stoeri, Dorsey & Whitney

David H. McCarty
Executive Vice President

December 4, 2006

Mr. David L. Mair
Director, Client Relations
Medex Global Group, Inc.
8501 LaSalle Road
Suite #200
Baltimore, MD 21286

Dear David,

We have received your December 1, 2006 letter and reviewed it internally and with
outside legal counsel. We appreciate your support of the transition and also your
acknowledgement for the importance of a smooth and seamless transition for all of our
customers. Given the importance we all place on making sure everyone is serviced
properly and effectively, I am confused and disappointed by your response to our
proposal regarding the phone numbers.

We are respectfully requesting that you reconsider our proposal that offers to pay you
$20 per phone call received PLUS $2,500 per phone line transferred. You have a
contractual duty to do whatever is reasonably necessary to cooperate with the transition
to our new service provider. If you are refusing to transfer the phone lines, then you at
least have a duty to transfer calls from our members that still come in to your phone
numbers. You only offered to do so "for those lines that will be answered." This is not
acceptable. You can imagine the tremendous, irreparable harm that would be done to
members at a time of medical emergency if their calls go unanswered, as you have
threatened. Due to the urgency of resolving this issue, I have asked our attorney to
contact the attorney copied on your correspondence, Mr. Stoeri. If we cannot reach an
agreement in the next few days regarding the appropriate handling and transfer of these
medical emergency calls, we will be in court shortly to resolve the matter. Your prompt
acceptance of our proposal to handle the phone calls and phone lines will therefore be
much appreciated and will save both parties significant legal costs.

You stated in your letter that the "only viable" route is for Medex to continue servicing
enrolled members through the end of their contracts. I discussed this option some time
ago with Rob Currie, and on two separate occasions, Rob told John Wigle (October 25,
2006) and Dave McCarty (November 10, 2006) that Medex would not agree to this
solution. We relied on this answer and we were left with no other choice but to proceed
with plans as outlined in our previous two letters. At this time, our clients have been
notified and all of the EA+ enrollees will receive a letter next week notifying them of this
change effective January 1, 2007. As you can imagine, coordinating activities between
two different providers will not be possible and trying to do that could result in service
errors. I can't speak for Medex, but AGIA is not willing to take the risk of the confusion
resulting from the proposal you described.

7950 Main Street North, # 215, Maple Grove, MN 55369
PHONE: 612.235.4951 800.244.2462 Ext.1 FAX: 763.416.4931 DMcCarty@AGIA.com

DMair-Dec4/jp

With regard to the unearned revenue due to AGIA, the contract clearly states that unearned fees are due upon the termination date, which is January 1st. The contract does not provide a 60-day window for this payment; to the contrary, it correctly anticipates that we will need to funds immediately, to remit to the new service provider. I understand that you might not have all of the information you will need at the first of January to remit all of the unearned revenues, so I will be arranging to deliver to you shortly a computation of the unearned fees due for members subscribed through the end of November. We will expect payment of that amount on January 2, 2007, and that you will promptly settle up with respect to the unearned fees for members subscribed in December. Your cooperation and agreement with this will be appreciated. If you continue to refuse to remit unearned fees immediately following termination, we will consider this a breach of the agreement and will be required to take whatever steps are appropriate to protect our rights.

I accept your statement regarding the need to retain some data for enrolled members for certain legitimate business purposes. One of the purposes stated in your letter was "ongoing sales." This is not a legitimate use of our enrolled member information. To be clear, AGIA will take whatever steps are necessary to ensure that Medex does not solicit the enrolled members for any service or product of any kind. Please confirm that Medex will not solicit, or help others to solicit, the purchase of any products or services by enrolled members.

David, time is running short to complete this transition in an orderly fashion. I sincerely hope Medex will assist us in making sure the transition is smooth and seamless for our customers. I will await your quick response.

Sincerely,



David H. McCarty
Executive Vice President

**Mike Schley**

| | |
|---|---|
| **From:** | Dave McCarty [DMcCarty@AGIA.com] |
| **Sent:** | Wednesday, December 06, 2006 10:32 AM |
| **To:** | David Mair |
| **Cc:** | Deneen Detorie; Bruce Kirby; Mike Schley; John Wigle; stoeri.bill@dorsey.com |

**Subject:** RE: EA+ Transition

David, I am disappointed and actually pretty frustrated with your email to me below. The unearned fees due to AGIA from Medex at the end of our contract (January 1, 2007) will total around $1,000,000. What I hear you repeatedly saying is that unless AGIA pays you that $1,000,000 you are not going to answer the phones as of January 1st. Is that what you are intending to say as your last and final solution to this?

As I have told you we are notifying the customers of the new telephone numbers they are supposed to use as of January 1st. However, you and I both know there may be some people that will still call the old numbers. Given that some of those calls will be medical emergencies I can't imagine you simply won't answer the phones??!!

We have offered to pay you for each phone call you receive after January 1st and we have also offered to buy the phone lines from you in order to make sure the few calls that do come in are taken care of. The offer of $20 per call received is something that we believe you have agreed to with other transitions and we can't understand why you won't even consider it from us.

At the very least I would expect you to provide a counter solution or proposal for how to handle this situation. The only solution you continually give me is to give you a million dollars or you will turn off the phones.

David H. McCarty
Executive Vice President
AGIA Insurance Services
7950 Main Street North
Suite 215
Maple Grove, MN  55369
612-235-4951 - phone
763-416-4931 - fax
DMcCarty@AGIA.com

**From:** David Mair [mailto:DMair@medexassist.com]
**Sent:** Wednesday, December 06, 2006 10:04 AM
**To:** Dave McCarty
**Cc:** Deneen Detorie; Bruce Kirby; Mike Schley; John Wigle; stoeri.bill@dorsey.com
**Subject:** RE: EA+ Transition

This will confirm our receipt of your December 4 letter. We will reply in more detail shortly. In the interim, because we recognize the sense of urgency you feel, this will affirm our previous offer to continue

service for participants through the end of their current enrollment period, an idea you commented to Deneen and me on November 29 was a third alternative you had not thought of earlier. We noted your request to reconsider sale and transfer of the phone lines with the same offer as previously declined. Repetition of the offer has not made it more acceptable, and again we decline.

I will be in the office most of the day in the event you feel that a discussion may be of benefit.

Regards,

David L. Mair
Director, Client Relations

MEDEX Global Group
8501 LaSalle Road, Ste. 200
Towson, MD 21286
Tel. 410-453-6367
Cell 443-414-8424
email: dmair@medexassist.com

This communication contains information which is proprietary to MEDEX Global Group is (and is intended to remain) confidential, being provided for the exclusive use of the intended recipient. It may contain information that may be legally privileged. If you have reason to believe you are not the intended recipient(s), disclosing, copying, disseminating or otherwise taking any action in connection with this communication or the information in it is prohibited and may be unlawful. If you have reason to believe you have received this communication in error, please notify the sender, comply with the foregoing warning and delete this communication from your system.

**From:** Dave McCarty [mailto:DMcCarty@AGIA.com]
**Sent:** Tuesday, December 05, 2006 9:51 AM
**To:** David Mair
**Cc:** Deneen Detorie; Bruce Kirby; Mike Schley
**Subject:** EA+ Transition

Please see attached.

David H. McCarty
Executive Vice President

December 8, 2006

Mr. David L. Mair
Director, Client Relations
Medex Global Group, Inc.
8501 LaSalle Road
Suite #200
Baltimore, MD  21286

Dear David,

This letter confirms our latest discussion on Wednesday regarding the upcoming transition. I thought you were going to send a confirmation of what we discussed, but I must have misunderstood.

You clarified for me that as of January 1st, Medex will continue to answer the phone lines previously utilized for our program, and that the caller would be given the numbers used for On Call International (866-816-2073 and 603-328-1752). This is better than just letting the calls go unanswered, but still not the warm transfer or automatic rollover we had requested.

I am now very clear you will not perform a warm transfer of these calls at the rate we had proposed of $20 per call or even the $45 per call you said you were charging for this service today in other similar situations. I don't understand why you won't provide this service to our customers especially when we are willing to pay you for it. Ideally, we could purchase the dedicated client numbers and have the calls automatically transferred to On Call; or simply pay for dedicated line calls to be automatically rolled over to the new On Call numbers. You have indicated these numbers are a valued asset, but you don't seem to know what that value is. I have offered to buy those lines from you for $2,500 each and also trade other toll free numbers to satisfy the future client needs you mentioned. You have clearly turned us down on each of these proposals.

We believe your duty under our contract would include a warm transfer of members who call the old phone numbers after January 1, and we are willing to pay reasonable compensation for that service. Alternatively, we would like calls to the dedicated lines to be automatically rolled over to the new phone numbers. You are refusing to cooperate with either of these requests. At this time, it looks like our only option is to move forward with the only option you seem agreeable with. That is for you to provide callers the new On Call telephone numbers (866-816-2073 and 603-328-1752) when they call. We do not feel this is the best approach, especially in the case of an emergency, and we want to be clear that this is not our choice. In the event of a loss or claim based on your decision to handle the callers in this manner, we will look to Medex for defense and indemnity under section 14 of our current agreement.

Mr. David L. Mair
December 8, 2006
Page 2 of 2

We also discussed the reimbursement to AGIA of the unearned fees. You indicated it would be a challenge to do that upon termination as our contact requires, which would be January 1st. You indicated you would need a complete accounting of fees earned and unearned prior to January 1st in order to do that. At this point, we have paid Medex for services through October. Your fees for services rendered in November are due January 1st, and the December fees are due February 1st. Next week, I will send you a complete summary of the unearned fees due to AGIA through October that equals the previously mentioned $790,457, and also the fees due for services provided by Medex in November and December. This should provide you with ample time to provide us a reimbursement for unearned fees due us less the fees earned by you for November and December, and to do that on or before January 2nd.

You indicated it was your desire to make the transition complete and clean on January 1st. As long as our customers receive the transition they need, we agree with you. Thank you for your past service.

Sincerely,


David H. McCarty
Executive Vice President

**MEDEX Global Group, Inc.**
8501 LaSalle Road | Suite 200 | Baltimore, MD 21286
p 800-537-2029  f 410-453-6301
www.medexassist.com



**MEDEX**®

Via Electronic Mail

December 15, 2006

David McCarty
Executive Vice President
AGIA
7950 Main Street North, #215
Maple Grove, MN 55369

Re: MEDEX Service Agreement

Dear Dave:

This will serve to summarize our telephone conversation from December 6, 2006 and reply to your December 4 and 8, 2006 letters. I appreciate you taking the time for our conversation.

We discussed MEDEX's intent for answering calls from existing EA+ participants beginning on January 1, 2007. You were under the false impression that calls would not be answered. As shared with you on November 29 and again on December 1, dependent on the number dialed, callers will either be answered by a coordinator or a voice message. Since you did not accept our proposal to continue to provide services for existing participants, callers will be given the new numbers you provided for On Call International. As we agreed, MEDEX will continue to support cases involving ongoing medical evacuations until the conclusion of the medical transportation.

Second, we discussed the timing for the unearned portion of the fees. You said that you had an estimated year end calculation. I reiterated MEDEX's position, which you asked specifically I reduce to writing for you. You indicated that you did not mind that this would be repetitive. Therefore, I share again the following excerpt from my December 1 letter, from which I paraphrased during our call:

> Regarding calculation and return of unearned revenue, we agree this is contemplated by Section 9D of the Service Agreement. The January 2, 2007 date expressed in your November 16 letter is, however, impracticable. At that date, MEDEX will not have received a complete report or fees for sales during the preceding two months. The Service Agreement provides that AGIA has up to 60 days following receipt of collected fees to remit the fees to MEDEX. Thereby, the last date for submission of reports and fees is March 1, 2007. As discussed, we will calculate unearned revenue beginning on March 2. Since the Service Agreement is silent with regard to the timing for return of unearned fees, we will use a corresponding 60 day period, which was viewed as a reasonable time, for payment of the unearned amount. We agreed that if AGIA was able to confirm and remit fees earlier than 60 days, we would use the date following our receipt of the fees as an alternative start date for our calculations.

Our counsel has opined that "Upon termination" is reasonably interpreted as an obligation to return the unearned portion of the fees following the end of active performance obligations associated with the Service Agreement. We agree and have proposed what we believe is a reasonable timing following receipt of the last remittance, the final requirement of AGIA to conclude its active

TRAVEL WITH **CONFIDENCE**

obligations. So that there are no questions as to the amount, we intend to engage an independent review. Our proposal included our willingness to accelerate the start of our calculation based on the date we receive final payment. In essence, AGIA controls how quickly the calculation will begin and, accordingly, how soon payment can be made.

We read with interest your comments regarding Rob Currie's apparent rejection of AGIA's request that MEDEX continue to support existing program participants. We will generally reserve our recitation of the facts. However, we disagree with your statements, noting in particular that the dates cited in your letter occurred before AGIA informed us you were exercising termination. When talking with Deneen and me on November 29, you commented this was an interesting third alternative you had not considered. The incongruity is striking to us.

In each of your November 29, December 4 and December 8 letters, you state that you have numbers established (866-816-2073 and 603-328-1752) and you are notifying clients of the change. You have and are implementing a solution. That you are not completely comfortable your solution will yield the desired service result is a consequence of AGIA's decision to change providers and your transition preparations. We proposed two alternatives, a run-out solution, under which participants would see no direct effect of your change in providers or the option you seem to prefer of providing your new numbers to callers. It is curious to us that the lack of confidence in your solution and the assertion that declining further provision of services for which we are no longer contracted are characterized as grounds for seeking indemnity. Remember, it is AGIA who dismissed MEDEX, not the contrary.

