**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| A.G.I.A, Inc., | : | |
| Plaintiff, | : | |
| vs. | : | CA No.:  07-CV-105 RCL |
| MEDEX ASSISTANCE CORPORATION, | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL RECONSIDERATION AND VACATION
OF FEBRUARY 5, 2007 ORDER AND RELATED STAY**

Defendant mischaracterizes the Court's February 5, 2007, Order granting Preliminary Injunction (the "Order").  The Order speaks for itself, but it can be paraphrased as follows; it enjoins (1) solicitation; and (2) using or disclosing Eligible Member Data; and (3) requires the transfer of four dedicated toll-free telephone numbers.  By its Motion, styled as a motion for "Partial" reconsideration, the Defendant  has expressly elected to let stand the Court's rulings with regarding non-solicitation and the use or disclosure of Eligible Member Data.  As such, the Defendant has waived all objections thereto. The only part of the Order under reconsideration now is the transfer of telephone lines.  Plaintiff wants to avoid any implication that the non-solicitation and non-disclosure/use portions of the Order are not barred by the Order or that, that such portions of the Order are subject to the current Motion to Reconsideration.

**INTRODUCTION**

Defendant is currently in contempt of the Court's Order granting Preliminary Injunction. The Court has ordered it to show cause why it should not be held in contempt for having failed to comply with the Order.  Defendant's Motion is simply an attempt to avoid and delay compliance with the Preliminary Injunction.  It is not based on the discovery or presentation of any new

evidence, facts or law.   It simply reargues the case that the Court already heard fully and upon which the court issued the Order.

In support of this ruse, the Defendant offers yet another Declaration from a Mr. Mair, filed February 12, 2007.  This adds nothing.  In fact, Mr. Mair admits in the first paragraph of his declaration that its purpose "is to substantiate certain representations made by counsel for MEDEX at the preliminary injunction hearing."  MEDEX has made no showing as to why the information contained in Mr. Mair's latest declaration was not included in Mr. Mair's first and second declarations, or why it would matter at this point that such facts are "substantiated" when the court gave those facts consideration already at the hearing and ruled against the Defendant.

What is most telling about Mr. Mair's declaration is that even though this is his third he has yet to explain what possible harm MEDEX will suffer if the court were to let stand its ruling.

<u>FACTS</u>

**A.  NO ONE OWNS TOLL FREE NUMBERS**

No one owns a toll-free number. All a user of a toll-free number has is a right of control. The 800 Service Management System (SMS/800) Functions Tariff, F.C.C. No. 1 which regulates toll-free telephone numbers provides as follows:

**2.1.7. Provision and Ownership of 800 Telephone Numbers**

No individual or entity (e.g., subscriber/assignee, service provider, etc.) shall acquire any interest in, or proprietary right to, any 800 telephone number assigned to the subscriber. However, 800 subscribers and/or their assignees can retain a specific 800 number despite changes in Service Provider and/or Resp Orgs

This tariff may be viewed at *www.sms800.com.*

**B.  MEDEX FOFIETED ITS RIGHT TO CONTROL THE DEDICATE NUMBERS**

The Court's Order did not transfer "ownership" of the numbers.  It merely transferred control of those numbers to AGIA pending arbitration.  The legal basis for the Court ordering the transfer of these numbers is the non-solicitation and confidentiality provisions in the Service Agreement and the Maryland Uniform Trade Secrets Act.  Under both Rule 65 and MUTSA the court has broad discretion to craft an appropriate order to protect an aggrieved party.

In balancing the hardships the injury a defendant might suffer if an injunction is imposed should be discounted if the defendant brought that injury upon itself by the conduct sought to be enjoined.  *Novartis Consumer Health, Inc. v. Johnson & Johnson* (3d Cir. 2002) 290 F. 3d 578-596.  In the instant case MEDEX' threats to drop the numbers, its actual use of the numbers to solicit and its continued threats to redeploy the numbers have left the Court no choice but to order transfer of  control of the numbers to AGIA pending arbitration in order to protect AGIA, the affinity groups and the Eligible Members.

Any harm MEDEX' will suffer as a result of its decision to redeploy one of the numbers to the mysterious international health care provider is likewise self inflicted.  We now know the number MEDEX chose to redeploy is (877) 565-2542, which just coincidentally handles the most traffic. This number serves 48, 933 Eligible Members affiliated with the Good Sam Club and other affinity groups sponsored by Affinity Group Inc. ("AGI"). Further as explained in Mr. McCarty's declaration, filed herewith the number also serves 400,000 individuals enrolled in a related program sponsored by the Good Sam club know as Good Sam Emergency Roadside Service ("ERS").

