**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| A.G.I.A., INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No. 07-CV-105-RCL |
| **v.** | ) | |
| | ) | |
| MEDEX ASSISTANCE CORPORATION, | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
RECONSIDERATION AND VACATION OF THE FEBRUARY 5, 2007 ORDER**</u>

MEDEX brings this motion under Fed. R. Civ. P. 54(b), which permits a court to revise

interlocutory orders pending final judgment, and only alternatively under Fed. R. Civ. P. 59(e),

which permits a court to alter or amend a final judgment.  The standard for reconsideration under

Rule 54(b) is different, and lower, than the standard under Rule 59(e).[1]  Reconsideration is

appropriate under Rule 54(b) when a court has "patently misunderstood a party, has made a

decision outside the adversarial issues presented to the Court by the parties, has made an error

not of reasoning but of apprehension, or where a controlling or significant change in the law or

facts [has occurred] since submission of the issues to the Court.  *Singh v. The George*

*Washington Univ.*, 383 F.Supp.2d 99, 101 (D.D.C. 2005) (quoting *Cobell v. Norton*, 224 F.R.D.

266, 272 (D.D.C. 2004)).  By transferring the telephone lines, the Court misunderstood the legal

basis of AGIA's claims and ordered relief outside the scope of the issues presented to it.  The

---

[1] AGIA argues that this motion must be made under Rule 59(e), but AGIA is wrong.  *See
Cobell v. Norton*, 224 F.R.D. 266, 271-72 (D.D.C. 2004); *Merry Maids, L.P. v. WWJS
Enterprises, Inc.*, 2006 WL 2040245 at *1 (D.Neb.); *Abdullah v. Wisconsin Dept. of Corrections*,
2005 WL 2885802 at *7 (E.D.Wis.).  Even under Rule 59(e), however, the Court committed
clear error and its transfer of the telephone lines has been overtaken by an intervening change in
the law.

Court altered the status quo and prejudged a number of issues that the parties intend to arbitrate.

The transfer of telephone lines was not narrowly tailored to prevent the purely hypothetical

injuries alleged by AGIA, but rather gave AGIA substantive rights to which it was never

entitled.[2]

Furthermore, since the February 5, 2007 Order, and indeed since MEDEX filed this

motion, the United States Supreme Court decided *Philip Morris USA v. Williams*, --- S.Ct. ---,

2007 WL 505781 (2007), wherein it held that a court commits a judicial taking in violation of the

Due Process Clause of the United States Constitution when it authorizes relief that is

unconnected to the claims before it.  The Supreme Court's holding in *Williams* makes it plain

that a court errs, where, as here, it awards relief unconnected to the claim under which the relief

was sought.

### CORRECTIONS OF AGIA'S MISSTATEMENTS OF "FACTS"

**Whether (877) 565-2542 Serves Emergency Roadside Service ("ERS") Members**

The February 5, 2007, Order is based on a number of false premises advanced by AGIA.

AGIA first represented to the District Court that transferring control of the number (877) 565-

2542 to AGIA was essential to prevent eligible members traveling in remote corners of the world

from receiving emergency medical assistance.  AGIA knew that this was false; as MEDEX has

demonstrated and as AGIA ultimately conceded, only callers in the United States can reach (877)

565-2542.  AGIA now tries to claim that (877) 565-2542 "also serves 400,000 individuals

enrolled in a related program sponsored by the Good Sam club know [sic] as Good Sam

---

[2]  After filing its Motion for Reconsideration, MEDEX, under threat of a contempt motion, authorized transfer of the four toll-free telephone numbers to AGIA.  Since the primary relief that MEDEX now seeks is AGIA's return of those numbers pending the parties' arbitration, MEDEX submits revised Proposed Orders with this Reply.

Emergency Roadside Service ("ERS")."  AGIA Opp." at 3.  *See also id.* at 14 ("over 400,000

Good Sam ERS members do use these numbers within the United States").  This allegation is

based on the Supplemental Declaration of David H. McCarty ("Supp. McCarty Decl."), who

attests, in relevant part, as follows:

> **The ERS program has about 400,000 members who have historically called into (877-565-2542)**.  That program is not part of AGIA's EA+ program, but it is related.  The Good Sam Club sponsors and administers the ERS program, but has subcontracted with AGIA to administer the portion of the program that has benefits similar to those in the EA+ program.  AGIA, in turn, contracted with MEDEX to deliver the telephone support, medical referrals and similar services that are part of the customer's ERS contract.