Our remaining positions on other issues remain as described in our letter of December 1, 2006. We asked if you had any questions about other matters in the call, and you said you did not. Consequently, we conclude that you now understand and accept those positions and that they require no further discussion.

Please let me know if you have questions.

Sincerely,

David L. Mair
Director, Client Relations

DLM:

cc:  Bruce Kirby
     Deneen Detorie
     John Wigle
     Bill Stoeri, Dorsey & Whitney



8501 LaSalle Road | Suite 200 | Baltimore, MD 21286
p 800-537-2029  f 410-453-6301
www.medexassist.com

<u>Via Electronic Mail</u>

December 15, 2006

David McCarty
Executive Vice President
AGIA
7950 Main Street North, #215
Maple Grove, MN 55369

Re: MEDEX Service Agreement

Dear Dave:

This will serve to summarize our telephone conversation from December 6, 2006 and reply to your December 4 and 8, 2006 letters. I appreciate you taking the time for our conversation.

We discussed MEDEX's intent for answering calls from existing EA+ participants beginning on January 1, 2007. You were under the false impression that calls would not be answered. As shared with you on November 29 and again on December 1, dependent on the number dialed, callers will either be answered by a coordinator or a voice message. Since you did not accept our proposal to continue to provide services for existing participants, callers will be given the new numbers you provided for On Call International. As we agreed, MEDEX will continue to support cases involving ongoing medical evacuations until the conclusion of the medical transportation.

Second, we discussed the timing for the unearned portion of the fees. You said that you had an estimated year end calculation. I reiterated MEDEX's position, which you asked specifically I reduce to writing for you. You indicated that you did not mind that this would be repetitive. Therefore, I share again the following excerpt from my December 1 letter, from which I paraphrased during our call:

> Regarding calculation and return of unearned revenue, we agree this is contemplated by Section 9D of the Service Agreement. The January 2, 2007 date expressed in your November 16 letter is, however, impracticable. At that date, MEDEX will not have received a complete report or fees for sales during the preceding two months. The Service Agreement provides that AGIA has up to 60 days following receipt of collected fees to remit the fees to MEDEX. Thereby, the last date for submission of reports and fees is March 1, 2007. As discussed, we will calculate unearned revenue beginning on March 2. Since the Service Agreement is silent with regard to the timing for return of unearned fees, we will use a corresponding 60 day period, which was viewed as a reasonable time, for payment of the unearned amount. We agreed that if AGIA was able to confirm and remit fees earlier than 60 days, we would use the date following our receipt of the fees as an alternative start date for our calculations.

Our counsel has opined that "Upon termination" is reasonably interpreted as an obligation to return the unearned portion of the fees following the end of active performance obligations associated with the Service Agreement. We agree and have proposed what we believe is a reasonable timing following receipt of the last remittance, the final requirement of AGIA to conclude its active

TRAVEL WITH **CONFIDENCE**

obligations. So that there are no questions as to the amount, we intend to engage an independent review. Our proposal included our willingness to accelerate the start of our calculation based on the date we receive final payment. In essence, AGIA controls how quickly the calculation will begin and, accordingly, how soon payment can be made.

We read with interest your comments regarding Rob Currie's apparent rejection of AGIA's request that MEDEX continue to support existing program participants. We will generally reserve our recitation of the facts. However, we disagree with your statements, noting in particular that the dates cited in your letter occurred before AGIA informed us you were exercising termination. When talking with Deneen and me on November 29, you commented this was an interesting third alternative you had not considered. The incongruity is striking to us.

In each of your November 29, December 4 and December 8 letters, you state that you have numbers established (866-816-2073 and 603-328-1752) and you are notifying clients of the change. You have and are implementing a solution. That you are not completely comfortable your solution will yield the desired service result is a consequence of AGIA's decision to change providers and your transition preparations. We proposed two alternatives, a run-out solution, under which participants would see no direct effect of your change in providers or the option you seem to prefer of providing your new numbers to callers. It is curious to us that the lack of confidence in your solution and the assertion that declining further provision of services for which we are no longer contracted are characterized as grounds for seeking indemnity. Remember, it is AGIA who dismissed MEDEX, not the contrary.

Our remaining positions on other issues remain as described in our letter of December 1, 2006. We asked if you had any questions about other matters in the call, and you said you did not. Consequently, we conclude that you now understand and accept those positions and that they require no further discussion.

Please let me know if you have questions.

Sincerely,

David L. Mair
Director, Client Relations

DLM:

cc:  Bruce Kirby
     Deneen Detorie
     John Wigle
     Bill Stoeri, Dorsey & Whitney



December 22. 2006

Please reply to
our Santa Barbara Office:
311 E. Carrillo Street
Santa Barbara, CA 93101
T: 805-966-2940
F: 888-453-1535
E: MSchley@slglegal.com

By Email:  stoeri.bill@dorsey.com
and FAX:  (612) 340-8800

William R. Stoeri
Dorsey & Whitney LLP

Re:  Medex Assistance Corp. / A.G.I.A,. Inc.

Dear Bill:

I have been unable to reach you to follow up on our 8:00 a.m. teleconference yesterday. and. given the urgency of the pending issues, I must use this more formal written communication to address our position on the two open issues between our clients.

### Unearned Fees

Yesterday morning you offered for your client to place the unearned fees it holds into an interest-bearing trust account. held by a mutually acceptable custodian, until the parties agree upon a final accounting.  Though you did not mention a figure, I assume you are referring to the $790.457 in unearned fees currently held by your client.

This offer goes a long way toward resolving AGIA's concerns.  However, I would like to propose an alternative. simpler path.  I generally agree that a trust or escrow account may be appropriate to hold an amount in dispute until the dispute is resolved: however. $790.457 is not the amount in dispute between the parties.  AGIA is requesting a smaller net payment of $733.078.[1] but even that smaller amount is not the amount in dispute.  Whatever concerns your client might have about the accuracy of AGIA's reported numbers. the disputed amount could not be more than a few thousand dollars. I'm sure your client would agree.  This is a business that has been conducted between the parties for seven years. with the numbers being fairly predictable.

I therefore ask you to consider whether it would be far more efficient for Medex to pay an agreed estimated net figure in the vicinity of $733.078 on January 2. with an accounting and true-up settlement to occur by January 15. and avoid the need for a third-party trust arrangement.  Please consider this alternative and let us know whether it would be satisfactory to your client.  Further.

---

[1] $790,457 is the amount of fees paid to Medex through October 31 that will be unearned as of December 31.  An offsetting factor is the amount AGIA will owe Medex for November and December earned fees, estimated by AGIA to be $57,379.  Thus, AGIA believes Medex owes approximately $733,078.

please confirm that, whether an estimated net figure is paid as we propose, or a trust account or some other device is to be used, Medex will be funding the agreed payment on January 2, 2007.

### Member Data

Yesterday morning you restated your position that Medex is entitled to use the member data for future solicitations. To paraphrase your position as I understand it, you believe that this use is permitted because the contract does not specifically prohibit it.

To restate our position, we believe any such use would violate both the confidentiality clause of the agreement and the express prohibition in Appendix A on Medex doing business with AGIA's clients. Furthermore, we believe the member data is a trade secret as defined in the Uniform Trade Secrets Act[2] because it is confidential, it has value derived from its confidentiality, and AGIA uses reasonable efforts[3] to safeguard the confidentiality of the data. Any use of the data for competing solicitations would therefore be a misappropriation of trade secrets subject to sanctions under the act, including injunctive relief, punitive damages and recovery of attorneys' fees.

Our conclusions regarding the proper interpretation of the contract and the status of the member data as protected trade secrets are further supported by the regulatory and contractual context of the parties' relationship. AGIA's provision to Medex of the member data is governed by the privacy provisions of the Gramm-Leach-Bliley Act ("GLBA"),[4] which generally requires that a consumer be provided a notice and opportunity to "opt out" of the use of the consumer's personal information[5] and, in any case, requires that AGIA maintain a contract with each third-party provider imposing confidentiality requirements and use restrictions on any third-party provider such as Medex. Furthermore, state insurance laws impose consumer privacy protections on licensed insurance administrators such as AGIA,[6] requiring AGIA in turn to protect consumer data that is given to a third-party provider such as Medex. Finally, AGIA's client contracts consistently prohibit a third-party vendor's use of the member data by a third-party provider for any use other than the programs authorized by the client. After reflecting on its duties under these laws and its client contracts, AGIA realizes that it has no option to leave the member data in the hands of a third-party provider for any purpose other than the purposes of

---

[2] *Md. Comm'l L. C.§§11-1201 et seq.; Cal. Civ. C. §§3426 et seq.* We will cite here to both Maryland and California law, as either might apply to the threatened misappropriation in this case.

[3] For example, the member information sent by AGIA to Medex is encrypted for protection.

[4] 15 USC §§6801 et seq.

[5] Even though the member data in question here is fairly basic (name, DOB, address, etc), it is still "nonpublic personal information" protected by GLBA because it is taken from a consumer's subscription application.

[6] To give guidance to the state insurance regulators in implementing the GLBA privacy requirements for the insurance industry, the National Association of Insurance Commissioners ("NAIC") issued a model privacy regulation in September 2000, titled *Privacy of Consumer Financial and Health Information Model Regulation* ("Model Privacy Regulation"). Forty states, plus the District of Columbia and Puerto Rico, have promulgated regulations based on the Model Regulation. In April 2002, the NAIC issued its *Standards for Safeguarding Customer Information Model Regulation*, which has become the basis for 33 states' laws on protection of customer information. In addition, 17 states (including some of the states that have adopted the Model Privacy Regulation) have privacy laws based on the NAIC's earlier *Insurance Information and Privacy Protection Model Act.* Consequently, all 50 states plus the District of Columbia and Puerto Rico have laws that mandate privacy protections that equal or exceed GLBA's requirements.

*Mr. William R. Stoeri*                                                        *Page 3*
*December 22, 2006*

the service agreement. particularly when the third-party provider is asserting other rights to use the data.

You offered yesterday that your client would agree to give AGIA some appropriate period of notice before beginning to use the member data to solicit sales. For the reasons stated above. AGIA has decided that this solution is not acceptable. AGIA should not be put in the position of having to initiate a court action at a future date to maintain control of its own proprietary data. As far as we can determine. Medex has no foreseeable need for any of the member data other than the information relating to actual cases serviced by Medex. We understand that this represents perhaps as few as a two dozen members. out of approximately 80.000 total member data files. Accordingly. AGIA will demand the return of all member data involving members who have not been cases actually serviced by Medex. no later than January 15. 2007. and will require that Medex maintain the confidentiality of the remaining case data and not use it for commercial or marketing purposes. AGIA will agree, of course. to provide access to the returned data should Medex demonstrate any legitimate need for such information, even though we cannot anticipate now what that need might be.

I am writing to you because I have been unable to reach you by telephone. Your and Medex' silence. in the context of negotiating these urgent issues, indicates to us and AGIA the potential that Medex has plans other than good faith compliance with its obligations. Unless we receive a satisfactory response to this letter by close of business on Wednesday, December 27. AGIA will have no alternative but to commence the dispute resolution procedure specified in the contract and to seek interim injunctive relief. In addition to an injunction and damages. AGIA will seek an award of attorney's fees as provided by the contract and by the UTSA. Your client may avoid a preliminary injunction by providing its written agreement. no later than Wednesday. December 27. that it will not use the member data for any commercial. marketing, sales or solicitation purposes pending final arbitration of the parties' dispute.

Our clients' contract provides for mediation of this dispute. AGIA is willing. of course. to comply with this requirement. At the same time. we believe mediation might not be a productive use of both parties' money, given the extensive negotiations that have already occurred. If Medex will not be agreeing to the propositions set forth in this letter by Wednesday. please let us know whether you agree that mediation is unnecessary. as we will need to know whether to initiate mediation or arbitration. Further. if you will request mediation. and have any preferences regarding the forum for mediation. please call my partner Ian Guthrie (direct dial (805) 966-2985) to discuss appropriate mediation arrangements.

Sincerely.

Michael D. Schley                                           Cc: Ian M. Guthrie



DORSEY

F. MATTHEW RALPH
(612) 492-6964
FAX (612) 340-2868
ralph.matthew@dorsey.com

December 29, 2006

<u>VIA EMAIL AND POSTAL SERVICE</u>

Michael D. Schley
Schley Look & Guthrie LLP
311 E. Carrillo Street
Santa Barbara, CA 93101

      Re:    MEDEX Assistance Corp./AGIA, Inc.

Dear Mike:

      This letter relates to our telephone conference on December 27, 2006 in which we discussed issues raised in your December 22, 2006 letter to Bill Stoeri. We agreed that, by December 29, 2006, MEDEX would evaluate and respond to your arguments, some of them raised for the first time, that MEDEX cannot contact individuals who have previously purchased travel assistance products serviced by MEDEX. In addition to responding to those arguments, this letter summarizes the other issues we discussed by telephone.

      1.    <u>Member Data Issue.</u> Your December 22, 2006 letter claims that MEDEX's use of member data is prohibited by the confidentiality clause (¶ 12) and Addendum A of the Service Agreement, by the Uniform Trade Secrets Act ("UTSA"), by the Gramm-Leach-Bliley Act ("GLBA"), by state insurance laws, and by AGIA's other client contracts. We believe these arguments lack merit for many reasons, including the following:

- Paragraph 12 of the Service Agreement limits MEDEX's disclosure of member data. It does not limit MEDEX's use of member data;

- Addendum A prohibits MEDEX from communicating directly with "representatives" of AGIA's clients. Addendum A does not prohibit MEDEX from contacting members of AGIA's clients;

- We do not believe that the information at issue is a trade secret under the Maryland UTSA, or that MEDEX owes a duty not to use the data;

- The GLBA does not prohibit MEDEX's use of the member data and, in any event, does not create a private right of action;

- You have not cited any specific state insurance laws prohibiting MEDEX's use of member data. You state only that such laws require AGIA to protect such data;

DORSEY & WHITNEY LLP · WWW.DORSEY.COM · T 612.340.2600 · F 612.340.2868
SUITE 1500 · 50 SOUTH SIXTH STREET · MINNEAPOLIS, MINNESOTA 55402-1498
USA CANADA EUROPE ASIA



Michael D. Schley
December 29, 2006
Page 2

- We do not see the relevance of AGIA's other client contracts to the parties' rights and duties under the Service Agreement.