## C.  THE ULTIMATE CONTROLL OF THESE NUMBERS IS AN ISSUE FOR THE ARBITRATOR

MEDEX' ultimate right to control these numbers is in issue and is specifically referenced in the prayer of AGIA's complaint.  The ultimate determination of who should control these numbers will be up to the arbitrator.  AGIA's position is that MEDEX obtained the four numbers as the agent of AGIA or alternatively that the numbers belong to AGIA by implication.  With respect to the most important of the four numbers, we now know it belongs to AGI.  As is explained in detail in the declaration Mike Guglielmo filed February 15, 2007, AGI originally acquired (877) 565-2542 and only transferred control to MEDEX in April 2001 to facilitate the handling of calls.

## D.  THERE IS NO HARM TO MEDEX

As set forth in the declaration of Craig Pels filed February 12, 2007, toll free numbers are readily available at no particular cost and MEDEX could easily obtain four new numbers in the time it has taken to prepare and file its Motion for Reconsideration.  Indeed, it is common for companies in this industry to maintain reserve numbers.  AGIA has four reserve numbers which it has offered by Ian M. Guthrie's letter of February 9, 2007, to transfer to MEDEX in exchange for the four dedicated numbers.  Exhibit E, to Plaintiff's consolidated motion re. contempt filed February 13, 2007.  One of the mysteries of this case is why MEDEX is fighting over these numbers.  It is undisputed that these numbers are used solely by EA+ Members and are thus of considerable value to AGIA.  All MEDEX need do if it wants to deploy toll-free numbers is obtain them form its carrier.

## E. AS AN ALTERNATIVE THE COURT COULD ORDER THE NUMBERS BE "POINTED" TO AGIA

If the Court is considering changing its Order it could protect AGIA and the Eligible Members without transferring the numbers by ordering MEDEX to "point" the numbers to AGIA's new provider On Call. This process and its problems are explained in the declaration of Gregory Pels. However, AGIA begs the Court not to modify its Order as there is no reason to believe MEDEX will be any more likely to comply with an order to "point" the number to AGIA and it will simply led to further delay.

## LEGAL STANDARD

A motion for reconsideration of a preliminary injunction order is subject to FRCP section 59 (e) (motion to alter or amend judgment.) *Sierra On-Line v Phoenix Software, Inc.,* 739 F2d 1415, 1419 (9th Cir. 1984). Federal Rule of Civil Procedure 54(a) defines a judgment to include any order from which an appeal lies.  28 USCS § 1292(a) (1) Permits appeal from a preliminary injunction.  Thus, a motion for reconsideration of an order granting a preliminary injunction must be made under federal FRCP 59 (e).  *Lichtenberg v. Besicorp Group, Inc.,* 204 F. 3d 397, 400 (2nd Cir. 2000).  In *People for the Ethical Treatment of Animals, Inc. v. Gittens,* 2002 U.S. Dist. LEXIS 27710 (D.D.C. 2002), the District Court for the District of Columbia applied FRCP rule 59 (e) to a motion for reconsideration of an order granting a preliminary injunction.

While a court has discretion when ruling on a rule 59 (e) motion for reconsideration, the reconsideration of a previous order is an extraordinary measure and  disfavored unless extraordinary circumstances are established, *ZYKO v. DOD*, 180 F. Supp. 2d 89, 90-91 (D.D.C. 2001).

"The district court's discretion to reconsider a non-final ruling is, however, limited by the law of the case doctrine and 'subject to the caveat that where litigants have once battled

5

for the court's decision, they should neither be required, nor without good reason
permitted, to battle for it again.'"  The sure and speedy administration of justice requires
no less.  (Internal citations omitted.)

*Singh v. George Washington Univ.,* 383 F. Supp. 2d 99, 101-102 (*Singh* involved a motion for
reconsideration under rule 54(b).)

[A] motion for reconsideration is "not simply an opportunity to reargue facts and theories
upon which the court has already ruled."  Nor is it "a vehicle for presenting theories or
arguments that could have been presented earlier" or a method of "introducing evidence
that was available but not offered at the original motion or trail."  (Internal citations
omitted.)

*Globalaw Ltd.  v. Carmon & Carmon Law Office & Globalaw, Inc.,* 452 F. Supp. 2d, 60, 61.