Supp. McCarty Decl., ¶ 4 (emphasis in original).

MEDEX does not provide "emergency roadside services." Indeed, the only ERS

members who call (877) 565-2542 for emergency roadside services are those who call *by*

*mistake*.  See Detorie Decl. To address this problem, MEDEX provided the following message

on (877) 565-2542 before January 1, 2007:

> Thank you for calling Emergency Medical Referral Services, the program designed to help you find medical assistance while you are traveling.  If you have a question regarding your Emergency Medical Assistance benefit or if you have a question about your Emergency Road Service program, please hang up and dial 1-800-842-5351 and a service representative will be happy to help you.  If you need assistance with finding medical dental or legal help, replacing a prescription or need to speak with someone to schedule a doctor or dentist appointment, please stay on the line and an Emergency Medical Referral Service Representative will be right with you.
>
> All collect calls are accepted….

AGIA's claim that ERS members "use" (877) 565-2542 , or that the number "serves"

ERS members is, at best, grossly misleading.   AGIA's allegation that it "contracted with

MEDEX  to deliver the telephone support, medical referrals and similar services that are part of

the customer's ERS contract" is outright false.  The falsity of the allegations is underscored by

AGIA's admission that it has not sent new membership cards to the 400,000 ERS subscribers.

Supp. McCarty Decl., ¶ 5.  AGIA tries to argue that AGI is responsible for that decision, but

3

AGIA does not claim that it recommended any such action to AGI and AGI's failure to issue new cards shows that it does not share the same over-hyped fears that AGIA keeps urging before this Court.

**Whether EA+ Members Can Be Said To "Use" These Numbers Any Longer**

AGIA repeatedly claims that its EA+ Eligible Members "use" the toll-free numbers at issue. AGIA Opp. at 3, 8, 14. AGIA terminated the parties' contract as of December 31, 2006. In mid-December, AGIA mailed updated membership cards to EA+ Eligible Members with new toll-free numbers effective January 1, 2007. To the extent EA+ Eligible Members are even calling the toll-free numbers, they are doing so *by mistake*.

The fault for any such mistakes lies with AGIA, not MEDEX. Other than its single mailing in December, AGIA has not claimed to have made any contact with its EA+ Eligible Members to remind them of the updated numbers. AGIA has not identified any steps it has undertaken to ensure that the new cards mailed in December ever reached existing members. In other words, AGIA undertook *minimal* efforts to ensure that its members call the new, updated numbers and yet acts as though MEDEX should use its own resources to prevent, and simultaneously bear the risk of, any mistakes.

**ARGUMENT**

I.      **UNDER RULE 54(b) THE COURT MAY REVISE ITS PRELIMINARY INJUNCTION "AS JUSTICE REQUIRES"**

Rule 54(b) of the Federal Rules of Civil Procedure provides that any "order" that adjudicates fewer than all the claims of the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims." Fed. R. Civ. P. 54(b). This Court and other courts have treated motions for reconsideration of injunctive orders as motions under Rule 54(b). *See Cobell v. Norton*, 224 F.R.D. 266, 271-72 (D.D.C. 2004); *Merry Maids, L.P. v. WWJS*

4

*Enterprises, Inc.*, 2006 WL 2040245 at \*1 (D.Neb.); *Abdullah v. Wisconsin Dept. of Corrections*, 2005 WL 2885802 at \*7 (E.D.Wis.).

In *Cobell*, the Court was asked to reconsider an order that clarified and "carried out the conditions of" a prior order of injunctive relief. *Cobell*, 224 F.R.D. at 271. The Court concluded that the motion for reconsideration was properly brought under Rule 54(b) rather than under Rule 59(e) or Rule 60(b) because the order was interlocutory and not final. *Id.* In *Merry Maids*, the court similarly treated a motion for reconsideration of an order granting a preliminary injunction as a motion under Rule 54(b). *Merry Maids*, 2006 WL 204025 at \*1. In *Adbullah*, the court treated a motion for reconsideration of an order denying a preliminary injunction as a motion under Rule 54(b). *Adbullah*, 2005 WL 2885802 at \*7. The cases contradict AGIA's argument that a motion to reconsider an injunctive order is necessarily a Rule 59(e) motion.[3]

Rule 54(b) allows revision of orders "as justice requires." *Singh v. The George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (citing *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)). "Justice may require revision when the Court has 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'" *Id.* at 101 (quoting *Cobell*, 224 F.R.D. at 272). MEDEX meets several of these standards here.