As we discussed, MEDEX has not yet decided whether it will exercise its right actively to solicit persons who previously purchased MEDEX products. MEDEX has offered to provide at least 14 days' notice to AGIA of any prospective use. You told me that this offer was unacceptable to AGIA and that, unless MEDEX returns the member information or promises not to use it pending final arbitration of the parties' dispute, AGIA would move for a preliminary injunction. MEDEX believes its offer moots any basis for seeking injunctive relief, but we stand ready to respond to whatever action you bring.

2.      Unearned Fee Issue.   The Service Agreement does not require that MEDEX pay an estimated amount of unearned fees to AGIA at any time, much less by January 2. For this reason, MEDEX will not make any payment to AGIA, or to a trust account, by that date. MEDEX is willing to entertain a concrete proposal to use an interest-bearing trust account, but MEDEX insists that any calculation of unearned fees be based on final figures, not estimates. The date on which MEDEX will remit unearned fees, either into a trust fund or to AGIA directly, is therefore contingent upon the date when AGIA provides final figures. As we discussed, MEDEX has reason to believe the November and December figures will not be consistent with historical figures. Since our discussion, I have learned that MEDEX has also found discrepancies between AGIA's reports and the checks it has remitted for the January-to-October period. MEDEX thus has reason to believe that AGIA's figures for that period are not yet final.

3.      Mediation.   As we discussed, MEDEX does not waive the mediation component of the dispute resolution provision of the Service Agreement (¶ 16). You agreed to send a mediation proposal for MEDEX's consideration, including proposed locations, names of potential mediators, and any procedures AGIA would prefer.

4.      Service of Process.   As we discussed, Dorsey & Whitney LLP is not authorized to accept service of process on behalf of MEDEX.

Please call me if you would like to discuss any aspect of this letter.

Sincerely,

*Matt Ralph*

F. Matthew Ralph

cc:     David L. Mair
        Bill Stoeri



## SCHLEY LOOK & GUTHRIE LLP
### ATTORNEYS AT LAW

December 29, 2006

Please reply to<br>
our Santa Barbara Office:<br>
311 E. Carrillo Street<br>
Santa Barbara, CA 93101<br>
T: 805-966-2940<br>
F: 888-453-1535<br>
E: MSchley@slglegal.com

By Email:  Ralph.matthew@dorsey.com
and FAX:  (612) 340-8800

Matthew Ralph
Dorsey & Whitney LLP

Re: Medex Assistance Corp. / A.G.I.A., Inc.

Dear Matt:

I am writing with a proposal for mediation of our clients' disputes:

**Provider:**     JAMS (www.jamsadr.com).  Alternatively, AAA.

**Location:**     Los Angeles or Washington DC.

**Procedure:**     No formal procedure – no written briefs, argument schedule, or the like.  We propose simply that each party's CEO participate in person, along with counsel, in one or more sessions with the chosen mediator to negotiate a settlement of the matters in dispute.  Alternatively, we could follow the procedures offered by the provider.

This proposal gives you options as to provider, location and procedure.  Please let us know by Wednesday if one of these options is acceptable, so that we may commence the process and choose a mediator.

Sincerely,

Michael D. Schley                                        Cc:  Ian M. Guthrie



# SCHLEY LOOK & GUTHRIE LLP
A T T O R N E Y S   A T   L A W

Please reply to<br>
our Santa Barbara Office:<br>
311 E. Carrillo Street<br>
Santa Barbara, CA 93101<br>
T: 805-966-2940<br>
F: 888-453-1535<br>
E: MSchley@siglegal.com

December 29, 2006

By Email:  ralph.matthew@dorsey.com
and FAX:  (612) 340-8800

F. Matthew Ralph
Dorsey & Whitney LLP

Re:  Medex Assistance Corp. / A.G.I.A.. Inc.

Dear Matt:

I am writing with a proposal for a trust account for unearned premiums:

| | |
|---|---|
| **Trustee:** | Dorsey & Whitney. LLP.  Alternatively, Nasif. Hicks. Harris & Co.. CPAs. Santa Barbara. CA.\* |
| **Trustee's Duties:** | Hold cash deposited by Medex, in a segregated trust account. Invest it in accordance with the parties' instructions in an interest-bearing bank account or comparably safe investment. |
| **Timing:** | AGIA will deliver to Medex a final report for December activity. no later than January 15. 2007.  Medex will fund the account within three business days of receiving AGIA's report.  If this timing is not acceptable. please be specific about what would be acceptable. |
| **Amount:** | The amount funded will equal $790.457 minus the fees due to Medex for November and December 2006 subscriptions. as reported by AGIA.  AGIA has already shown how this figure will be derived and given its estimate that the net amount owed will be $733.078.  If you do not agree with this method of calculation, please tell us what amount Medex is proposing to deposit in the trust account. |

---

\* Nasif, Hicks, Harris & Co. are the independent auditors of AGIA. They have expressed willingness to hold the trust fund, subject to their confirmation that this role would not affect their ability to continue serving as independent auditors of AGIA (which they can confirm promptly, if chosen).

---

*Mr. F. Matthew Ralph*
*December 29, 2006*

*Page 2*

**Disbursement:**   The trustee will disburse the funds according to the written authorization of both parties.  If an arbitration decision is issued, the trustee will pay the amount found due to AGIA, and remit any balance to Medex.

Please let us know by Wednesday if this trust arrangement will be acceptable and which trustee your client would choose.

Sincerely,

Michael D. Schley

Cc:  Ian M. Guthrie



Please reply to
our Santa Barbara Office:
311 E. Carrillo Street
Santa Barbara, CA 93101
T: 805-966-2940
F: 888-453-1535
E: MSchley@slglegal.com

December 29, 2006

By Email:  ralph.matthew@dorsey.com
and FAX:  (612) 340-8800

F. Matthew Ralph
Dorsey & Whitney LLP

Re:  **Medex Assistance Corp. / A.G.I.A., Inc.**

Dear Matt:

I am writing with a proposal for a trust account for unearned premiums:

**Trustee:**  Dorsey & Whitney, LLP.  Alternatively, Nasif, Hicks, Harris & Co., CPAs, Santa Barbara, CA.[*]

**Trustee's Duties:** Hold cash deposited by Medex, in a segregated trust account. Invest it in accordance with the parties' instructions in an interest-bearing bank account or comparably safe investment.

**Timing:**  AGIA will deliver to Medex a final report for December activity, no later than January 15, 2007.  Medex will fund the account within three business days of receiving AGIA's report.  If this timing is not acceptable, please be specific about what would be acceptable.

**Amount:**  The amount funded will equal $790,457 minus the fees due to Medex for November and December 2006 subscriptions, as reported by AGIA.  AGIA has already shown how this figure will be derived and given its estimate that the net amount owed will be $733,078.  If you do not agree with this method of calculation, please tell us what amount Medex is proposing to deposit in the trust account.

---

[*] Nasif, Hicks, Harris & Co. are the independent auditors of AGIA.  They have expressed willingness to hold the trust fund, subject to their confirmation that this role would not affect their ability to continue serving as independent auditors of AGIA (which they can confirm promptly, if chosen).

*Mr. F. Matthew Ralph*                                                                                    *Page 2*
*December 29, 2006*

**Disbursement:**   The trustee will disburse the funds according to the written authorization of
both parties.  If an arbitration decision is issued, the trustee will pay the
amount found due to AGIA, and remit any balance to Medex.

Please let us know by Wednesday if this trust arrangement will be acceptable and which trustee
your client would choose.


Sincerely,



Michael D. Schley                                                        Cc:  Ian M. Guthrie



F. MATTHEW RALPH
(612) 492-6964
FAX (612) 340-2868
ralph.matthew@dorsey.com

January 9, 2007

<u>VIA EMAIL AND FIRST-CLASS MAIL</u>

Michael D. Schley
Schley Look & Guthrie LLP
311 E. Carrillo Street
Santa Barbara, CA 93101

     Re:    MEDEX Assistance Corp./AGIA, Inc.

Dear Mike:

     On December 29, 2006 you sent me two proposals relating, respectively, to use of a trust account for handling unearned fees and to mediation. This letter responds to both of your December 29, 2006 proposals.

<u>TRUST ACCOUNT</u>

     Since receiving your trust account proposal, our clients have apparently resolved the unearned fees issue. Subject to MEDEX's receipt of actual sales information and enrollment reports by January 15, MEDEX has agreed to pay all unearned fees to AGIA no later than February 28. Please confirm that AGIA agrees to these terms.

<u>MEDIATION</u>

     Thank you for your mediation proposal. Before MEDEX responds, however, it would like additional information as to what AGIA believes the scope of mediation would be. Please identify all of the issues AGIA would like to mediate, in as much detail as possible. If the only remaining issue is MEDEX's right to use member information, MEDEX would be willing to waive mediation and proceed to arbitration.

     Furthermore, if the only issue relates to member information, MEDEX would be willing to agree to use of the AAA emergency relief provisions in order to prevent the parties from incurring unnecessary costs related to a court action for preliminary injunction. As we have indicated, however, we do not see a need for injunctive relief, nor do we think it would be granted for the following reasons:

     •    The member information that MEDEX possesses is extremely limited. MEDEX does not possess information pertaining to all members of any AGIA client. MEDEX possesses information pertaining only to that small portion of members who purchased products serviced by MEDEX. Furthermore, the information in

DORSEY & WHITNEY LLP · WWW.DORSEY.COM · T 612.340.2600 · F 612.340.2868
SUITE 1500 · 50 SOUTH SIXTH STREET · MINNEAPOLIS, MINNESOTA 55402-1498

USA   CANADA   EUROPE   ASIA



Michael D. Schley
January 9, 2007
Page 2

> MEDEX's possession is not intrinsically valuable or confidential. The information consists almost exclusively of contact information; it does not include social security numbers, financial information, or medical information.

- MEDEX has not decided whether it will even use this limited member information. MEDEX's mere possession of this information, absent use, is not an irreparable harm to AGIA. As AGIA has acknowledged, MEDEX has legitimate reasons for retaining this information for such ongoing business purposes as audit, compliance, case records, and individual correspondence.

- MEDEX does not propose to disclose member information to third parties. The only issue is MEDEX's use of member information to contact members who formerly purchased products serviced by MEDEX.

- MEDEX has agreed to provide AGIA 14 days' notice of any prospective use of member information to contact members. MEDEX further agrees that it will not use member information to contact members while any motion for injunctive relief is pending. The 14-day notice period is more than sufficient to allow AGIA to seek injunctive relief, should the need arise.

The members at issue have previously bought products serviced by MEDEX. They are aware that MEDEX has information about them. The purpose of contacting these members would be to ask whether they would like to purchase such products again. In these circumstances, the proposed contacts would not be intrusive and would be related to legitimate business purposes.

Sincerely,

F. Matthew Ralph

cc:    David L. Mair
       Bill Stoeri

January 9, 2007

Transcript of EA+ Phone Message
877-565-2542

Hi, this is Jackie at MEDEX with an important message for EA+ participants.
For the past seven years MEDEX has been honored to provide benefits behind EA+.  The
many complements shared with us confirm the value of your association found in our
work.  Thank you.

Effective January 1st your group administrator made a change, and MEDEX is no longer
working with EA+.  We will give you the number for the new company in just a moment

As a leader in travel assistance MEDEX offers you and your family, programs that let
you peg the price and benefits that best fit your travel needs.  Whether it is for one trip or
for one year, we would love to help you.

To learn more please call, 410-453-6367.  To reach the new provider please call On Call
International collect at 603-328-1752 or toll free in the U.S. at 866-816-2073.

To repeat this message please press 1 now.



F. MATTHEW RALPH
(612) 492-6964
FAX (612) 340-2868
ralph.matthew@dorsey.com

January 9, 2007

BY EMAIL AND FIRST-CLASS MAIL

Michael D. Schley
Ian M. Guthrie
Schley Look & Guthrie LLP
311 E. Carrillo Street
Santa Barbara, CA 93101

     Re:   MEDEX Assistance Corp./AGIA, Inc.

Dear Mike and Ian:

     In our telephone conversation earlier today, you objected to the fact that MEDEX has a recorded message on its phone lines, part of which informs callers that, if they are interested in obtaining more information about MEDEX products or services, they may contact MEDEX at a particular website or telephone number. You did not articulate any legitimate basis for objection and there is none. By using this recorded message for answering incoming calls to it, MEDEX is not contacting members, let alone representatives of AGIA client groups. Nor is MEDEX using member information. The recorded message is not inconsistent with any provision of the Service Agreement or with any representations to AGIA. The message simply provides those calling MEDEX with the option to contact MEDEX at a different number if they are interested. Your suggestion that MEDEX is acting improperly by offering this option on its own phones lines to persons calling it who have previously purchased its products is meritless.

     Certainly this recorded message for incoming calls involves none of the concerns you raised in prior conversations, i.e. sale of customer lists resulting in cold calls to members who have no interest in products. MEDEX only offers its products and services to callers who ask about them first. None of the eight persons, excluding Ian Guthrie, who have called since January 1, 2007 have asked about products or services.