The test for granting a motion for reconsideration under rule 59 (e) is laid out in

*Firestone v Firestone,* 76 F. 3d 1205, 1209 (D.C. Cir. 1996).  A motion for reconsideration under

rule 59 (e) will not be granted unless there is (1) an intervening change of controlling law, (2)

new evidence; or (3) the need to correct a clear error or prevent injustice.  None of these

circumstances exist in this case.  MEDEX' Motion for Reconsideration makes no mention of any

change in controlling law or newly discovered evidence.  Instead, Plaintiff's Motion is

essentially a rehash of the same arguments it made in opposition to AGIA's Motion for

Preliminary Injunction and in oral argument before this Court.

## ARGUMENT

## I.      THE TRANSFER OF THE PHONE NUMBER WAS PROPERLY BEFORE THE COURT

AGIA specifically sought the transfer of the dedicated toll-free numbers in its Complaint,

Application for Preliminary Injunction and Proposed Order.  It specifically pointed out in its

Memorandum of Law that it was seeking a mandatory injunction to transfer the dedicated toll-

free numbers.  (Plaintiffs Memorandum of Law filed January 25, 2007 at part V p. 18.)  Counsel

for the parties vigorously argued the issue at the hearing and the court made specific findings

with respect to the transfer of the numbers.

### A.  A MANDATORY INJUCTION WAS APPROPRIATE

It is sometime difficult to determine whether an injunction is prohibitory or mandatory.

The result depends basically on the injunction's effect.  Mandatory injunctions are disfavored

because they are perceived as altering rather than preserving the *status quo*.  The function of a

preliminary injunction is to preserve the *status quo* and to prevent irreparable loss or rights prior

to judgment.  *Sierra-Online, Inc. v. Phoenix Software, Inc.,* 739 F. 2d 1415, 1422 (9th Cir. 1984).

In some cases, prohibitory orders may be ineffective or inadequate.  In such cases, federal courts

are fully empowered to grant mandatory preliminary injunctions even though they are generally

disfavored.

> Although the nature of the mandatory injunction—requiring Brush to provide the
> Customs Service with consent to importation—may be somewhat unusual, it was within
> the broad discretion of the district court to fashion a remedy to preserve the *status quo*
> and prevent irreparable harm.

*Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.,* 240 F3d 832, 841, fn. 8 (9th Cir. 2001).

Both mandatory and prohibitory injunctions are governed by the same criteria, courts are

generally more cautious about issuing mandatory preliminary injunctions that would alter the

*status quo*.  Mandatory relief is "subject to a heightened scrutiny and should not be issued unless

the facts and law clearly favor the moving party."  *Dahl v. HEM Pharmaceuticals Corp.,* 7F. 3d

1399, 1403 (9th Cir. 1993).  Judge Lamberth specifically stated in ruling from the bench that

AGIA had met this heightened standard.

The purpose of a preliminary injunction is always to prevent irreparable injury so as to

preserve the court's ability to render a meaningful decision on the merits.  *Stenberg v. Checker

Oil Co.,* 573 F. 2d 921, 925 (6th Cir. 1978).  Recognizing that the preservation of the court's

ability to exercise meaningful review may require affirmative relief in order to prevent some

future irreparable injury, commentators and court's have criticized judicial hesitancy to disturb

the *status quo* where this conditions favoring injunctive relief are satisfied.

> In *Stenberg,* the Sixth Circuit similarly rejected, "Any particular magic in the phrase *'status quo.'*" Explaining that, "The focus always must be on prevention of injury by proper order, not merely on preservation of the *status quo*," *Stenberg* recognized the fact that , "If the currently existing *status quo* itself is causing one of the parties' irreparable injury, it is necessary to alter the situation so as to prevent the injury." We therefore see little consequential importance to the concept of the *status quo,* and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful."

*United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,*
163 F. 3d 341, 348 (6th Cir. 1998)

In the instant case the Court's Order does not significantly alter the *status quo* with

respect to MEDEX. At the time the Order was issued all calls to the dedicated numbers were

being answered by a recording that referred the members to On Call. Thus, MEDEX was not

benefiting from these numbers and if replacements are needed they are readily available.

However, from the perspective of the 91,593 Eligible Members who use these four numbers and

the approximately 400,000 ERS members, the Order restores the *status quo*; their calls will be

answered without having to listen to a recording and dialing a second number.

**B.  THE COURTS ORDER TRANSFERRING THE NUMBERS WAS CORRECT**

*Columbia Hosp. For Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,* 15 F. Supp.