---

[3] Rule 59(e) permits a Court to alter or amend a judgment if it finds "the need to correct clear error or to prevent manifest injustice." *Lance v. United Mine Workers of Am. 1974 Pension Trust*, 400 F.Supp.2d 29, 31 (D.D.C. 2005). MEDEX's motion also meets the standards of Rule 59(e).

II.    **THE ORDER TO TRANSFER TELEPHONE LINES WAS OUTSIDE THE SCOPE OF THE ISSUES BEFORE THE COURT AND WAS CLEARLY ERRONEOUS**

A.    <u>**The February 5, 2007 Order Altered the Status Quo**</u>

The purpose of a preliminary injunction is to preserve the status quo pending final adjudication. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). The D.C. Circuit has interpreted the "*status quo ante*" to mean that each party retains its pre-dispute property and contractual rights. *Consarc Corp. v. U.S. Treasury Dept.*, 71 F.3d 909, 912-913 (D.C. Cir. 1995). Here, the Court has fundamentally altered the status quo by ordering MEDEX to transfer the telephone lines to AGIA. Order, ¶ 8(3).

AGIA tries to overcome the controlling precedent in *Consarc* by citing a Sixth Circuit decision that focused on preventing injury more than preserving the status quo. AGIA Opp. at 8 (quoting *United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998)). But the transfer of telephone lines does not prevent any actual injury to AGIA, and AGIA glides over that point.

AGIA never presented evidence that any EA+ Eligible Member has experienced actual delay or interruption of service by virtue of MEDEX's operation of the toll-free lines. MEDEX presented evidence that AGIA's alleged concerns are far-fetched. Mair Decl., ¶ 12. In its opposition brief, AGIA does not identify any actual harm to AGIA, but rather points to purely hypothetical actions by MEDEX as justification for the transfer of the toll-free numbers. AGIA Opp. at 3. To prove "irreparable injury," the injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985) (per

curiam)).  AGIA never proved actual injury.  Furthermore, AGIA could have, but did not, ask the

Court to enjoin any of MEDEX's hypothetical actions, but rather to transfer MEDEX's assets to

AGIA.

**B.**      **The Court Clearly Erred by Concluding AGIA Had Any Entitlement to the Toll-Free Telephone Numbers**

MEDEX also pointed out that the Court committed clear error by concluding that AGIA

had any legal entitlement to the telephone lines.  Nothing in the Service Agreement entitles

AGIA to ownership of any of the numbers.  MEDEX, moreover, introduced uncontroverted

evidence that "MEDEX pays for, owns, and services the toll-free numbers."[4]  Mair Decl., ¶ 3.

In its opposition to this motion, AGIA tries desperately to manufacture a legal claim to

these lines with a series of self-contradictory arguments.  First, AGIA tries to palm off as "fact"

its legal argument that MEDEX does not "own" the toll-free telephone lines because, according

to AGIA, nobody can "own" a toll-free number.  Plaintiff's Memorandum of Law in Opposition

to Defendant's Motion for Partial Reconsideration ("AGIA Opp.") at 2.  AGIA nevertheless goes

on to argue that the number (877) 565-2542 "belongs" to its client AGI, which "transferred

control to MEDEX in April 2001 to facilitate the handling of calls."  AGIA Opp. at 4.  As a

result of this alleged loan from AGI to MEDEX, AGIA claims that MEDEX "obtained the four

numbers as the agent of AGIA or alternatively that the numbers ***belong to AGIA*** by implication."

*Id.* (emphasis added).[5]

---

[4] AGIA asserts that the Supplemental Declaration of David L. Mair contains "legal arguments."  AGIA Opp. at 11.  The Supplemental Declaration contains nothing of the sort.  By contrast, patently legal arguments may be found throughout AGIA's supporting declarations.  See, e.g., Supplemental Declaration of David H. McCarty, ¶¶ 5-7; Declaration of Michael Guglielmo, ¶ 5.