     AGIA has no basis for objecting to this recorded message. MEDEX stands by its promise to provide AGIA 14-days notice of any prospective use of member information to solicit members. As to your email threatening to file in federal district court in Washington, DC, please

DORSEY & WHITNEY LLP · WWW.DORSEY.COM · T  612.340.2600 · F  612.340.2868
SUITE 1500 · 50 SOUTH SIXTH STREET · MINNEAPOLIS, MINNESOTA 55402·1498

4818-4953-0881\1 1/9/2007 3:22 PM        USA  CANADA  EUROPE  ASIA



Michael D. Schley. Ian M. Guthrie
January 9. 2007
Page 2

see my letter to Mike Schley earlier today. in which MEDEX agrees to use the emergency relief
provisions of the AAA rules if the only remaining issue relates to the member information.

Sincerely.

F. Matthew Ralph

cc:     David L. Mair
        Bill Stoeri

DORSEY & WHITNEY LLP



| HOME | ABOUT US | WHO WE SERVE | ADVICE & INFO | NEWS ROOM | CONTACT US | Call 1-800-537-2029 to learn more |

MEDEX HOME / MEDEX GROUP / CONTACT US / Privacy Statement

MEDEX Global Group, Inc. (MEDEX) is committed to your right to privacy. As a visitor to our websites, you deserve the ability to control the uses of your Personal Information. This privacy statement discloses our privacy practices.

If you feel that MEDEX is not abiding by its posted privacy policy, you should contact us by addressing your concerns to privacy@medexassist.com.

**Personal Information Collection**

MEDEX collects Personal Information about you when you provide such information to us to purchase a product or service, become a member of one of our online resources or when this information is given to us by affiliated entities or third parties. "Personal Information" is information that would allow someone to identify or contact you, including, for example, your full name, address, telephone number, or e-mail address. In addition, depending upon the service that we provide, we may collect information about your travel plans, medical information to create an emergency medical record or when you call into our Emergency Response Center to open a case. Personal Information does not include aggregated or bundled information that, by itself, does not permit the identification of individual persons (such as statistics on the number of persons visiting the MEDEX website each month).

You provide certain Personal Information to us when you: (a) order products and services from MEDEX websites, (b) submit forms through the Member Center website (c) send other information to us through the "Feedback" interface, or (d) take an online survey . Your employer or an affiliated entity may provide information about you to us to provide you and your employer services, such as travel related services. When you choose to pay for MEDEX services by credit card, you will be required to provide us the name of your credit card issuer, credit card number and expiration date.

You may also wish to subscribe to one of our newsletters, receive a white paper or attend a Webinar for which you must opt in or enroll. At that point we ask for contact information such as name and e-mail address. Users who no longer wish to receive a future newsletter, notice of a new white paper or a future notification of a Webinar can unsubscribe when they receive it by clicking on a link at the bottom of the newsletter or notification. The user will then be given an opportunity to opt in or out of future newsletters or notifications and opt in or out of further periodic MEDEX communications.  When we hire vendors to deliver e-mails to you on our behalf, they cannot use your e-mail address for any other purpose.

E-mail forwarding functionality is provided in many of our communications. Using this functionality will forward the communication privately. However, if you use other forwarding methods, like those provided by your e-mail server, they may transfer personally identifiable information. These e-mail messages may contain "clear GIFs" (Graphics Interchange Format...a type of picture file used on the internet).   However, we do not collect personally identifiable information through "clear GIFs."

**Use of Personal Information**

MEDEX will use your Personal Information to provide you with services that you purchase, or services that are purchased by your employer or affiliate. These services are designed to provide tools for risk management, medical and security assistance. Your Personal Information may be transferred to affiliated entities that are performing services for MEDEX or acting as its agent. We will require that any such entities or persons providing services on behalf of MEDEX agree to protect the privacy of your Personal Information and use it only for the purposes for which the information is transferred.  MEDEX will not use or disclose your Personal Information except as described in this Statement unless you give us your permission to use or disclose it for other purposes. MEDEX will take reasonable steps to ensure that data is reliable and relevant for its intended use, accurate, complete, and current.

**Cookies**

MEDEX uses "cookies" to help you personalize your online experience. A cookie is a small text file that is placed on your hard disk by a web server. Cookies cannot be used to run programs or deliver viruses to your computer. Cookies are uniquely assigned to you, and can only be read by a web server in the domain that issued the cookie to you. Cookies enable us to track and target the interests of our users to simplify and enhance the experience on our site (i.e., pre-filling forms similar to those you may have already completed). Once the user closes their browser, the cookie information is no longer available through our server. You can set your browser to notify you when you receive a cookie, giving you the opportunity to decide whether to accept it. If a user rejects the cookie, they can still use our site.

**Log Files**

We use IP addresses in log files to analyze trends, administer the site, track a user's movements, and gather broad demographic information for aggregate use. Log files do not enable us to access personal identifying information, such as e-mail addresses.

**Links**

Our website contains links to other sites. Please be aware that MEDEX is not responsible for the privacy practices of such other sites. We encourage our users to be aware when they leave our site and to read the privacy statements of each and every website that collects personally identifiable information. This privacy statement applies solely to information collected at this website.

**Information Security**

MEDEX takes precautions to protect user information. When a user submits sensitive information via our web site, information is protected both online and off-line. MEDEX has implemented policies that forbid its employees from using or disclosing Personal Information in an inappropriate or unlawful manner and maintains security measures to safeguard Personal Information from unauthorized access, misuse, alteration, loss or destruction.

When an individual provides information (such as travel, health and activity information) through online forms, the information is protected using industry-standard SSL encryption. SSL is an acronym for Secure Sockets Layer, a protocol for transmitting private documents via the Internet. SSL works by using a private key to encrypt data transferred over an SSL connection.

MEDEX has an agreement with Thawte, an independent third party, that provides in order to provide its customers with the most secure way to collect and provide information. This assures MEDEX customers that we are who we say we are. It also assures that all information sent to and from this site is encrypted, protecting against disclosure to third parties.

**Correcting inaccuracies in Personal Information**

You can review the Personal Information that we have collected from you by using your password to access your record through our website. To update, delete or amend any Personal Information that we create and that we are able to change, simply contact us through privacy@medexassist.com or through the "Contact Us" link on our website.

**Changes to Privacy Policy**

MEDEX will update this policy from time to time. A "last revised" date will always be included on the bottom of the statement. To keep up-to-date with MEDEX's policy, please check this page periodically.

**Contacting the Website**

If you have any questions about this privacy statement, the practices of this site, or your dealings with this Website, you can contact us at privacy@medexassist.com.

Home  |  Site Map  |  About Us  |  Who We Serve  |  Advice & Info  |  News Room  |  Contact Us

US✈A          ⓘthawte          VeriSign          

TRAVEL WITH



**MEDEX**

Worldwide Travel Assistance & Travel Insurance



**GROUP**
- Corporations
- Scholastic Groups
- Insurance Companies
- Government Entities

**INDIVIDUAL**
- Leisure Travelers
- Business Travelers
- Scholastic Travelers
- Families

**ARE YOU ALREADY A MEMBER?**

username

password

Log in >

### Welcome to MEDEX Travel Insurance and Emergency Assistance
*Emergency Travel Assistance and International Medical Insurance*

Forgot user name?
Forgot user password?

MEDEX Global Group, Inc. is a recognized leader in emergency travel assistance and international medical insurance. Providing quality services to millions of members and hundreds of global organizations, MEDEX provides peace of mind to travelers and those who care about them.

#### Group Programs
The world's leading multinational corporations, USAID contractors, colleges and universities, and international organizations trust MEDEX for all of their travel preparation and emergency assistance needs. MEDEX offers customized global travel solutions from pre-travel intelligence and contingency planning to 24-hour emergency medical and security assistance, as well as evacuation and repatriation programs.

#### Individual Programs
Whether traveling for business or pleasure, savvy travelers never leave home without the protection of MEDEX, the world's strongest global safety net. Every MEDEX program includes an essential 24-hour, multilingual travel emergency service, providing help during emergency medical or security situations, replacement prescriptions, emergency travel arrangements, emergency evacuations, pre-travel advice and more. These affordable and comprehensive evacuation and repatriation and international medical insurance programs are easily available online or over the phone.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| A.G.I.A., Inc., | : | |
| Plaintiff, | : | |
| vs. | : | CA No.: 07-CV-105 RCL |
| MEDEX ASSISTANCE CORPORATION, | : | |
| Defendant. | : | |

## DECLARATION OF JOHN B. WIGLE

I, John B. Wigle, declare:

**1.** I am the chairman and president of A.G.I.A., Inc. ("AGIA").

**2.** I submit this declaration in support of AGIA's application for a temporary restraining order and/or preliminary injunction in aid of arbitration to enjoin Defendant MEDEX Assistance Corporation ("MEDEX") from violating its confidentiality obligations to AGIA, from misappropriating AGIA's trade secrets and from violating third party privacy rights. I have personal knowledge of the facts herein, except where indicated.

**3.** I have worked in executive, entrepreneurial and consulting roles in the insurance and marketing industries for three decades. I have earned and hold the RHU (registered health underwriter) designation.[*] During my tenure as the chief executive of AGIA, I have established AGIA as one of the largest privately held third-party marketer and administrator in the affinity marketplace. Under my direction, AGIA has grown from

---

[*] The RHU designation signifies that an individual working in the traditional health insurance marketplace or in the managed care industry has successfully completed a rigorous three-course program. In addition, students also must meet specified experience requirements, maintain ethical standards, and agree to comply with both The American College's Code of Ethics and Procedures and applicable continuing education requirements.

23 associates to more than 280 employees with offices in California, Arizona, Illinois,

Minnesota and Washington, DC.  I am active in national industry organizations,

including the Professional Insurance Marketing Association (PIMA). There are a

significant number of entities, both third-party administrators or brokers and carriers

themselves, serving the affinity insurance market, and this niche industry is therefore

very competitive. I am often asked to speak, consult or advise regarding industry topics

and practices in light of my extensive experience, and I consider myself qualified as an

expert in this area.

## INTERSTATE COMMERCE

4.  A.G.I.A., Inc. ("AGIA"), a California corporation, is an insurance

administrator and marketer. AGIA is domiciled in California. On information and belief,

MEDEX is domiciled in Maryland. AGIA has marketed the EA+ program (defined

below) to members of its affinity group clients in all 50 states and in the District of

Columbia. AGIA holds the insurance licenses required to conduct this business in all 50

states and in the District of Columbia. Under its Service Agreement with AGIA,

MEDEX has responded to EA+ emergency service calls from EA+ subscribers (the

"Eligible Members") traveling around the United States and in locations throughout the

world.

## AGIA'S AFFINITY GROUP BUSINESS

5.  AGIA's primary business is the development, marketing and administration

of insurance programs and similar programs sold to AGIA's clients, which are affinity or

membership groups. These are membership organizations involving some common field

of interest, such as recreational vehicle enthusiasts or war veterans.  AGIA's

representative clients include the Good Sam Club, the National Rifle Association, the Legionnaires Insurance Trust (serving members of the American Legion), the California State Employees' Association and the Marine Corps Association. AGIA has one or more contracts with each of these affinity group clients. These contracts generally provide that AGIA, or an affiliate company it designates, is appointed as an agent of the affinity group to perform product development, marketing and program administration services for the client, and is granted authority to use the affinity groups' membership lists for purposes of marketing AGIA's programs. AGIA must provide budgets and reports to the clients and must compensate the client in the form of a royalty or marketing or administration fees.

6. An essential element of each client contract is that AGIA is permitted access to the affinity group's confidential membership data, so that it may market AGIA programs to the members. AGIA uses the membership data to generate direct mail and other marketing campaigns targeted to group members. AGIA also advertises in affinity group publications.

7. AGIA's client contracts identify the membership data as confidential and proprietary information, and grant AGIA a license to use this confidential and proprietary information for marketing purposes. AGIA's contracts with its affinity group clients typically limit AGIA's use of the groups' membership lists solely to marketing the approved product and impose on AGIA a duty to maintain the confidentiality of the membership list and prohibit it from otherwise using or distributing the list. Thus, AGIA would be in breach of these agreements if it were to use the member data for any other purpose or if it were to provide the member data to any other party for such a purpose.

3                                   07-CV-105 RCL

### AGIA'S EA+ PROGRAM

**8.** Beginning in 1991, AGIA worked with its clients and with prospective service partners to develop a program to help travelers deal with medical emergencies. AGIA began marketing the program in 1993, working with service providers other than MEDEX. AGIA eventually branded its program "Emergency Assistance Plus" or simply "EA+." AGIA owns all intellectual property relating to the program, and filed with the US Patent and Trademark Office for registration of the "Emergency Assistance Plus" and "EA+" trademarks. Neither mark was ultimately registered, for technical reasons relating to eligibility for registration, but AGIA believes that it owns these marks and the goodwill associated therewith as against the rest of the world. AGIA developed the marks and has consistently used them in commerce since the early years of the program.

**9.** The EA+ program entitles an Eligible Member to worldwide 24-hour toll-free (or collect call) telephone assistance for locating appropriate medical care, emergency medical evacuation services, transportation after initial evacuation, repatriation of the Eligible Member to his or her home or community medical facility, return of mortal remains, and travel arrangements for dependents or family members, together with related services (all as described in the Plan Description a true and correct copy of which is attached as Exhibit 1.)

### AGIA'S MARKETING OF EA+

**10.** In promoting, marketing and administering the EA+ program for its clients, AGIA provides the following services:

      **a.**   As the affinity groups agent, AGIA performs these responsibilities:

- AGIA designs program benefits, limitations and services appropriate for marketing to the affinity group's members. For example, AGIA has developed a special program for Good Sam Club members that provide a subset of EA+ benefits tailored specifically to recreational vehicle ("RV") enthusiasts that are enrolled in Good Sam's Emergency Road Service program.