2d 1 (D.D.C. 1997) relied on by MEDEX with regard to the higher standard necessary to obtain a

mandatory injunction relies on *Dorfmann v. Boozer,* 414 F. 2d 1168, 1173 (D.D.C. Dis. 1969)

which  states as follows:

> The power to issue a preliminary injunction, especially a mandatory one, should be "sparingly exercised."  Before issuing such an injunction, the court must balance the damage to both parties.  Thus, even where denial of a preliminary injunction will harm the plaintiff, the injunction should not be issued where it would work a great and

potentially irreparable harm to the party enjoined, unless an overwhelming case in the Plaintiff's favor is present on the merits and equity is of the controversy.

As stated above Plaintiff has met the heightened standard for mandatory injunction. What is frustrating about MEDEX' argument is that while it belabors AGIA's position it fails to provide any factual detail with regard to why it is they need these numbers and what if any harm it will suffer.

### C.  THE COURT'S RULING IS NOT ON THE MERITS AND DOES NOT PREJUDICE THE ISSUES

MEDEX' argument that the court has made rulings that are unnecessary to its determination is unfathomable.  The court is required to make findings when issuing an injunction.  FRCP § 52(a).  The arbitrator is not bound to the Court's findings.  At a hearing on a preliminary injunction the court need only find the probability of success not rule on the merits. Findings of fact and conclusion of law made in connection with a preliminary injunction are not binding adjudications.  The court is free to change its position on the merits at trial upon the development of a full factual record. *University of Texas v. Camenisch* (1981) 451 U.S. 390, 101 S. Ct. 1830.

### II.  THE ORDER TO TRANSFER THE DEDICATED NUMBERS IS DIRECTLY RELATED TO AGIA's CLAIMS AND NECESSARY TO PROTECT AGIA AND THE ELIGIBLE MEMBERS

The transfer of the dedicated numbers is necessary because MEDEX used its control of these numbers to solicit AGIA's Eligible Members in violation of both the non-solicitation provisions of the Service Agreement and the Maryland Uniform Trade Secrets Act.  MEDEX' argument is like a murderer arguing he should not have to turn over his pistol because his ownership thereof is not in issue.  The Court's preliminary injunction order does not, as MEDEX argues: "Transfer ownership…of an important asset…."  The court made no ruling with respect

to the ownership of the line.  It simply ordered the transfer of numbers currently under the control of MEDEX to AGIA.       As one would expect and as Mr. Pel's declaration explains, toll-free numbers may be readily transferred between users.  If new facts develop in the future this court can order the numbers be transferred back.  If the arbitrator determines that a transfer is not necessary, it can order those numbers transferred back.  One of the many frustrating aspects of MEDEX' approach to this matter is that it continues to insist that these four numbers have significant value and are important assets but it has failed to submitted any evidence to support this.

## III.    THE COURT SHOULD NOT STAY THE EFFECT OF THE ORDER

AGIA agrees with MEDEX that the factors to be considered when deciding whether or not to issue a stay are: (1) whether a moving party has made a strong showing that it is likely to prevail on the merit; (2) whether the moving party has shown the denial of stay will cause irreparable harm; (3) whether other interested parties would harmed by the stays; and (4) whether the public interest will be served by granting a stay.  *People for Ethical Treatment of Animals, Inc. v. Gittens,* 2002 U.S. Dist. LEXIS 27710, citing, *WMATA v. Holiday Tours, Inc.,* 559 F 2d 841,842 (D.D.C. 1977.)

These are substantially the same factors AGIA had the burden of establishing in order to obtain preliminary injunction.   However, in seeking a stay the burden with respect to these factors now rests *with MEDEX*.   Medex has failed to offer new facts that will meet this burden.

### A.  AGIA WILL SUCCEED ON THE MERITS

This court already found that it was highly likely that AGIA would succeed on the merits. Nothing in Medex's motion for reconsideration adds anything to its original opposition.   Medex has failed to meet its burden with regard to a stay of the Order.

**B.  MEDEX HAS MADE NO SHOWING OF ANY HARM RESULTING FROM THE TRANSFER OF THE DEDEICATED NUMBERS**

As support for its argument that it will suffer grave harm, Medex relies on the Declarations of Mr. Mair.   Mr. Mair has now submitted three separate declarations in this matter.   Eachof which is comprised of conclusionary and misleading statements,  none of which actually suggest MEDEX will suffer any harm whatsoever.

In Mr. Mair's first declaration filed on January 30, 2007, he stated at paragraph 8 that: "Transfer of the numbers would create chaos."  When making the statement Mr. Mair intentionally ignored the fact that AGIA only sought the transfer of dedicated toll-free numbers and that the transfer of those numbers would have absolutely no impact on calls from MEDEX' other clients.  Mr. Mair's supplemental declaration filed on February 5, 2007, makes absolutely no mention of harm.