[5] These are all legal arguments masquerading as "facts."  The same goes for all of AGIA's declarations.  Legal conclusions and opinions predominate over facts based on personal

7

MEDEX obviously controlled the toll-free numbers because AGIA required MEDEX's permission to obtain them. The parties obviously valued the numbers because AGIA offered to pay for them, and MEDEX rejected the offer as insufficient. AGIA is in no position to quibble about the use of the word "own" to describe legal rights in the numbers. AGIA claims the numbers "belong" to it or AGI, as if "belong" indicates something other ownership. AGI itself said "we *own* the number" in April 6, 2001, before transferring control of the number to MEDEX. *See* Declaration of Michael Guglielmo, Ex. 1 (emphasis added).

The uncontroverted evidence established that MEDEX controlled, paid for, and maintained the numbers at issue. AGIA can point to nothing in the Service Agreement or elsewhere that suggests any entitlement by AGIA to the numbers.

## C. The Court's Order Unnecessarily Prejudges Issues To Be Decided at Arbitration

The February 5, 2007, Order altered the landscape of the arbitration by concluding that "basic information of AGIA's Eligible Members' is being misappropriated by Medex Assistance Corp.," Order, ¶ 2; that "Plaintiff will suffer irreparable harm if Medex is permitted to convert Plaintiff's property to Medex's use and benefit and is permitted to solicit AGIA's customers," *id.*, ¶ 3; that "AGIA has a statutory right to injunctive relief pursuant to the Maryland Uniform Trade Secrets Act," *id.*, ¶ 4; and that "AGIA has no adequate remedy at law," *id.*, ¶ 5. None of these rulings was necessary to support the grant of injunctive relief, and none of them supports the transfer of telephone lines. Yet AGIA now has this Court's imprimatur on certain of the positions it will take in the arbitration proceeding.[6]

---

knowledge.

[6] At the hearing, the Court also opined that Addendum A of the Service Agreement contained a broad anti-solicitation provision – found nowhere in the language of the Agreement – as AGIA

AGIA claims this argument is "unfathomable" because the arbitrator "is not bound to the Court's findings." AGIA Opp. at 9. This argument fails to address MEDEX's point, which was not that the arbitrator would be *bound* by the Court's decision, but rather that the arbitrator would be *influenced* by the Court's decision. An preliminary injunction is not supposed to prejudge any of the issues to be adjudicated. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir. 1995) (quoting *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 50 (1st Cir. 1986)).

How AGIA will use the Court's order is already visible in its opposition brief. Notwithstanding its several acknowledgements that the February 5, 2007, Order cannot have adjudicated any claims on their merits, but only provisionally, AGIA argues as follows:

> The transfer of the dedicated numbers is necessary because MEDEX used its control of these numbers to solicit AGIA's Eligible Members in violation of both the non-solicitation provisions of the Service Agreement and the Maryland Uniform Trade Secrets Act. MEDEX' argument is like a murderer arguing he should not have to turn over his pistol because his ownership thereof is not in issue.

AGIA Opp. at 9. As AGIA well knows, the Court was only empowered to determine whether MEDEX's conduct, based on evidence in the record, *could* be interpreted by a future fact-finder to have violated the Service Agreement or Maryland Uniform Trade Secrets Act. But AGIA

---

urged. This opinion also prejudges a crucial issue to be arbitrated. Addendum A provides that "MEDEX and its employees, officers and representatives will not communicate directly with *representatives* of these Participating or Prospective Groups unless AGIA authorizes MEDEX in writing to do so." Compl., Ex. A. Addendum A does not bar MEDEX from contacting members of Participating or Prospective Groups. The Service Agreement is to be interpreted and applied in accordance with Maryland law. S.A., ¶ 16. Under Maryland law, the language of the contract is controlling, not the parties' intentions. "Maryland courts follow the law of objective interpretation of contracts, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." *Towson University v. Conte*, 862 A.2d 941, 946 (Md. 2004) (omitting citations).

urges these supposed violations as an established fact and then stretches the bounds of hyperbole

(and decorum) by comparing MEDEX to a murderer.

### C.    MEDEX Suffered Substantial Injury By Transfer of the Numbers; In Any Event, the Degree of Harm to MEDEX Is Not at Issue

Just as AGIA repeatedly overstates the alleged harm to itself, AGIA repeatedly

understates (or misstates) the harm to MEDEX.  In fact, AGIA's opposition is based *primarily*

on its oft-repeated argument that the transfer of telephone lines does not harm MEDEX.