- AGIA makes arrangements with service providers, such as Defendant MEDEX Assistance Corporation ("MEDEX"), to provide services in support of the program.

- AGIA monitors the performance of the service provider, and reports to the affinity group its recommendations regarding keeping or changing the designated service provider.

b.  As the appointed marketer for the program, AGIA performs these responsibilities:

- AGIA creates in-house, or arranges for outside contractors to develop, all creative elements (marketing pieces, flyers, brochures, and the like) used to market the program.

- AGIA arranges all solicitation mailings.

- AGIA places advertisements in affinity group publications.

- AGIA creates an Annual Marketing Plan and budget.

- AGIA provides an analysis of the success of each marketing campaign to the client.

07-CV-105 RCL

- AGIA analyzes response data in order to isolate better-responding names from the membership lists for use in future solicitations.
- AGIA generally pays all marketing expenses.

c.   As the appointed administrator for the program, AGIA performs these responsibilities:

- AGIA receives and process all solicitation responses.
- AGIA generates from the solicitation responses a database of Eligible Members who have enrolled in the EA+ program.
- AGIA maintains the Eligible Members database on secure computer servers at its administrative facilities.
- AGIA processes all Eligible Member billings and renewals, and responds to related Eligible Member and client inquiries and service requests.

11. Pursuant to its affinity group client contracts, AGIA has conducted many mailings and advertising campaigns over the years, starting in 1992. AGIA estimates that the total membership base of affinity group clients that have endorsed EA+ numbers approximately **7.4 million members,** and all of these group members would have received solicitations for the EA+ program.

12. The cost to AGIA of developing and marketing the EA+ program since inception is not readily estimable, as much of this information is in archival storage. However, from 2002 – 2006 we estimate that AGIA has invested in excess of **$10.5 million** , comprised of:

- $4.9 million paid to affinity group clients in the form of royalties and other compensation.
- $5.6 million in marketing expenses (printing, paper, postage and other hard costs).

These figures do not include any value for the in-house design, marketing and product development efforts of AGIA.

13. EA+ Eligible Members subscribe in part based on the product endorsements provided by their affinity groups. For example, a Good Sam Club member knows that the Good Sam Club would not endorse the EA+ program without first satisfying itself regarding the suitability of the program for Good Sam Club members. Knowing this, a Good Sam Club member is more likely to purchase the product. AGIA has paid approximately $4.9 million to affinity group clients since 2002 for their endorsements of the EA+ program.

14. As a result of these efforts, **158,034** members of AGIA's affinity groups' 7.4 million members have signed up for the EA+ program since inception ( "Eligible Members"). This represents a historical penetration rate of approximately two percent. Of this amount, 92,754 were enrolled as of December 31, 2006. The difference between these numbers represents the results of ongoing additions (new Eligible Members) and attrition (Eligible Members who do not renew).

### AGIA'S RELATIONSHIP WITH MEDEX

15. During the period 1993-98, AGIA worked with different service providers that delivered different aspects of EA+ program services to the Eligible Members. MEDEX became the service provider on January 1, 1999.

**16.** On or about January 1, 2002, AGIA entered into a new contract (the "Service Agreement") with MEDEX Assistance Corporation to provide services in support of the EA+ program.  A true and complete copy of this Service Agreement, with two subsequent amendments, is filed under seal.  As described more fully in Addendum B of the Service Agreement, MEDEX provides to the EA+ Eligible Members worldwide 24-hour toll-free (or collect call) telephone assistance for locating appropriate medical care, emergency medical evacuation services, transportation after initial evacuation, repatriation of the Eligible Member to his or her home or community medical facility, return of mortal remains, and travel arrangements for dependents or family members, together with related services.

**17.** The Service Agreement includes the following confidentiality clause:

> 12. CONFIDENTIAL MATTERS:  Without prior written consent, neither AGIA nor MEDEX shall, at any time during or after termination of this Agreement cause or allow to be disclosed or divulged to any person, organization or news media representative, any information related to the business operations of the parties, including the terms and provisions, of, or a copy of, this Agreement and any exhibits or addenda attached hereto, the names and affairs of any eligible members if that information is designated by AGIA, MEDEX, eligible member or by law, custom or usage to be confidential or secret."

The Service Agreement also prohibits MEDEX from soliciting AGIA's clients.

> "The Participating or Prospective Groups listed below, along with their subsidiaries and affiliates, are clients and/or prospective clients of AGIA for the Emergency Assistance Plus plan (EA+), as described in the attachment to Addendum B.  MEDEX hereby agrees to work exclusively with AGIA on all MEDEX programs sponsored by a Participating or Prospective Group, including their subsidiaries or their affiliates. MEDEX and its employees, officers, and representatives will not communicate directly with representatives of these Participating or Prospective Groups unless AGIA authorizes MEDEX in writing to do so. This exclusive arrangement shall survive the termination of this agreement."

18. Since February, 1999, AGIA has provided to MEDEX, twice each month, a computer file meeting the following agreed specifications and contains the following fields of data for each Eligible Member who has enrolled or renewed, so that MEDEX could respond to Eligible Member calls. (Note that the report format was changed in 2005.):

| Data Fields – 2005 thru 2006 | Data Fields 2005 and earlier |
|---|---|
| 1    FIRST NAME | ('CERTIFICATE') |
| 2    INITIAL | ('FIRST NAME') |
| 3    LAST NAME | ('LAST NAME') |
| 4    COVERAGE | ('ADDRESS') |
| 5    EFF DATE | ('CITY') |
| 6    EXP DATE | ('STATE') |
| 7    CERTIFICATE | ('ZIP1') |
| 8    BIRTHDATE | ('ZIP2') |
| 9    ADDRESS | ('PHONE1') |
| 10   CITY | ('PHONE2') |
| 11   STATE | ('PHONE3') |
| 12   ZIP1 | ('BIRTHDATE') |
| 13   ZIP2 | ('EFF DATE') |
| 14   PAID TO DATE | ('PAID TO DATE') |
|  | ('BILLING STATUS') |
|  | ('COVERAGE') |

This data is hereinafter referred to as "Eligible Member Data."

19. Effective January 1, 2007, AGIA and MEDEX terminated the Service Agreement. This termination was at the instigation of AGIA, after it found that MEDEX' charges for its services were far higher than the fees charged by competitors, and after MEDEX had approximately one year's opportunity to propose more competitive contract terms.

20.  AGIA estimates that, since 1999, it has sent to MEDEX the complete set of Eligible Member Data for approximately 150,000 EA+ Eligible Members.  MEDEX has

denied our requests to return this data and destroy its copies. In fact it has asserted the right to use the data to solicit the sale of its own competing products and services to the Eligible Members, and it has actually begun soliciting sales of competing products and services to Eligible Members.

21. The EA+ subscription materials designed and mailed by AGIA, a sample of which is attached at Exhibit 2, clearly identify EA+ as endorsed or sponsored by the member's affinity group. MEDEX is merely a "service provider" and is also identified as an "administrator." These materials are purposely designed to permit AGIA to substitute other service providers and benefits, from time to time, as it has done in the past. Members do not believe they have a contract with MEDEX, but with the EA+ program provided by AGIA and their affinity group.

### EFFORTS TO MAINTAIN CONFIDENTIALITY

22. The affinity group lists from which AGIA developed the Eligible Member Data are not publicly available or ascertainable by MEDEX except by contracting with and paying the affinity groups for access. However, MEDEX would not be able to do this because AGIA typically has exclusive marketing relationships with its clients. So, as a practical matter, there is no legal way for MEDEX to obtain the membership lists.

23. The names of EA+ Eligible Members, and the address and contract information included in the Eligible Member Data are not publicly available nor are they readily ascertainable. As discussed above it has taken AGIA over a decade and the expenditure of over ten million dollars to distill the 7.4 million affinity group members to 158,034 EA+ Eligible Members. It is the Eligible Member Data for the approximately 150,000 EA+ Eligible Members that MEDEX holds that AGIA seeks to protect.

**24.** AGIA has taken all appropriate measures to protect the confidentiality of the Eligible Member Data for members subscribed to the EA+ Program. These measures include:

    **a.** The data is maintained by AGIA on secure servers, where the data is protected by the rigorous data security standards required for insurance administrators, including compliance with HIPAA data security standards mandated by the U.S. Department of Health & Human Services (at 45 C.F.R. Parts 160 et seq.) and insurance commissioners of the 50 states and the District of Columbia.

    **b.** AGIA takes other appropriate measures to protect the confidentiality of the Eligible Member Data, including appropriate confidentiality policies and agreements with its employees and contractors and employee training programs. Only AGIA employees and contractors supporting AGIA's functions have access to this data.

    **c.** When AGIA transmits the Eligible Members Data to MEDEX, it uses encryption software known as "PGP" secure file transfer to ensure that the data cannot be read or used by anyone other than the intended recipient. The file may be opened only with a private key delivered by AGIA to MEDEX.

    **d.** AGIA has included confidentiality and non-solicitation clauses in its Service Agreement with MEDEX, as it does with all of its third-party providers that obtain access to customer data.

**THE ELIGIBLE DATA HAS ECONOMIC VALUE**

**25.** The Eligible Member Data owned by AGIA and adversely possessed by MEDEX has significant economic value, especially in the hands of MEDEX, derived primarily from these factors:

      **a.**   The data is not publicly available, is confidential and is protected.

      **b.**   The list of Eligible Members represents approximately 150,000 individuals who have shown an interest in and willingness to purchase travel assistance services. This has been honed down from a total of 7.4 million members, at great expense and effort to AGIA. Any party wishing to sell travel-related services would find this list very valuable, as the likelihood of a positive solicitation response from this list is many times higher than from any other mailing list.

      **c.**   MEDEX knows AGIA's pricing. Therefore, it can simply undercut AGIA's price and solicit the Eligible Members for its competing program. MEDEX can undercut AGIA because it will have no development or marketing costs to recoup and no affinity group royalties to pay.

      **d.**   The purchase date and expiration date fields of the Eligible Member Data will permit MEDEX to prepare custom-tailored solicitations addressed to AGIA's EA+ members as the renewal date approaches for their EA+ contracts.

      **e.**   This is a highly loyal subset of one or more affinity group membership lists. The Eligible Members have placed their trust in an endorsement provided by their affinity group, and have shown their loyalty by purchasing the product. They are therefore likely to respond favorably to any solicitation coming from a party perceived to carry the endorsement or authorization of their affinity group. For example, because Good Sam members received the MEDEX telephone numbers in a direct mailing under the auspices of the Good Sam Club, they will expect that any offer they receive when calling that telephone number is endorsed by the Good Sam Club and that any solicitation coming from MEDEX will be endorsed by the Good Sam Club.

f.    MEDEX has been permitted under the Service Agreement to hold itself

out as a representative of AGIA's EA+ program and of the Eligible Members' affinity

groups. For example, MEDEX holds five toll-free numbers, each of which was

designated for servicing one or more specific affinity group clients of AGIA. The Good

Sam Club is one such affinity group with its own designated toll-free number.

Consequently, when Good Sam Club members have called this number, a MEDEX

employee has responded in a similar manner indicating that MEDEX is a representative

of the Good Sam EA+ program. As a result, Eligible Members will naturally assume that

a future sales offered from MEDEX is endorsed by their affinity group, when in fact it

would not be.

26. It is inconsistent for MEDEX' counsel to take the position the Eligible

Member Data "is not intrinsically valuable or confidential," as he does in his January 9,

2007 letter to AGIA's counsel (see Exhibit 15 and the declaration of Michael D. Schley,

filed herewith) when the website of MEDEX' marketing affiliate MEDEX Global Group,

Inc. (www.MEDEXassit.com) guarantees its own subscribers that their identities and

address are confidential. An excerpt is set out below and a print out of the applicable web

page is submitted as Exhibit 18.

> " MEDEX collects Personal Information about you when you provide such
> information to us to purchase a product or service, become a member of one of
> our online resources or when this information is given to us by affiliated entities
> or third parties. "Personal Information" is information that would allow someone
> to identify or contact you, including, for example, your full name, address,
> telephone number, or e-mail address…
>
> MEDEX will use your Personal Information to provide you with services
> that you purchase, or services that are purchased by your employer or affiliate.
> These services are designed to provide tools for risk management, medical and
> security assistance. Your Personal Information may be transferred to affiliated
> entities that are performing services for MEDEX or acting as its agent. We will
> require that any such entities or persons providing services on behalf of MEDEX

agree to protect the privacy of your Personal Information and use it only for the purposes for which the information is transferred.  <u>MEDEX will not use or disclose your Personal Information except as described in this Statement</u> unless you give us your permission to use or disclose it for other purposes."

(emphasis added.)

## MEDEX' BREACH AND THREATED MISAPPRORIATION WILL CAUSE IRREPARABLE HARM

27.  As set forth more fully in the Declaration of David H. McCarty filed herewith, MEDEX has threatened to use the Eligible Member Data for purposes of soliciting the sales of competing products and services to the Eligible Members. Furthermore, contrary to its own promises to AGIA, on January 1, 2007, it actually began soliciting sales to Eligible Members who were unknowingly calling the old MEDEX phone numbers instead of the new numbers provided by AGIA's new service provider.

28. By retaining the Eligible Member Data after termination with the expressed intent to solicit them, MEDEX has misappropriated it. My concern is MEDEX will use the Eligible Member Data to send a mailing to the Eligible Members explaining how MEDEX has served them for 7 years and can now offer them a new program. This is exactly what it has done with Eligible Members who called in after December 31 as explained in the declaration of David McCarty.