Mr. Mair's supplemental declaration filed on February 12, 2007, is a pastiche of legal arguments, conclusionary statements and irrelevant facts.  Paragraphs 2-4 are irrelevant and AGIA objects to them on that basis.  Paragraph 5 of Mr. Mair's declaration makes a conclusionary statement that, "MEDEX has paid for and owned the rights to [the four numbers] for years."  AGIA objects to this as a conclusion of law and lacking in foundation.

Mr. Mair has made no attempt to provide this court with facts indicating that MEDEX owns the right to control these numbers.  The reason is that Medex cannot make such a showing. When did MEDEX acquire each of these numbers?  How much did MEDEX pay for each of these numbers?  In point of fact with respect to the most important number, (877) 565-2542 it is uncontroverted  that AGI itself acquired this number from AT&T and transferred it some time later to MEDEX in April 2001 solely to facilitate MEDEX' providing services to Eligible

Members pursuant to the Service Agreement.  *See* the declarations of David McCarty and Mike Guglielmo.

Mr. Mair also suggests at paragraph 5 that there is some programming issue raised by the transfer.  As Mr. Pels points out in his declaration, the programming necessary to change toll free numbers is negligible and something that occurs in the ordinary course of business.  The most preposterous statement in Mr. Mair's declaration and the only one  suggestive of any harm to MEDEX is found at paragraph 8, where Mr. Mair argues that MEDEX will suffer unknown harm because it chose to "*redeploy*" one of the numbers (877) 565-2542 to one of its other clients.  Coincidentally this is the most important of the numbers because it is the one that is used by the largest number of Eligible Members.

Mr. Mair does not explain when this decision to "redeploy" was made, what it involves or what redeployment means despite the fact counsel for AGIA has repeatedly asked MEDEX' counsel for these details.  Certainly, MEDEX made the decision to "redeploy" this number with knowledge that AGIA claimed the numbers, without investigating the history of the number and in full awareness of the fact that AGIA would be seeking injunctive relief.  Indeed, paragraph 8 of Mr. Mair's declaration appears to be intentionally vague with respect to what, if any, actions have been taken regarding redeployment.

In response to concerns raised by counsel for AGIA about the impact of redeployment on this number, MEDEX' attorney, Mr. Magid stated in his February 11, 20007 email to counsel for AGIA that redeployment meant, "that it has been assigned to a different client…in any event the redeployment does not, as I explained to you, mean the other client will immediately begin using the number.  Rather, it means that the other client has printed cards and prepared to use the

number, which will be switched to that customer <u>a few months in the future</u>." Exhibit F, to Plaintiff's consolidated motion regarding contempt filed February 13, 2007.

The issue of "redeployment" is even *worse* that a simple red-herring. First, it is clear that what the Defendant means by "redeployed" is that it wants to sell the right to use of this number to another Insurance Company, perhaps a competitor of the Plaintiff. Telephone numbers do not have any intrinsic value. The Defendant's insistence that these particular toll-free numbers are important belies the fungible nature of telephone numbers. One could hazard a guess that the real reason that these numbers are "valuable" is because they are already printed on the cards of the Eligible Members who benefit from the Plaintiff's services. That is why the numbers have great value to the Plaintiff and very little *legitimate* value to the Defendant.

Moreover, the Defendant has admitted that it has not yet ""*redeployed*" the number and that it will not be "*redeployed*" in the next few months. The only suggested impact is that the Defendant's new customer *may* already have incurred some cost in printing cards with AGIA's telephone number on it. As explained in Mr. McCarty's declaration filed herewith, any printing costs would be nominal compared to the issues at stake. Such cost, which MEDEX has not even bothered to actually estimate, cannot possibly be of great substance when balanced against the harm to the Plaintiff, which the court has already resolved in favor of the Plaintiff. In any event, given the context, if MEDEX finds itself in a difficult position having attempted to sell the Plaintiff's number when it knew full well the circumstances, then it can blame only itself.[1]

## C. AGIA AND ITS MEMBERS ARE AT SIGNIFICANT RISK

Both rule 65 and the Maryland uniform trade secret act provide that a preliminary injunction may be issued to prevent threatened harm. AGIA's moving papers show that: (1)

---

[1] It should be noted that MEDEX currently holds over $700,000 in unearned premiums and AGIA has filed a surety in the amount of $25,000.