The court-mandated transfer of the telephone numbers has stripped MEDEX of legal

rights.  It has also caused MEDEX reputational damage with at least one of its significant clients.

Prior to the AGIA's application for injunctive relief, MEDEX had already taken steps to

redeploy one of the lines at issue.  Supp. Mair Decl., ¶ 5.  The transfer has prevented MEDEX

from redeploying the other lines for different uses.  *Id.*  MEDEX has paid all the costs of

maintaining and servicing the lines.  Mair Decl., ¶ 3.  MEDEX attributes value to these lines.

The mere fact that MEDEX has not assigned a dollar amount to this value and to its overall

damages makes no difference for purposes of the preliminary injunction.

AGIA was required prove irreparable injury to itself and *no substantial injury to*

*MEDEX*.  Plaintiff's Memorandum of Law in Support of Application for Temporary Restraining

Order and Preliminary Injunctive Relief at 6.  The deprivation of a legal right is, by definition, a

substantial injury.  *E.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)

(installation of cables on an apartment building a compensable taking despite minimal size of the

installation).  Legal rights are all-or-nothing.  *E.g.*, *Lucas v. South Carolina Coastal Council*, 505

U.S. 1003, 1019 n.8 (1992) (distinguishing between depriving a person of the entire value of his

property versus depriving him of only 95% of its value).  Legal rights do not exist on a

continuum and fade into nothingness as their market value approaches $0.00.  Furthermore, even

a temporary deprivation of a legal right is objectionable and compensable. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304 (1987).

AGIA's argument about the absence of harm to MEDEX are designed primarily to deflect attention from the absence of harm to AGIA.   A plaintiff seeking a preliminary injunction must demonstrate not only actual (as opposed to theoretical) injury, he must also identify an injury "of such ***imminence*** that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985) (per curiam) (omitting citation brackets and internal quotations)) (emphasis in original).  As of February 5, 2007, AGIA was suffering no actual harm and no likelihood of harm.  MEDEX had altered its outgoing messages to suit AGIA and had promised to maintain them that way pending arbitration.  AGIA did not introduce evidence that even a single EA+ Eligible Member responded to what AGIA characterizes as a "solicitation" on MEDEX's outoing messages between January 1 and January 12, 2007.  (The fact is, none did.)  AGIA's entire application for injunctive relief was based on hyped, and hypothetical, future actions by MEDEX that MEDEX had promised  not to do.  Thus, to date, AGIA has not proven that it has suffered any actual or imminent harm.[7]

AGIA's argument that the balance of injuries strongly favors AGIA is not only disingenuous, but hypocritical.  In proceedings to date, AGIA itself has never assigned a dollar value to these lines because to do so would undercut AGIA's ability to claim that "the harm it

---

[7] AGIA also argues that any reputational damage to MEDEX is self-inflicted, AGIA Opp. at 3, but the same could be said for AGIA.  AGIA has made minimal efforts to ensure that its EA+ Eligible Members have up-to-date telephone numbers.  Mistaken calls by EA+ Eligible Members to the old MEDEX numbers are attributable to AGIA's conduct, not to MEDEX's conduct.

would suffer is virtually incalculable." AGIA Opp. at 15.  In fact, AGIA has assigned a value to

these numbers.  On November 29, 2006, AGIA offered to pay MEDEX *$2,500 per line*.  Exhibit

5 in Support of Plaintiff's Application for a Temporary Restraining Order or Preliminary

Injunction.  AGIA's refusal to offer more undercuts its allegations about the "incalculable" value

of its interests.

## III.    UNDER INTERVENING SUPREME COURT PRECEDENT, THE COURT'S ORDER TO TRANSFER TELEPHONE LINES IS UNCONSTITUTIONAL

As MEDEX has previously argued, this Court erred in granting AGIA relief – a positive

injunction requiring transfer of the MEDEX-owned telephone numbers – without AGIA

asserting any colorable claim that it was entitled to the numbers.  (The gravamen of AGIA's

complaint is that MEDEX supposedly misappropriated "confidential" member data.  But that has

nothing to do with the telephone numbers.  The supposedly "confidential" member data might

hypothetically be used for *outgoing* calls, but has no relationship to the use or ownership of

*inbound* telephone numbers.)