29. Based on MEDEX' threats and conduct, I believe MEDEX will be relying on the names, addresses, and other confidential information comprising the Eligible Member Data to induce the Eligible Members (all of which MEDEX knew to be the confidential, propriety information of AGIA) to contact or do business with the Eligible Members. Furthermore, MEDEX will continue breaching their contractual and legal duties by using

such confidential information and contacting such customers and attempt to have them purchase competing products that are not authorized by AGIA or by AGIA's affinity group clients.

30. Without an injunction, the existence of irreparable harm is beyond doubt. MEDEX' use of AGIA's confidential information to acquire these customer accounts will destroy the benefits of all the resources AGIA has invested in their development, including years of advertising and marketing and affinity group endorsements, in which it has invested millions of dollars. No price tag can be placed on the destruction of the benefits AGIA has accrued from such efforts. It is nearly impossible to determine how much AGIA stands to lose as a result of MEDEX' breaches.

31. Moreover, MEDEX' misappropriation of AGIA's Eligible Member Data is a violation of the privacy protections afforded to Eligible Members by the Gramm-Leach-Bliley Act and related state insurance privacy laws, which are designed to ensure consumers that such information will not be disclosed to third parties.

32. MEDEX' continued violation will irreparably damage AGIA's client and Eligible Member good will and reputation. MEDEX' misappropriation of AGIA's Eligible Member Data is, in itself, grounds for AGIA's affinity group clients to terminate their longstanding marketing agreements with AGIA if AGIA does not take appropriate steps to stop the misappropriation. This is because those agreements generally prohibit the unauthorized use of affinity group member data by AGIA or by any of its contractors, and some of the client contracts specifically identify such a violation as grounds for automatic termination of the contract. The affinity groups will be immediately affected

by the loss of royalties. They will look to AGIA for those royalty dollars even though AGIA will no longer be receiving premium payments.

## THIRD PARTY PRIVACY RIGHTS

AGIA is a "financial institution" covered by the federal Gramm-Leach-Bliley Act and, as such would be required to observe certain notice, opt-out or consent procedures if it planned to provide the Eligible Member Data to third parties for purposes of marketing other products. AGIA has not provided "opt-out" notices, or solicitations for affirmative consents, to the EA+ Eligible Members, and thus cannot provide the Eligible Members' personally identifiable information to any third party for purposes of other marketing efforts. As a receiver of personally identifiable data subject to these privacy restrictions, MEDEX is also subject to FTC privacy rules, and its use of the Eligible Member Data to solicit unauthorized products or services therefore violates the Gramm-Leach-Bliley Act and FTC regulations.

33. A Temporary Restraining Order and Preliminary Injunction, therefore, are necessary to maintain the status quo in this proceeding and to prevent further irreparable harm to AGIA and to the Eligible Members.

34. No previous application for the relief requested herein has heretofore been made to this or any other court.

I declare under penalty of perjury that the foregoing is true and correct and was executed by me at Carpinteria, California on January 24, 2007.

John B. Wigle

16                                07-CV-105 RCL

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.G.I.A, Inc., | : |
|     Plaintiff, | : |
| vs. | :   CA No.: 07-CV-105 RCL |
| MEDEX ASSISTANCE CORPORATION, | : |
|     Defendant. | : |

## DECLARATION OF DAVID H. McCARTY

I, David H. McCarty, declare:

    **1.**  I am the executive vice president of A.G.I.A., Inc. ("AGIA") with responsibility for developing new business relationships, and expanding current business relationships with clients, carriers, and business partners.

    **2.**  I submit this declaration in support of AGIA's application for a temporary restraining order and/or preliminary injunction in aid of arbitration to enjoin Defendant MEDEX Assistance Corporation ("MEDEX") from violating its confidentiality obligations to AGIA, from misappropriating AGIA's trade secrets and from violating third party privacy rights.  I have personal knowledge of the facts herein, except where indicated.

    **3.**  I began working for AGIA in 1994 after having previously managed their business from the insurance company side. During my twenty-three years of prior experience in the insurance industry, I was responsible for sales and marketing, underwriting, actuarial and financial analysis, compliance, claims, and premium accounting.  My core competency is in developing and placing competitive products that

1

meet AGIA affinity group clients' unique needs and in negotiating the most favorable

financial arrangements for some of the largest affinity groups in the country. I consider

myself an expert in this area.

## AGIA'S RELATIONSHIP WITH MEDEX

4. I am the executive at AGIA primarily responsible for the company's

relationship with MEDEX.

5. From 1998 to present, I have been involved in negotiating and arranging for

service providers to support the EA+ program. The relationship with MEDEX began on

January 1, 1999. AGIA and MEDEX entered into a new Service Agreement dated

January 1, 2002. I personally negotiated the terms of the 2002 Service Agreement (the

"Service Agreement"). A copy of the Service Agreement was filed under seal with the

complaint.

6. A significant difference between the 1999 and 2002 Service Agreements is

that, in the 2002 agreement, I requested and obtained a provision stating that MEDEX

would not do business with AGIA's affinity group clients or prospects. The provision, in

Addendum A (as revised by Amendment 1), states:

> *The Participating Groups or Prospective Groups listed below [i.e.,*
> *AGIA's affinity group clients endorsing the EA+ program, and identified*
> *prospective clients], along with their subsidiaries and affiliates, are*
> *clients of AGIA for the Emergency Assistance Plus plan (EA+), as*
> *described in the attached Addendum B. MEDEX hereby agrees to work*
> *exclusively with AGIA on all MEDEX programs sponsored by a*
> *Participating or Prospective Group, including their subsidiaries, or their*
> *affiliates. Furthermore, MEDEX and its employees, officers and*
> *representatives will not communicate directly with representatives of these*
> *Participating or Prospective Groups unless AGIA authorizes MEDEX in*
> *writing to do so. This exclusive arrangement shall survive termination of*
> *this Agreement.*

This provision was negotiated at some length. It's a given in our industry that a provide can not market to the members of the groups it provides services to. It appeared in the 2002 Service Agreement, and then was revised in the first amendment to the Service Agreement. This provision was intended to prohibit MEDEX from doing business with AGIA's affinity group client or prospect groups. At the time, MEDEX had no significant affinity marketing activities or capabilities, and so its only access to the market represented by the Eligible Members was through AGIA. Accordingly, MEDEX was willing to deal exclusively with AGIA on business relating to the Eligible Members, and agreed to this exclusivity provision.

7. As described more fully in the Declaration of John B. Wigle filed herewith, the EA+ program provides to travelers worldwide 24-hour toll-free (or collect call) telephone assistance for locating appropriate medical care, emergency medical evacuation services, transportation after initial evacuation, and repatriation of the Eligible Member to his or her home or community medical facility. The EA+ program was designed and developed by AGIA for marketing to its affinity group clients. AGIA designs and produces all of the subscriber materials relating to the program, and markets it to the members of the affinity groups.

8. An affinity group member who subscribed for the EA+ program (an "Eligible Member") was given a card with a toll-free phone number for domestic calls and a collect number for international calls, for travel-related emergency services. The larger affinity groups had their own dedicated toll-free phone numbers used solely by their Eligible Members. Only those Eligible Members who had travel-related emergencies – a very small percentage of the total – actually had any contact with MEDEX.

9.    In late 2005, I became aware that MEDEX' pricing was substantially

higher than what was available in the market. After protracted negotiations, MEDEX'

price was still double that of On Call International, LLC ("On Call"). Therefore, AGIA

terminated the Service Agreement with MEDEX, effective December 31, 2006, and

replaced MEDEX with On Call as the new service provider.

## AGIA'S REQUST FOR MEDEX TO RETURN DATA AND TRANSFER PHONE LINES

10. I sent MEDEX' president Bruce Kirby a letter dated November 16, 2006, a

true and correct copy of which is submitted as Exhibit 3. In that letter I verified that the

Service Agreement would be terminated effective December 31, 2006. I also asked that

MEDEX do the following on or before January 2, 2006: (1) Return the Eligible Member

Data; (2) transfer the dedicated toll free numbers that eligible members call in the event

of an emergency; and (3) Pay AGIA unearned fees. I specifically stated that the

"Member Data belongs to AGIA and its clients. We will therefore insist upon an

appropriate procedure for your destruction of the data in your possession following

completion of your termination responsibilities."

11. . The toll-free numbers dedicated to AGIA's client groups are:

| Client Name | Tele Number |
|---|---|
| American Optometric Association | 800-527-0218 |
| Commissioned Officers Association | 877-773-3432 |
| California State Employees Association | 800-698-5688 |
| Camping World | 877-565-2542 |
| Coast to Coast | 877-565-2542 |
| Good Sam Club | 877-565-2542 |
| Legionnaire Insurance Trust | 877-773-3432 |
| Marine Corps Association | 877-773-3432 |
| MOOSE Voluntary Ins. Program (VIP) | 800-586-0193 |
| National Rifle Association | 877-773-3432 |
| NRA Freehunters | 877-773-3432 |
| Reserve Officers Association | 877-773-3432 |
| The Golf Card | 877-565-2542 |

**12.** These phone numbers are used solely by members of the identified affinity groups. MEDEX therefore has no legitimate need for these specific phone numbers. It only causes difficulty and confusion for the EA+ members if they accidentally call the wrong (old) telephone number and are told that they must now call another telephone number, particularly considering that the call might be from an injured or sick member with a bad phone connection in a very remote location on overseas travel. Despite my repeated requests that MEDEX transfer the dedicated toll-free lines to AGIA, and AGIA's offer to pay for or replace the lines, MEDEX has steadfastly refused to do so without giving any reasonable explanation.

**13.** I received a response letter dated November 22, 2006 from David L. Mair the Director of Client Relations for MEDEX. A true and correct copy is submitted as Exhibit 4. It was not responsive to my requests for data, the toll free lines and payment.

**14.** On November 29, 2006 I had a conference call with Mr. Mair and Denee Detorie. I sent Mr. Mair a letter dated November 29, 2006 following up our conversation of that day. A true and correct copy is submitted as Exhibit 5. In that call and the letter I reiterated AGIA's position that it would be best if MEDEX transferred the dedicated toll free lines to the new provider. Since it was clear MEDEX would not transfer the lines, I advised MEDEX that prior to the transition we would send notices to all Eligible Members and provide them with a new toll free line which would be answered by our new provider, On Call.

**15.** Because we knew that it was inevitable that some Eligible Members would be confused by the transition and would continue to call in on the old numbers, I asked in

5                                07-CV-105 RCL

the November 29 call and my November 29 letter that any Eligible Members who call

MEDEX on the old lines be provided with a "warm transfer" by MEDEX. A warm

transfer means that, when an Eligible Member calls, MEDEX answers and connects him

or her directly to On Call. Thus, the Eligible Member does not have to make a second

phone call during a time of need.

16. The best way to provide Eligible Members with continuity was for MEDEX to

transfer the dedicated lines to AGIA. The second best solution would have been for

MEDEX to arrange for an automatic rollover of the calls to the On Call numbers. Failing

that, or with respect to Eligible Members calling in on the non-dedicated MEDEX phone

lines, the best alternative was a warm transfer. I repeatedly requested that MEDEX agree

to transfer the dedicated lines, arrange an automatic rollover, or at least provide a warm

transfer, but Mr. Mair consistently refused all three options.

17. . All of these requests -- that MEDEX transfer the dedicated toll free lines,

arrange an automatic rollover and/or make a "warm transfer" -- were so that no EA+

Eligible Member in an emergency situation would be unnecessarily jeopardized.

18. In my November 29th call and my followup letter, I offered to pay MEDEX

$2,500 per dedicated toll free line and identified the numbers involved. Mr. Mair refused

to do so. When I asked him why, he merely said the lines were a "valued asset" of

MEDEX. I offered to pay the cost of MEDEX obtaining substitute toll-free numbers. I

also asked Mr. Mair to give me an estimate of the value MEDEX placed on these lines,

and AGIA would consider reimbursing MEDEX. Mr. Mair simply continued to say that

the lines were a "valued asset" and not for sale.

**19.** In the November 29th call, Mr. Mair not only refused all of my requests, he also stated his intention that, starting January 1st, MEDEX would "let the dedicated toll-free numbers ring unanswered to a dead end." He said that "the other Eligible Members, who call into the general MEDEX service lines, would simply be told to call their affinity groups." I told him this was unacceptable. I concluded my November 29th call and letter by reminding Mr. Mair of the contract's exclusivity provision and requesting a response to my proposal by December 1st.

**20.** Mr. Mair of MEDEX sent me a letter dated December 1, 2006 summarizing his version of the November 29, 2006 telephone conference, a true and corrected copy of which is submitted as Exhibit 6. In that letter Mr. Mair refused to transfer the dedicated toll free numbers stating: "These numbers are valued MEDEX assets and we expect to redeploy them for other business following the termination of the Service Agreement." He also refused AGIA's offer to purchase the lines. As these numbers are solely dedicated to specific EA+ affinity groups they can have no possible use other than serving those members.

**21.** In Mr. Mair's December 1st letter he also refused my request to return the Eligible Member Data stating: "We discussed briefly MEDEX's ongoing business purposes, including but not limited to, audit, compliance, case record, ongoing sales, and individual correspondence, as may be warranted." My recollection of what we discussed in this regard is servicing of open cases, period. Nothing was said about "ongoing sales."

**22.** What particularly concerned me about Mr. Mair's December 1st letter was his statement: "In the alternative, we [MEDEX] will provide the phone numbers to callers for *those lines that will be answered*, pending redeployment of the remaining toll-free lines."

(Emphasis added.) The import of this was that MEDEX would simply stop answering AGIA's dedicated phone lines and answer only its general service numbers, a repeat of the threat made by Mr. Mair in our November 29th phone call. I was appalled by this because it would have resulted in the majority of AGIA's Eligible Members calling an unanswered line in a time of medical crisis.