MEDEX has threatened to shut down the numbers; (2) MEDEX has actually used the numbers to solicit callers; and (3) MEDEX redeployment of the numbers at sometime in the future will reek havoc on EA+'s Members ability to use those numbers. Once it became clear that MEDEX would not cooperate, AGIA promptly sent out new cards to all of its members. Additional mailings are not going to solve the problem that many members will not update their files. Additionally, as explained in Mr. McCarty's declaration, no letter has been sent to the approximately 400,000 Good Sam ERS Members who also use that number nor would any such letter be helpful because.

MEDEX is beating a dead horse by continuing to focus on the fact, that members do not use these numbers to call from outside of the United States. Over 91,000 EA+ Members and over 400,000 Good Sam ERS members do use these numbers within the United States. Those callers instead of obtaining a prompt response are receiving a voice message directing them to call On Call at another number. This is at a minimum a huge inconvenience to ten's of thousands of individuals. In some emergency situations it could be disastrous.

### D. THE PUBLIC INTEREST IS FURTHERED BY IMMEDIATE ENFORCEMENT

Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.

*United States v. First Nat'l City Bank* 379 US 378, 383; 85 S. Ct. 528, 533 (1965). [TRG 1376 and cases cited.]

While courts have often subsumed the public interest into the balancing of the hardships, it is better seen as an element that deserves separate attention; i.e., where the public interest is involved, the court must also determine whether the public interest favors the moving party.

*Sammartano v. First Judicial Dist. CT., in & for County of Carson City,* 303 F 3d 959,974. (9th Cir. 2002)  In *Sierra club, the Georgia power of Co.,* 180 F. 3d 1309, 1310 (11 Cir. 1999), the

court refused to issue a preliminary injunction to force a power of company to limit its discharge of heated waste water into a lake because the only way to do so would substantially reduce electrical power available to its customers. In the instant case failure to transfer the numbers impacts hundreds of thousands of EA+ and ERSD members.

## IV.    ANY STAY MUST BE CONDITION ON ADEQUATE SECURITY

MEDEX ignores the fact that both rule 62 (b) and 62 (h) require security as condition for granting a stay. This once again brings us back to the balance of harm. The very reason AGIA applied for a preliminary injunction was because the harm it would suffer is virtually incalculable. AGIA discussed the risk of harm it may suffer in it original motion papers and will not repeat them here except to say MEDEX' meddling with the numbers could result in the loss of substantial business with its affinity groups. Therefore any stay ought to be conditioned on a bond of at least ten million dollars.

## <u>CONCLUSION</u>

MEDEX' motion is clearly a fig leaf designed to justify its contemptuous failure to comply with the Court's Order and should be denied.

Respectfully submitted,

JOSEPH, GREENWALD, & LAAKE, P.A.

_____/s/ filed via ECF_____
Stephen M. Pavsner (Bar No. DC912220)
Lawrence R. Holzman (Bar No. DC466472)
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301)220-2200
(301)220-1214 (fax)
spavsner@jgllaw.com
lholzman@jgllaw.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 16th day of February, 2007, a copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Reconsideration and Vacation of February 5, 2007 Order and Related Stay was sent to:

Creighton  R. Magid
Dorsey & Whitney, LLP
Washington Square
1050 Connecticut Avenue, NW, Suite 1250
Washington, DC  20036
***via ECF***

                        */s/ filed via ECF*_____
                     Lawrence R. Holzman

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| A.G.I.A., Inc., | : | |
|     Plaintiff, | : | |
| vs. | : | CA No.: 07-CV-105 RCL |
| MEDEX ASSISTANCE CORPORATION, | : | |
|     Defendant. | : | |

_____

### SUPPLEMENTAL DECLARATION OF DAVID H. McCARTY

I, David H. McCarty, declare:

**1.** I am the executive vice president of A.G.I.A., Inc. ("AGIA") with responsibility for developing new business relationships, and expanding current business relationships with clients, carriers, and business partners.

**2.** I submit this declaration in support of AGIA's Consolidated Motion for Contempt and to Enforce Preliminary Injunction and in opposition to the Motion for Reconsideration and Stay filed by Defendant MEDEX Assistance Corporation ("MEDEX"). I have personal knowledge of the facts herein, except where indicated.