In *Philip Morris USA v. Williams*, --- S.Ct. ---, 2007 WL 505781 (Feb. 20, 2007), the

United States Supreme Court held that a judicial award – in *Williams*, a punitive damages award;

here, a positive injunction forcing MEDEX to transfer its telephone lines – constitutes an

unconstitutional "taking" when, as here, it is not based on a colorable claim advanced by a

plaintiff in the particular case and does not afford the defendant an adequate opportunity to

defend against the charge.  In *Williams*, the Supreme Court  reviewed a decision of the Oregon

Supreme Court upholding a jury's award of $79.5 million in punitive damages against cigarette

maker Philip Morris.  The Supreme Court held that the trial court had violated Phillip Morris's

due process rights in allowing the jury to consider damages to persons other than the plaintiff in

determining punitive damages, and engaged in an unconstitutional taking of Phillip Morris's

property.  Here, none of the causes of action asserted by AGIA in its Complaint provided a legal

basis for claiming the MEDEX-owned telephone numbers.  (AGIA used its claim that MEDEX

posed the threat of misappropriating "confidential" customer data not only to seek relief related

to its claims – namely, an injunction against use of the customer data – but also to make a

judicially-sanctioned land grab of the extremely valuable telephone numbers, to which it has

failed to articulate *any* legal claim.) By awarding ownership to AGIA of  MEDEX's property

(the MEDEX-owned telephone numbers) without AGIA advancing a colorable legal claim to the

numbers, the Court engaged in an unconstitutional taking and denied MEDEX its due process

rights to defend against whatever legal basis AGIA might have conjured up to claim the

numbers.  (A party can't defend against a claim that isn't brought.)  As *Williams* makes clear, the

Court's injunction in this matter, at least with respect to the telephone numbers, constitutes an

unconstitutional taking.

AGIA argues that the "legal basis for the Court ordering the transfer of these numbers is

the non-solicitation and confidentiality provisions in the Service Agreement and the Maryland

Uniform Trade Secrets Act."  AGIA Opp. at 3.  This is a red herring.  The telephone lines at

issue are passive.  They receive incoming calls only.  The lines are answered by recorded

message, with an option for the caller to speak to somebody live.  MEDEX has no opportunity to

use any allegedly confidential EA+ Member Information through operation of these lines, nor

does it have any rational reason to disclose such information through operation of these lines.

The Court could have addressed any concern about solicitation or confidentiality (and

simultaneously preserved the status quo) by barring MEDEX from altering its then-current

outgoing messages on the toll-free lines, by ordering MEDEX to record different outgoing

messages, by enjoining MEDEX to answer the toll-free lines in person, or by ordering MEDEX

4818-0975-2833\1 2/8/2007 1:26 AM

to "warm transfer" EA+ callers to other lines designated by AGIA.  Instead, the Court

improperly transferred legal rights from one party to another.[8]    A preliminary injunction "must

be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs." *Price v.

City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004); *see also Nat'l Ry. Labor Conference v.

Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741 (7th Cir. 1987).

## CONCLUSION

For the foregoing reasons, MEDEX asks the Court to reconsider its February 5, 2007,

Order and to direct AGIA to transfer the four toll-free telephone numbers back to MEDEX

pending arbitration.  MEDEX also asks the Court to enter a revised February 5, 2007, Order in

the form accompanying this brief.


Dated: February 26, 2007                          /S/ CREIGHTON R. MAGID
                                                  Creighton R. Magid (D.C. Bar # 476961)
                                                  Dorsey & Whitney LLP
                                                  Washington Square
                                                  1050 Connecticut Avenue NW, Suite 1250
                                                  Washington, D.C. 20036
                                                  (202) 442-3000 (telephone)
                                                  (202) 442-3199 (facsimile)

                                                  Counsel for Defendant
                                                  **MEDEX ASSISTANCE CORPORATION**

---

[8] Although AGIA claims the transfer of the telephone numbers is justified by the parties' confidentiality agreement, there is no evidentiary or rational reason why MEDEX would elect to disclose EA+ Eligible Member data through one of these toll-free numbers, nor is there any method by which MEDEX could use EA+ Eligible Member data to solicit