**23.** By letter dated December 4, 2006, I responded to Mr. Mair's letter of December 1st. A true and correct copy is submitted as Exhibit 7. I reiterated AGIA's offer to pay MEDEX $20 per warm transfer and $2,500 per dedicated toll free line. I pointed out to Mr. Mair the "tremendous, irreparable harm that would be done to members at a time of medical emergency if their calls go unanswered as you have threatened." I believe that the issue of maintaining continuity for Eligible Members who were calling in for emergency help was so significant that I informed Mr. Mair we would seek a preliminary injunction unless this transitional issue was resolved.

**24.** I also took issue in my December 4th letter with Mr. Mair's statements regarding the Eligible Member Data, stating: "One of the purposes in your letter was 'ongoing sales.' This is not a legitimate use of our enrolled member information. To be clear, AGIA will take whatever steps are necessary to insure that MEDEX does not solicit the enrolled members for any purpose or product of any kind." I specifically asked Mr. Mair to confirm that MEDEX had no intent to solicit Enrolled Members.

**25.** On December 6th, Mr. Mair sent me a very brief email acknowledging my December 4th letter. A true and correct copy of Mr. Mair's email and of my reply is submitted as Exhibit 8. Mr. Mair did not deny his threat to let calls go unanswered; he merely repeated his previous offer "to continue service for participants through the end of

their current enrollment." The court should be aware that almost all Eligible Members sign annual contracts, and thus their enrollment periods would not coincide with the January 1st transition. In other words, Mr. Mair was repeating his threat to quit answering calls on January 1st unless AGIA continued to pay MEDEX for servicing the existing Eligible Members through the end of their contracts. Basically, MEDEX was trying to stop AGIA from terminating the Service Agreement.

26. Later in the day on December 6, 2006, I had a telephone conversation with David Mair. During our conversation, Mr. Mair backed off of his threat to simply let calls go unanswered, although he still refused to provide a warm transfer or automatic rollover. I should note that, by this time, AGIA's attorneys had contacted MEDEX' attorneys and informed them that if MEDEX did not withdraw its threat to let calls go unanswered, AGIA would have no alternative but to seek a TRO, to avoid the Eligible Members being stranded in an emergency. The details of our attorneys' communications with MEDEX's counselors are set forth in Mr. Schley's declaration.

27. In the December 6th phone call, I again offered to pay MEDEX $20 per call for a warm transfer. Mr. Mair again refused to provide a warm transfer. I explained to Mr. Mair that I was aware that MEDEX had in the past provided warm transfers in similar situations. Mr. Mair admitted that this was so, but stated that MEDEX charged $45 per warm transfer. I then asked Mr. Mair if MEDEX would consider providing a warm transfer for AGIA's Eligible Members for $45 per call, to which he responded "No."

28. I followed up our December 6th, telephone conversation with a letter to Mr. Mair dated December 8, 2006, a true and correct copy of which is submitted as Exhibit 9.

In that letter, I confirmed Mr. Mair's promise that MEDEX would not let calls go unanswered but would make some referral to the new phone numbers, although still not by means of a warm transfer. I repeated my preference for a transfer of the dedicated lines, an automatic rollover or at least a warm transfer.    I expressed my dismay that MEDEX would not agree to a warm transfer if we paid them $20 or even $45 a call.

29. I received a letter from Mr. Mair of MEDEX dated December 15, 2006, belatedly responding to our various telephone conversations and my letters of December 4 and 8.  A true and correct copy of that letter is submitted as Exhibit 10.  In that letter, Mr. Mair stated that when Eligible Members called in using the existing phone numbers they would be "[a]nswered by a coordinator or a voice message" and given the new number for On Call.  My understanding is that a coordinator would answer the non-dedicated toll-free and collect lines and refer the caller to On Call, and Eligible Members who called in on the dedicated lines would hear a voice message referring them to On Call.  Mr. Mair did not mention that any Eligible Member who called in would also be solicited for new sales, as turned out to be the case.

30. I was  shocked to learn, on January 8, 2007, that MEDEX was in fact using the recorded greeting on the AGIA dedicated client numbers to blatantly solicit AGIA's members to sign up for competing services at MEDEX.  Instead of a simple message referring our members to their new phone numbers, MEDEX was using the message as an opportunity to sell competing products and refer the members to another MEDEX telephone number.  The recording stated:

> Hi, this is Jackie at MEDEX with an important message for EA+ participants. For the past seven years MEDEX has been honored to provide benefits behind EA+.  The many complements shared with us confirm the value of your association found in our work. Thank you.

> Effective January 1st your group administrator made a change, and MEDEX is no longer working with EA+. We will give you the number for the new company in just a moment.
>
> **As a leader in travel assistance MEDEX offers you and your family programs that let you peg the price and benefits that best fit your travel needs. Whether it is for one trip or for one year, <u>we would love to help you</u>. <u>To learn more please call, 410-453-6367</u>.**
>
> To reach the new provider please call On Call International collect at 603-328-1752 or toll free in the U.S. at 866-816-2073. (See Exhibit 11; emphasis supplied.)

In fact, the 410-453-6367 phone number is Mr. Mair's direct line.

31.    The above greeting was apparently in place from January 1, 2007 until it was changed, on January 12, 2007, following a demand by AGIA's attorneys. This greeting was clearly different from the simple new-phone-number message that MEDEX had promised. Furthermore, this solicitation-greeting was posted at the very time when MEDEX was saying, through its lawyers, that MEDEX had no plans to solicit the members and that MEDEX would be glad to provide at least 14 days' notice before doing so (see Declaration of Michael D. Schley filed herewith).

32. Throughout my discussions and correspondence with Mr. Mair, he has persisted in maintaining that MEDEX need not return the Eligible Member Data and in fact is entitled to use it to solicit sales of competing products to the Eligible Members.

33. MEDEX has no foreseeable legitimate need to retain the AGIA EA+ Eligible Member data in its possession. In demanding return of this data, AGIA has offered: (i) MEDEX may maintain records relating to actual members it has serviced, so that it may respond to follow-up issues, customer claims or litigation; and (ii) MEDEX would be given access to any of the other returned Eligible Member Data should any reasonable

and legitimate need arise, e.g., to satisfy an inquiry from MEDEX' independent auditors (see Declaration of Michael D. Schley). This offer would address every legitimate foreseeable need MEDEX might have for the Eligible Member Data.

34. Throughout my conversations and correspondence with Mr. Mair, I have insisted on a prompt refund of unearned premiums, as provided at paragraph 9.D. of the Service Agreement. AGIA has had to front the compensation due to the new service provider, On Call.

35. The net amount owed by MEDEX is exactly $728,157, as calculated by AGIA's finance department. To date, MEDEX has paid no portion of this sum to AGIA, notwithstanding that no reasonable dispute over the calculation of the sum could exceed a few thousand dollars in its entirety.

## IRREPARABLE HARM

36. The greatest risk is to Eligible Members who still have the old dedicated toll free numbers in their wallets and purses. They are at MEDEX' mercy should it follow through on it threats not to answer or "redeploy" these numbers. Even if MEDEX maintains the voice mail message referring callers to the new On Call numbers, it still means an Eligible Member with a travel emergency will have to make two calls instead of one to get help. There is no legitimate reason that Eligible Members should be put in this situation. AGIA asks this court to order MEDEX to immediately transfer all the dedicated toll free lines identified above to AGIA or its designee to protect the Eligible members. AGIA is willing to post security of $2,500 per line and leave it to the arbitrator to determine the actual value.

**37.** I have personally negotiated many of the AGIA affinity group client contracts in force today relating to the EA+ program and other products. Based on this experience, I cannot emphasize enough just how much damage would be done to AGIA's client relationships if a third-party service provider such as MEDEX were permitted to take Eligible Member Data and use it to market products or services that are not authorized by the affinity group clients. Member relationships are the most valuable assets of the affinity groups and they go to great length to protect and preserve these relationships. AGIA's affinity group contracts may be terminated if AGIA does not take all necessary actions to stop MEDEX from misappropriating the Eligible Data. AGIA may be sued for damages; and AGIA could lose an inestimable amount of business from Eligible Members who may be deceived into buying competing MEDEX products in the belief that they are products sponsored by AGIA's affinity group clients. Furthermore, a security breach of this type, allowed to succeed, would mark AGIA, in our industry, as an unsafe business partner for other prospective affinity group clients, irreparably damaging AGIA's future business prospects.

**38.** MEDEX has repeatedly stated that it has the right to solicit AGIA's Eligible Members. It has actually solicited Eligible Members who have called in on the toll free lines. Should MEDEX send the Eligible Members a mass mailing offering a similar service at a reduced price, AGIA's EA+ business would be decimated. It would lose not only the future income associated with lost EA+ Members, it would also lose its opportunity to recoup the millions of dollars and many years it has spent developing the product.

39. The most severe impact of MEDEX' refusal to return the data and threatened solicitation is on AGIA's relationships with its affinity group clients. MEDEX' retention of the Eligible Member Data with the intent to solicit and its actual solicitation puts AGIA in danger of breaching its affinity group contracts if AGIA does not act promptly to protect the Data. It is important that the court understand that EA+ is only one of the many products AGIA markets through its affinity group clients. The most significant other products are life insurance, accidental death and dismemberment insurance, specific disease (cancer) insurance, hospital income insurance, travel accident insurance, and Medicare supplemental insurance. The amount of business written under these other products dwarfs the EA+ program. If AGIA does not successfully protect the Eligible Member Data in this case, its reputation in the industry and the good will it has built up over decades will be destroyed. If its affinity groups lose confidence in AGIA's ability to maintain confidentiality and protect customer lists, AGIA stands to lose all of its affinity group relationships and their endorsement of all of AGIA's product lines, not just the EA+ program.

I declare under penalty of perjury that the foregoing is true and correct and was executed by me at Carpinteria, California on January 23, 2007.

David H. McCarty

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

A.G.I.A., Inc.,                                    :

     Plaintiff,                                :

vs.                                                :    CA No.: 07-CV-105 RCL
MEDEX ASSISTANCE CORPORATION,                      :

     Defendant.                              :

---

## DECLARATION OF MICHAEL D. SCHLEY

I, Michael D. Schley, declare:

    **1.** I am a partner in the law firm of Schley Look & Guthrie LLP, Santa Barbara,
California. I have served as outside corporate counsel to A.G.I.A., Inc. ("AGIA") for
approximately fifteen years.

    **2.** I submit this declaration in support of AGIA's application for a temporary
restraining order and/or preliminary injunction in aid of arbitration to enjoin Defendant
MEDEX Assistance Corporation ("MEDEX") from violating its confidentiality
obligations to AGIA, from misappropriating AGIA's trade secrets and from violating
third party privacy rights. I have personal knowledge of the facts herein, except where
indicated.

### NEGOTIATIONS WITH MEDEX' COUNSEL

    **3.** In early December 2006, as AGIA encountered difficulties in reaching
amicable transition arrangements with MEDEX, I became involved in negotiating
transition and contract issues with MEDEX' attorneys, Messrs. Bill Stoeri and Matthew
Ralph at Dorsey & Whitney LLP in Minneapolis. The first issue I raised was an apparent
threat, in a letter dated December 1, 2006, from MEDEX executive David Mair to AGIA

(see Exhibit 6), that MEDEX would let some calls to the dedicated AGIA client toll-free numbers go unanswered after December 31, 2006. I discussed this with Bill Stoeri on December 4 and again on December 5. In his response by phone on December 5, Mr. Stoeri confirmed that there would be no unanswered calls, and that callers who reach the old phone numbers by mistake would get either a recording or a live voice referring them to the new phone numbers. This was subsequently confirmed in writing, by letters of David McCarty of AGIA (December 8, 2006) and David Mair of MEDEX (December 15, 2006), submitted as Exhibits 9 & 10. The Mair letter of December 15 stated simply that "callers will be given the new numbers you provided for On Call International [the new service provider]." At no time during my negotiations with the Dorsey attorneys, nor in written email or letter correspondence between the parties, did MEDEX state that it would be soliciting product sales to the EA+ subscribers ("Eligible Members") who call the old phone numbers. This possibility was not even suggested or intimated. Had it been, it would have drawn a quick and sharp response.

4. On December 19, I spoke with Bill Stoeri and told him why the future use of the Eligible Members' information (the "Eligible Member Data") by MEDEX would, in our view, be prohibited by contract and law and that AGIA would have no option but to go to court over the matter. He disagreed with my positions, but said he would discuss these matters with his client. I also urged that MEDEX agree to pay the estimated amount of unearned premium (then estimated at about $730,000) to AGIA at the beginning of January, with an interparty settlement of the difference in mid-January based on final December numbers.

2

5. In a telephone conversation on December 21, Mr. Stoeri stated his view that MEDEX was entitled to use the Eligible Member Data for its own business and marketing purposes. His justification was that neither the Service Agreement nor trade secret laws would prohibit it. However, he suggested that MEDEX could agree not to use the Eligible Member Data except after a reasonable period of notice to AGIA, giving AGIA the opportunity to go to court if necessary in the interim. He also offered that MEDEX would pay the unearned premium amount into an interest-bearing trust account held by a mutually acceptable custodian, pending final verification of the amount due. I stated the reasons why I disagreed with his position on use of the Eligible Member Data but said that I would discuss the trust account offer with my client.