### THE DEDICATED TOLL-FREE NUMBERS

**3.** At AGIA's request, MEDEX has subscribed to four specific toll-free numbers that are dedicated to servicing only the corresponding AGIA's. These four dedicated toll-free numbers serve 91,593 of 92,754 EA+ Eligible Members. Over half of these are served by (877)-565-2542

**4.** The information above does not reflect another AGIA client program, the Good Sam ERS (Emergency Roadside Service) program. **The ERS program has about 400,000 members who have historically called into (877-565-2542).** That program is not part of AGIA's EA+ program, but it is related. The Good Sam Club sponsors and administers the ERS program, but has subcontracted with AGIA to administer the portion of the program that has benefits similar to those in the EA+ program. AGIA, in turn, contracted with MEDEX to deliver the telephone support, medical referrals and similar services that are part of the customer's ERS contract. Consequently, there are approximately 450,000 customers who could call the 877-565-2542 toll-free number.

**5.** AGIA has NOT sent new membership cards to the 400,000 ERS program subscribers. AGIA services only part of the ERS program, and so it is not in a position to issue new membership cards to all members; that is a decision for the client, AGI, to make. Since AGI originally procured the toll-free number and has the right to control the number, it should not have to incur this expense and neither should AGIA. AGIA wants to be sure the ERS calls are answered by the program's new provider, On Call International, and not by MEDEX, which clearly wants to maintain control of this number so that it can solicit these customers for sale of its own competing products and services.

**6.** Since the date of the Preliminary Injunction Hearing, AGIA has had more time to look into the terms on which MEDEX was asked to procure these four toll-free numbers dedicated to the use of AGIA's clients. We have found these additional facts contradicting MEDEX' assertion that it "owns" the numbers and indicating at least an

implied contract that control of the numbers should have been transferred along with the servicing of the accounts:

      **a.**   The 877-565-2542 number was **originally subscribed to and paid for by AGIA's client**, Affinity Group, Inc. ("AGI"), sponsor of the Good Sam Club. Under an arrangement between AGI, MEDEX and AGIA, the routing of the number was changed from AGI to MEDEX in 2001 to facilitate MEDEX' servicing of the Eligible Members. The history of the 877-565-2542 number is set out in more detail in Mr. Guglielmo's declaration. The email chain between AGIA, AGI and Medex from April 2001 attached as Exhibit 1 to Mr. Guglielmo's declaration makes it clear that all parties understood the 877-565-2542 phone number was AGI's and was being routed to MEDEX solely to expedite handling of member calls.. Clearly, the parties understood that AGI "owned" the number and never intended to relinquish ownership when they simply re-routed the calls to Medex, and would have anticipated at the time that the number would be re-transferred if ever MEDEX' contract came to an end, which was the reason AGI obtained this number themselves directly from the phone company. Yet now MEDEX claims that it "owns" the number.

      **7.**   The terms on which MEDEX procured these toll-free numbers for AGIA can only be inferred from the parties' conduct and the nature of their service relationship, as there was no side agreement addressing the "ownership" of the numbers. MEDEX was performing its services as AGIA's agent, and AGIA assumed that any numbers MEDEX procured exclusively for AGIA's benefit would continue to benefit AGIA after the term of the Service Agreement. The parties' communications about procurement of toll-free numbers are consistent with this assumption. I have attached additional emails relating to

the procurement of dedicated toll-free numbers for AGIA, at Exhibit 1 . You can see from these communications between MEDEX and AGIA that the toll-free numbers were **"reserved for" or assigned to" the named AGIA clients**. MEDEX did not assert an ownership interest in the toll-free numbers or a right to control them. In fact, MEDEX never made this assertion until it saw that its contract was coming to an end.

**8.** Mr Mair in his Supplemental Declaration filed February 12, 2007 states: "the British healthcare provider had already begun preparing ID card stock with the toll-free number for use by its members." It is hard to understand Mr. Mair's point because he does not actually say cards have been printed. However, the cost of printing cards is relatively modest. AGIA can get cards for $3,036.41 per 10,000 cards or $17,493.90 per 100,000 cards. These numbers are far less than Medex counsel, Mr. Magid, asserted during the court hearing on February 5th, where he stated that the cost of cards already printed was between $500,000 and $1,000,000.

I declare under penalty of perjury that the foregoing is true and correct and was executed by me at on February 16, 2007.

David H. McCarty

## Loralyn Whitaker

| | |
|---|---|
| **From:** | Deneen Detorie [Ddetorie@medexassist.com] |
| **Sent:** | Tuesday, March 29, 2005 11:32 AM |
| **To:** | Loralyn Whitaker |
| **Cc:** | Steve Seivert; Claudia Davoli |

**Subject:** RE: Medex

Hi Loralyn —

Here you go...fresh off the press.  The dedicated toll-free that has been reserved for Moose VIP is 800-586-0193.