6. On December 22, 2006, I sent to Mr. Stoeri a letter stating with specificity the legal grounds for AGIA's objections to MEDEX' proposed use of the Eligible Member Data. A true copy is submitted as Exhibit 11. I stated that any use by MEDEX of the Data would be a violation of the privacy provisions of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et. seq. (GLBA). I also explained that any use of the Data by Medex would put AGIA in breach of its contracts with its affinity group clients. I explained why AGIA would not be satisfied with a prior notice agreement regarding use of the Eligible Member Data: AGIA should not be put in the position of having to go to court to regain control of its own Data. Furthermore, MEDEX was asserting the right to use the Data, and AGIA could not take the risks of leaving the Data with MEDEX, given this assertion. Finally, AGIA saw no legitimate need for MEDEX to maintain any of the Data other than the few files of Eligible Members it had actually serviced. I therefore demanded return of all Eligible Member Data other than files representing cases MEDEX had serviced

07-CV-105 RCL

(which MEDEX could retain only if it agreed not to misappropriate the data for commercial or marketing purposes); and I offered that AGIA would provide future access to the Eligible Member Data for any legitimate purpose. I requested MEDEX agree, by December 27, to return the Eligible Member Data or AGIA would be forced to seek a preliminary injunction. I explained that AGIA would not seek a preliminary injunction if MEDEX would simply agree not to use the Eligible Member Data prior to a final arbitration decision on rights to the data. I also suggested a plan for payment of the net unearned fees on January 2, 2007, as an alternative to the proposed trust account.

7. In the December 22 letter, I also noted that the Service Agreement contains a mediation agreement. Given the prior negotiations between our clients and the parties' positions, I requested MEDEX waive mediation or contact our office to arrange for mediation.

8. Matthew Ralph of the Dorsey firm, called me on December 27 to respond to my letter. He said that MEDEX had not decided whether it would use the Eligible Member Data, but nevertheless would not promise to refrain from marketing to the Eligible Members pending our arbitration. He asked for a few days' opportunity to research the law cited in my December 22 letter and to respond in detail. He said that his client would only be willing to place the unearned premium in a trust account, and he invited a detailed proposal for the trust account. He also said that MEDEX would not waive mediation, but was not interested in AAA mediation. When I asked whether his firm would accept service on behalf of MEDEX, he said they would not.

9. On December 29, 2006, Mr. Ralph sent me a letter, a true and correct copy of which is submitted as Exhibit 12. In his letter Mr Ralph asserted that MEDEX was free to

use the Eligible Member Data because: (1) The confidentiality clause prohibits

disclosure of Member Data, not use; (2) The non-solicitation clause prohibits solicitation

of the affinity groups, not their members; (3) the GLBA does not prohibit their use of the

Data; and (4) AGIA's contractual obligations to its affinity groups was irrelevant. Mr

Ralph supplied no legal authority for any of these positions. He again offered "to provide

at least 14 days notice to AGIA of any prospective use." He concluded by asking me to

provide him with a "concrete proposal" regarding a trust account and that I send him a

mediation proposal. He stated again that his firm was not authorized to accept service of

process on behalf of MEDEX.

**10.** In his December 29 letter, Mr. Ralph also stated "MEDEX has not yet decided

whether it will exercise its right *actively* to solicit persons who previously purchased

MEDEX products" (emphasis added). In retrospect, this suggests to me that MEDEX

had a plan at that date to "passively" solicit the Eligible Members who, MEDEX knew,

would be continuing to call the old MEDEX toll-free numbers after December 31.

**11.** Later on December 29, I sent to Mr. Ralph the two letters submitted at

Exhibits 13 & 14 responding to his requests for detailed proposals for a trust account and

for mediation.

**12.** On January 4, 2007, Mr. Ralph called me and my partner Ian Guthrie to

discuss open issues. He acknowledged that the vast majority of the $730,000 estimated

unearned fees were not in dispute, and said that MEDEX would pay AGIA the amount it

believed was undisputed "early next week." This was to be followed by a reconciliation

and final settlement based on the final numbers. No such payment has been received.

Regarding mediation, he asked what issues would be mediated, and we told him: (1) Any

5

07-CV-105 RCL

dispute regarding unearned fees due; (2) rights to the Eligible Member Data; and (3) any open transition issues between the parties. In the telephone call, Mr. Ralph also stated that his client would consent to AAA emergency procedures; but when we asked whether we could send him an agreement to confirm this, he said he would have to first consult with his client. He promised a letter later that day addressing these issues.

13. On January 9, Mr. Ralph finally responded by letter to my letters of December 29. A true and correct copy is submitted as Exhibit 15. In that letter he states that MEDEX would simply pay the net unearned premiums directly to AGIA by February 28, instead of into a trust account. Mr. Ralph responded to my mediation proposal by stating: "Before MEDEX responds, however, it would like additional information as to what AGIA believes the scope of the mediation would be." I considered this disingenuous and part of a tactic of delay, considering that I had reviewed the issues, somewhat exhaustively, with him in the prior telephone conferences and correspondence summarized above. Mr. Ralph also communicated MEDEX' agreement to waive mediation *if* the only open issue is use of Eligible Member Data, and he communicated MEDEX' willingness to use the emergency relief procedures of the AAA *if* the only issue in dispute is MEDEX' rights to the Eligible Member Data.

14. One of the most troubling aspects of Mr. Ralph's January 9th letter is his statement that: "Medex does not propose to disclose member information to third parties. The only issue is MEDEX' use of the member data to contact members who formally purchased products serviced by MEDEX... The members at issue have previously bought products serviced by MEDEX. They are aware that MEDEX has information about them. The purpose of contacting these members would be to ask whether they would like to

6

purchase such products again." This is exactly the solicitation conduct to which AGIA objects. Furthermore, Mr. Ralph's letter misstates the facts and is misleading. The vast majority of Eligible Members never have any contact with MEDEX. They are aware of MEDEX' role only if they have read very carefully the EA+ subscription materials, which describe MEDEX as a service provider.

15. Despite MEDEX' repeated assurances not to use the Member Data without prior notice to AGIA, AGIA learned on January 8, 2007, and promptly informed me, that Eligible Members calling into the EA+ dedicated toll-free lines were greeted with a recorded message soliciting them to purchase MEDEX products and asking them to call a number which rings directly to Mr. Mair. A transcript of the voice message is submitted as Exhibit 16. I myself dialed one of the toll-free numbers and heard the greeting, on January 9, 2007.

16. When I learned of MEDEX' solicitation of the EA+ Eligible Members in this manner, I placed a call, with my litigation partner Ian Guthrie, to MEDEX counsel Matthew Ralph to complain about this blatant misappropriation and contract violation. When we confronted him regarding his promise that there would be no solicitations without at least 14 days' prior notice, he responded that MEDEX was not technically using "member data" to accomplish the solicitation. We told him that AGIA would accept no more such promises from MEDEX and would be seeking a court order. He followed up this conversation with the letter dated January 9, 2007 submitted as Exhibit 17, seeking to justify and excuse MEDEX' clear breach of its non-solicitation promise. Incredibly, in that letter Mr Ralph states: "MEDEX only offers its products and services to callers who ask about them first." It is even more outrageous that EA+ Eligible

Members were forced to listen to this solicitation before they were referred to On Call for their emergency medical services.

17. To summarize, MEDEX' position on the two key issues in this case has been rapidly shifting and inconsistent. MEDEX, directly and through its attorneys, has stated:

a. With respect to the solicitation issue, that there would be no solicitations without prior notice – and then, after almost two weeks of solicitation went by until MEDEX was caught red-handed, MEDEX' position changed to: Yes, we have been soliciting the Eligible Members, without your knowledge, but we didn't really break our promise.

b. With respect to the mediation and arbitration, MEDEX, through its attorneys, at first offered to expedite dispute resolution (by waiving mediation and using AAA emergency relief procedures), but then later tied conditions to these agreements that made them meaningless offers.

c. With respect to MEDEX' refund of the unearned premiums owed to AGIA, MEDEX, through its officers and attorneys, has at first offered only a five-month payment plan, then offered to place the money immediately in trust, then offered to make a net payment early in January 2007, then claimed it had a binding agreement that no money was due until February 28, 2007.

This pattern indicates that MEDEX and its counsel are intent on misleading AGIA and on delaying any resolution of the issues in dispute – which delay will only benefit MEDEX.

I declare under penalty of perjury that the foregoing is true and correct and was executed

by me at Santa Barbara, California on January 23, 2007.

Michael D. Schley

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| A.G.I.A, Inc., | : | |
|     Plaintiff, | : | |
| vs. | : | CA No.:  07-CV-105 RCL |
| MEDEX ASSISTANCE CORPORATION, | : | |
|     Defendant. | : | |

### L.R. Civ. P. 65.1 DECLARATION
### OF LAWRENCE R. HOLZMAN, ESQUIRE

LAWRENCE R. HOLZMAN, ESQUIRE hereby declares as follows:

1.　　I am an attorney with the firm of Joseph, Greenwald & Laake, P.A., which serves as local co-counsel for Plaintiff ("A.G.I.A., Inc.").  I am over the age of 21 and believe in the obligations of an oath.  I have personal knowledge of the facts set forth herein, except where otherwise indicated.

2.　　I hereby certify that actual notice of the time of making the application for Temporary Restraining Order and Preliminary Injunction, and copies of all pleadings and papers filed in the action to date or to be presented to the court at the hearing, have been furnished to the adverse party as set forth below.

3.　　On January 25, 2007, I provided notice to Defendants' attorneys.  I informed Defendant's attorneys that A.G.I.A. would be seeking a Temporary Restraining Order and Preliminary Injunction against Defendants and that the application therefore would be filed on that same date.  I also provided today a copy of the Complaint and all other papers filed in this matter herewith by e-mail and by overnight delivery to Defendants' attorneys.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

January 25, 2007.


_____*/s/ filed via ECF*_____
Lawrence R. Holzman, Esquire


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 25th day of January 2007, a copy of the foregoing L.R. Civ. P. 65.1 Declaration of Lawrence R. Holzman, Esquire in Support of Application for a Temporary Restraining Order and Preliminary Injunction was sent to:

Medex Assistance Corporation
c/o Resident Agent
Bruce R. Kirby
8501 LaSalle Road, Suite 200
Towson, MD  21286
***via overnight delivery (FedEx)***

Creighton  R. Magid
Dorsey & Whitney, LLP
Washington Square
1050 Connecticut Avenue, NW, Suite 1250
Washington, DC  20036
***via electronic mail (magid.chip@dorsey.com) and overnight delivery (FedEx)***

William R. Stoeri
F. Matthew Ralph
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
***via overnight delivery (FedEx)***


_____*/s/ filed via ECF*_____
Lawrence R. Holzman

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

A.G.I.A, Inc.,                                              :

      Plaintiff,                                      :

vs.                                                        :     CA No.:  07-CV-105 RCL

MEDEX ASSISTANCE CORPORATION,          :

      Defendant.                                     :

_____

<u>**ORDER**</u>

      Plaintiff's Motion having been presented to the Court, and the Court having reviewed the Complaint and supporting Declaration submitted therewith, and the Court having determined that:

      1.      Pursuant to the Federal Arbitration Act ("FAA") 9 U.S.C. § 3 and *Performance Unlimited v. Questar Publishes Inc.,* 52 F.2d 1373, 1380 (6th Cir. 1995) AGIA has the right to seek interim injunctive relief from this Court pending an arbitration hearing before a panel of duly appointed arbitrators;

      2.      AGIA Eligible Member Data consisting of the names, addresses and certain other basic information of AGIA's Eligible Members' is being misappropriated by Medex Assistance Corp. ("Medex") and MEDEX is soliciting AGIA's Eligible;

      3.      Plaintiff will suffer irreparable harm and loss if Medex is permitted to convert Plaintiff's property to Medex's use and benefit and is permitted to solicit AGIA's customers;

      4.      AGIA has a statutory right to injunctive relief pursuant to The Maryland Uniform Trade Secrets Act, *Md. Code Ann. Com. Law II §11-1202;*

      5.      AGIA has no adequate remedy at law;

6.      Greater injury will be inflicted upon AGIA by denial of temporary injunctive relief than would be inflicted upon Medex by the granting of such relief; and

7.      The issuance of injunctive relief will serve the public interest, *inter alia*, further preserve the Eligible Members access to emergency help and preserve their privacy.

8.      **IT IS HEREBY ORDERED** that, pending further order of this Court or of a panel of duly appointed arbitrators**:**

(1)      Medex is directed, along with their agents, employees and representatives, including their new employer, to return to AGIA within 48 hours all documents and computerized materials, including without limitation all customer files and data, records and lists and copies and/or extracts thereof related to the program known among the parties as Emergency Assistance Plus ("EA+"), which itself is the subject of the Service Agreement, (the "Documents") and further directing Medex not to retain any copies thereof, and to permanently remove any and all such information (including data contained on computer software, computer hard drives and/or personal digital assistants) from their possession and custody; and

(2)      Medex is enjoined, directly or indirectly, with their agents, employees and representatives, from (a) using or disclosing in any way any of the Documents related to the EA+ program and/or EA+ eligible persons to solicit EA+ eligible customers, and (b) using in any way or furnishing to any third-party any of the Documents and other information contained in the Documents at any time, or any copies and/or extracts thereof;

(3)      Using, disclosing, or transmitting EA+ Eligible Member Data for any purpose, other than providing services under the Service Agreement;

(4)      Medex shall immediately make appropriate arrangements to transfer all the EA+ dedicated toll free phone numbers currently in its control to AGIA or its designee.

**ORDERED** that Plaintiff shall post a bond of $_____ with the Court on or before _____2005 and shall be allowed to act as its own surety for such bond; and it is further

**ORDERED** that (a) all answering papers, if any, shall be served by overnight mail so as to be received at least three (3) business days before the return date of this application on Lawrence R. Holzman, Esquire, Joseph, Greenwald & Laake, P.A. 6404 Ivy Lane, Suite 400, Greenbelt, MD 20770, counsel for Plaintiff, and (b) reply papers, if any, shall be served on the return date of this application.

_____
Judge Royce C. Lamberth
       U.S. District Court for the
       District of Columbia