Best regards,
Deneen

---

**From:** Loralyn Whitaker [mailto:LWhitaker@AGIA.com]
**Sent:** Monday, March 28, 2005 1:33 PM
**To:** Deneen Detorie
**Cc:** Steve Seivert; Claudia Davoli
**Subject:** RE: Medex

Hi Deneen -
Please set-up the Moose EA+ group as Moose VIP.  Any news on the telephone number yet?  Please advise so we can create I.D. cards.  THANKS!

-LW

> -----Original Message-----
> **From:** Deneen Detorie [mailto:Ddetorie@medexassist.com]
> **Sent:** Tuesday, March 22, 2005 10:17 AM
> **To:** Loralyn Whitaker
> **Subject:** RE: Medex
>
> Hi Loralyn - Steve is right, that's great news about the Moose.  I have requested a dedicated toll free line from our Telecom Department.  As soon as I hear back, I'll send you another email.  Regarding the group number, I have reserved "518" for this latest group.  Do you want me to set the group up as "Moose VIP" or Loyal Order of Moose or something else?  Also, what is the effective date?  Just want to be clear.
>
> Thanks,
> Deneen
>
> > **From:** Loralyn Whitaker [mailto:LWhitaker@AGIA.com]
> > **Sent:** Tuesday, March 22, 2005 12:11 PM
> > **To:** Deneen Detorie
> > **Subject:** FW: Medex
> >
> > Hello Deneen!
> >
> > Please let me know the new 800 telephone number and group number for the MooseVIP group for EA+.  THANKS much!
> >
> > -LW

3/29/2005

## Claudia Davoli

| | |
|---|---|
| **From:** | Deneen Detorie [Ddetorie@medexassist.com] |
| **Sent:** | Friday, October 01, 2004 8:48 AM |
| **To:** | Claudia Davoli; Jesse Armitage |
| **Cc:** | Loralyn Whitaker |
| **Subject:** | RE: CSEA EA+ Schedule Page of Benefits |

This looks good.  Thank you.
Deneen

---

**From:** Claudia Davoli [mailto:CDavoli@AGIA.com]
**Sent:** Thursday, September 30, 2004 5:39 PM
**To:** Deneen Detorie; Jesse Armitage
**Cc:** Loralyn Whitaker
**Subject:** RE: CSEA EA+ Schedule Page of Benefits

Thanks Deneen,
So here is the schedule page for approval with the new number included.
Claudia

> -----Original Message-----
> **From:** Deneen Detorie [mailto:Ddetorie@medexassist.com]
> **Sent:** Thursday, September 30, 2004 2:07 PM
> **To:** Jesse Armitage; Claudia Davoli
> **Subject:** RE: CSEA EA+ Schedule Page of Benefits
>
> Good news...the toll-free number that is assigned to CSEA is 800-698-5688.  Thank you for your patience.
>
> Deneen
>
> ---
>
> **From:** Deneen Detorie
> **Sent:** Wednesday, September 29, 2004 4:01 PM
> **To:** 'Jesse Armitage'; Claudia Davoli
> **Subject:** RE: CSEA EA+ Schedule Page of Benefits
>
> Hi Jesse,
>
> I agree that it would be better to ring directly into a live person but because I am new to the AGIA programs I just wanted to make sure.  I was checking some of your other toll free numbers and discovered there is a recording that fields some of the issues. I am still waiting on the number to give you.  I just checked and our telecom department is not yet able to give me this but again promises that I will have it tomorrow.  I apologize for the delay on this but I will continue to follow-up.
>
> Thanks,
> Deneen
>
> ---
>
> **From:** Jesse Armitage [mailto:JArmitage@AGIA.com]
> **Sent:** Tuesday, September 28, 2004 6:07 PM
> **To:** Claudia Davoli; Deneen Detorie
> **Subject:** RE: CSEA EA+ Schedule Page of Benefits

10/1/2004

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

A.G.I.A, Inc.,                                          :

     Plaintiff,                                    :

vs.                                                     :   CA No.:  07-CV-105 RCL

MEDEX ASSISTANCE CORPORATION,            :

     Defendant.                                   :

_____

## <u>ORDER</u>

UPON CONSIDERATION of Defendant's Motion for Reconsideration and Plaintiff's

Opposition thereto, it is this _____ day of _____, 2007, hereby

ORDERED, that Defendant's Motion for Reconsideration is hereby DENIED.

_____
Judge, U.S. District Court for the
District of Columbia